**Crim No. ELH-13-0512**

---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

---

**UNITED STATES OF AMERICA,**

**v.**

**ANTOINE WIGGINS, et al.**

**Defendants.**

---

## GOVERNMENT'S CONSOLIDATED RESPONSE
## TO DEFENDANTS' PRE-TRIAL MOTIONS

---

**Rod J. Rosenstein**
**United States Attorney**

**Seema Mittal**
**Christopher J. Romano**
**Assistant United States Attorneys**

**36 S. Charles Street, 4th Floor**
**Baltimore, Maryland 21201**
**(410) 209-4800**

**July 28, 2014**

## TABLE OF CONTENTS

**FACTUAL AND PROCEDURAL SUMMARY OF THE CASE** ...........................................1

**ARGUMENT**............................................................................................................…..………4

    **(A)  None Of The Defendants Are Entitled To Severance** ...........................................4

    **(B)  Motion To Adopt Motions Filed By Co-Defendants And Motion For Leave To File Additional Pre-Trial Motions**.…………………………………………………7

    **(C)  The Wire Tap Evidence Was Properly Obtained**.…………………………………7

        *(i)       The Affidavits Set Forth Ample Probable Cause*…………………………8

        *(ii)      There Was No Violation Of The Court's Minimization Requirements*…..11

        *(iii)     The Investigators Complied With The Exhaustion Provisions Of18 U.S.C. §2518(3) (c)*……………………………………………………..17

        *(iv)     The Wiretap Orders Were Not General Warrants In Violation Of The Fourth Amendment*……………………………………………………20

    **(D)  Goode's Motion for Disclosure of Statements of Co-Defendants and Co- Conspirators Intended to be used Pursuant to Fed. R. Evid. 801(d)(2)(E), as adopted by Co-Defendants**.……………………………………………………23

    **(E)  Goode's  Motion for Disclosure Pursuant to Fed. R. Crim. P. 12, as adopted by Co-Defendants**.……………………………………………………………23

    **(F)  Goode's Motion to Require Prosecution to Review and Confirm Witness Backgrounds, as adopted by Co-Defendants**……………………………………25

    **(G)  Blanks' Motions To Suppress Evidence**………………………………………26

        *(1)      Search of Blanks' person, December 21, 2011. (Docket # 246)*…………26

        *(2)      Search of 118 North Howard Street, December 21, 2011. (Docket # 247)*………………………………………………………………26

        *(3)      Search of Harley Davidson F-150 pick-up truck, March 30, 2013. (Docket # 244)*………………………………………………………………28

        *(4)      Search of Harley Davidson F-150 pick-up truck, September 10, 2013. (Docket # 249)*………………………………………………………………28

*(5)*    *Search of 11 S. Eutaw Street, Apt. 1607, September 13, 2013.*
         *(Docket # 248)*…………………………………………………………30

*(6)*    *Search of Harley Davidson F-150 pick-up truck, October 7, 2013.*
         *(Docket # 250)*…………………………………………………………31

*(7)*    *Blanks' motion to suppress in-court and out-of-court identification*
         *(Docket # 245)*…………………………………………………………32

**(H)  MOTION FOR DISCLOSURE PURSUANT TO RULE 404(b)**
      **AND RULE 609**………………………………………………………33

    *(1)*    *The Evidence is Relevant*…………………………………………...37

    *(2)*    *The Evidence is Necessary*…………………………………………39

    *(3)*    *The Evidence is Reliable*……………………………………………39

    *(4)*    *The Evidence is Not Unduly Prejudicial*…………………………40

**(I)    MOTION FOR DISCOVERY**………………………………………41

**(J)    MILES' MOTION TO SUPPRESS STATEMENTS AND TANGIBLE**
      **EVIDENCE**………………………………………………………………43

    *(1)*    *Miles' Motion to Suppress Statements Should Be Denied*………………43

    *(2)*    *Tangible Evidence*…………………………………………………43

**CONCLUSION**………………………………………………………………...47

**CERTIFICATE OF SERVICE**………………………………………………48

# EXHIBITS

**Exhibit A:**   Wiretap Affidavit dated June 7, 2013

**Exhibit B:**   Wiretap order dated June 7, 2013

**Exhibit C:**   Minimization Guidelines

**Exhibit D:**   Court Report 1

**Exhibit E:**   Search Warrant dated December 21, 2011-118 N. Howard Street, Apt. 811

**Exhibit F:**   Enzo Blanks Consent To Search dated September 10, 2013

**Exhibit G:**   Search Warrant dated September 12, 2013- 11 S. Eutaw Street, Apt. 1607

**Exhibit H-1:**   Search Warrant dated September 24, 2013, 3406 Brendan Avenue

**Exhibit H-2:**   Affidavit dated September 24, 2013, 3406 Brendan Avenue

**Exhibit I-1:**   Seizure Warrant dated September 24, 2013, Mercedes Benz Brabus

**Exhibit I-2:**   Affidavit dated September 24, 2013, Mercedes Benz Brabus

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA          :

      v.                               :

                              Criminal No.  ELH-13-0512

ANTOINE WIGGINS, et al            :

                       :

Defendants

                       :

...o0o...

**GOVERNMENT'S CONSOLIDATED RESPONSE
TO DEFENDANTS' PRE-TRIAL MOTIONS**

Now comes the United States of America by its attorneys, Rod J. Rosenstein, United States Attorney for the District of Maryland, and Seema Mittal and Christopher J. Romano, Assistant United States Attorneys, and responds in opposition to the Defendants' Pre-Trial Motions.

**I.      FACTUAL AND PROCEDURAL SUMMARY OF THE CASE**

On September 24, 2013, a federal grand jury returned a fourteen count indictment in the above-captioned matter.   Count One charged that from in or about December 2011, and continuing through the date of the indictment, in the District of Maryland and elsewhere, a total of fourteen defendants, including Antoine Wiggins (Wiggins), Enzo Blanks (Blanks), Anthony Miles (Miles), Marlow Bates (Bates), Tyrie Coy Amos (Amos), Robert Lomax III (Lomax), Keya Renee Dean (Dean), Donte Thomas (Thomas), Andre Carter (Carter), Virginia Moore (Moore), Randy Adkins (Adkins), Rebecca Belete (Belete), Abraham Goode, (Goode), and Jeffrey John Lee (Lee), conspired to distribute and possess with intent to distribute one kilogram or more of a quantity of a mixture or substance containing a detectable amount of heroin, a Schedule I narcotic controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), and 846.

Count Two charged that on December 21, 2011, Blanks knowingly, intentionally and unlawfully possessed with the intent to distribute 100 grams of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Three charged that on December 21, 2011, Blanks knowingly, intentionally and unlawfully used and maintained the premises at 118 N. Howard Street, Apt. 811, Baltimore Maryland for the purpose of manufacturing, distributing and using heroin, in violation of 21 U.S.C. § 856 and 18 U.S. C. § 2.

Count Four charged that on January 4, 2013, Wiggins knowingly, intentionally and unlawfully possessed with the intent to distribute a quantity of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C.  § 2.

Count Five charged that on April 10, 2013, Lomax knowingly, intentionally and unlawfully possessed with the intent to distribute a quantity of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Six charged that April 10, 2013, Lomax knowingly, intentionally and unlawfully used and maintained the premises at 603 Gold Street, Baltimore Maryland for the purpose of manufacturing, distributing and using heroin, in violation of  21 U.S.C. § 856 and 18 U.S.C. § 2.

Count Seven charged that April 10, 2013, Lomax, having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly and unlawfully possessed in and affecting commerce approximately 200 rounds of .22 caliber ammunition, in violation of 18 U.S.C. § 922(g).

2

Count Eight charged that on August 2, 2013, Blanks knowingly, intentionally and unlawfully possessed with the intent to distribute a quantity of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Nine charged that on August 4, 2013, Miles knowingly, intentionally and unlawfully possessed with the intent to distribute a quantity of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Ten charged that on August 4, 2013, Lee knowingly, intentionally and unlawfully possessed with the intent to distribute a quantity of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Eleven charged that on September 10, 2013, Blanks knowingly, intentionally and unlawfully possessed with the intent to distribute a quantity of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Count Twelve charged that September 10, 2013, Blanks knowingly, intentionally and unlawfully used and maintained the premises at 301 W. Madison Avenue, Apartment 612 W., Baltimore, Maryland, for the purpose of manufacturing, distributing and using heroin, in violation of  21 U.S.C. § 856 and 18 U.S. C. § 2.

Count Thirteen charged that on September 10, 2013, Belete knowingly, intentionally and unlawfully possessed with the intent to distribute a quantity of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

3

Count Fourteen charged that September 10, 2013, Belete knowingly, intentionally and unlawfully used and maintained the premises at 301 W. Madison Avenue, Apartment 612 W., Baltimore, Maryland, for the purpose of manufacturing, distributing and using heroin, in violation of 21 U.S.C. § 856 and 18 U.S.C. § 2.

Several of the defendants have filed pre-trial motions, seeking *inter alia*, suppression of evidence obtained from wiretaps, search warrants, statements made by them, and in-court identification, as well as motions for severance and discovery, *viz.* co-defendants' statements, Rule 12, 404(b) and 609, and inquiry into law enforcement officers' backgrounds.  In addition, many of the defendants have also filed motions to adopt their co-defendant's motions, or to file additional motions.  Some of the defendants who filed motions have abandoned their motions and pled guilty, or indicated a willingness to plead guilty and have asked the Government not to respond to the motions filed by them.  At present, the defendants who have filed motions and are apparently pursuing them are as follows: Blanks, Miles, Bates, and Lomax.[1]   All other defendants have either not filed motions or have abandoned any motions filed by their counsel.

## II.    ARGUMENT

### (A)    None Of The Defendants Are Entitled To Severance.

Defendant Miles filed a motion for severance.  To the extent other defendants have filed boiler plate motions to adopt the motions filed by the co-defendants, arguably they also seek a severance.

Defendants who are indicted together should be tried together.  *United States v. Hall*, 93 F.3d 126, 131 (4th Cir. 1996).  Indeed, unless a "miscarriage of justice" will result, there is a presumption that co-defendants should and will be tried together.  *Richardson v. Marsh,* 481

---

[1] The Government will not be responding to Lomax's motion to suppress. The Government intends to move for dismissal of the counts in which Lomax is named as a defendant.

U.S. 200, 206-11 (1987); *United States v. Samuels*, 970 F.2d 1312, 1314 (4th Cir. 1992). This is particularly true for defendants who participate in the same conspiracy. *United States v. Akinkoye*, 185 F.3d 192, 197 (4th Cir. 1999); *United States v. Tipton*, 90 F.3d 861, 883 (4th Cir. 1996); *United States v. Ford*, 88 F.3d 1350, 1361 (4th Cir. 1996); *United States v. Reavis*, 48 F.3d 763 (4th Cir. 1995); *United States v. Roberts*, 881 F.2d 95, 102 (1989). Count One of the indictment charges that from December 2011, and continuing through the time of the indictment, September 24, 2013, the defendants conspired with each other and others both known and unknown to the grand jury to distribute and possess with the intent to distribute one kilogram or more of a quantity of a mixture or substance containing a detectable amount of heroin.

The Government has broad discretion in initiating and structuring a prosecution, including the joinder of counts and defendants that qualify under Fed. R. Crim. P. 8. *United States v. Smith*, 44 F.3d 1259, 1266 (4th Cir. 1995).

Fed. R. Crim. P. 8 (b) provides that:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all defendants need not be charged in each count.

In the case at bar, each of the defendants are properly joined with their co-defendants, as the Government's proof will establish that they all participated in a drug conspiracy.

Miles argues, without any legal or factual support, that the jury would not be able to compartmentalize the evidence as to each defendant, and claims that a separate trial of him would not be burdensome to the judicial system.

In *Zafiro v. United States*, 506 U.S. 534 (1993), the Supreme Court stated:

> There is a preference in the federal system for joint trials of defendants who were indicted together. Joint trials "play a vital role in the criminal

> justice system."   They promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."   For these reasons, we repeatedly have approved of joint trials. (Citations omitted).

*Id* at 537.

To the extent that Miles also argues that the jury would be confused by possible irreconcilable and conflicting defenses, Fed. R. Crim. P. 14 provides in part that: "If it appears that a defendant or the government is prejudiced by joinder of offenses or of defendants...the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever relief justice requires."   In order to prevail on a severance motion pursuant to Rule 14, <u>each</u> of the defendants, including Miles, bear the burden of demonstrating that a joint trial "would be so unfairly prejudicial that a miscarriage of justice would result."   *United States v. Williams*, 10 F.3d 1070, 1080 (4th Cir. 1993).   While the defendants allege prejudice, the burden is squarely on them to establish that <u>actual</u> prejudice would result from a joint trial. *Reavis*, 48 F.3d at 767; *United States v. Brooks*, 957 F.2d 1138, 1145 (4th Cir. 1992).   None of the defendants, including Miles, have met their burden.

Even <u>if</u> any of the defendants were to demonstrate any <u>actual</u> prejudice, as opposed to their speculative allegations of prejudice, the mere showing of prejudice is not enough to require severance.   *United States v. Lane*, 474 U.S. 438, 449 (1986).   Rather, tailoring of relief, if any, for any potential prejudice resulting from a joint trial is left to the sound discretion of the district court. *Zafiro*, *supra* at 538-540.   As the Fourth Circuit stated in *United States v. Jamar*, 561 F.2d 1103:

> In ruling on a motion for severance, the trial court is vested with discretion; it must carefully weigh the possible prejudice to the accused against the often equally compelling interests of the judicial process, which include the avoidance of needlessly duplicative trials involving substantially similar proof.

*Id* at 1106.

The trial court has a wide range of discretion in matters of severance.  *United States v. Acker*, 52 F.3d 509, 514 (4th Cir. 1995).  Notwithstanding Miles' claim to the contrary, limiting instructions and the jury's ability to compartmentalize the evidence as to each defendant act to cure any risk of prejudice.  *United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996); *Zafiro*, 506 U.S. at 539.  Accordingly, the motions for severance should be denied.

**(B)     Motion To Adopt Motions Filed By Co-Defendants And Motion For Leave To File Additional Pre-Trial Motions.**

Although the Government does not object to these requests, it is respectfully requesting that co-defendants adopting motions be required to particularize the basis for their adopting those motions to the extent that they are relying on grounds or authorities other than those set forth in the adopted motions.  To the extent that any defendant wishes to file additional motions, the Government does not object, provided there is a satisfactory explanation as to <u>why</u> the motion was required to be filed <u>after</u> the deadline and multiple extensions of the date set by the Court.

**(C)     The Wire Tap Evidence Was Properly Obtained.**

Defendants Blanks, Miles, Bates, and Lomax, argue that the wiretap recordings must be suppressed because (i) the orders were based on affidavits that lacked probable cause; (ii) the monitoring agents failed to properly minimize calls; and (iii) the investigators failed to exhaust other investigative procedures.  In addition, Bates argues that the wiretap orders were "general warrants," while Blanks argues that the investigators failed to cease monitoring after the objectives stated in the orders had been achieved and that the orders themselves were "facially deficient."

(i)     *The Affidavits Set Forth Ample Probable Cause.*

18 U.S.C. § 2518(3)(d) establishes three alternative bases for establishing probable cause for interception of electronic communications: (1) that the target facilities are being used or are about to be used in connection with an enumerated offense; or (2) that the target facilities are leased to or listed in the name of an individual believed to have committed an enumerated offense; or (3) that the target facilities are commonly used by an individual believed to have committed an enumerated offense.

The existence of probable cause is determined by looking at the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213 (1983).  Probable cause exists where the totality of the circumstances reveal that there is a fair probability that the wiretap will uncover evidence of a crime. *United States v. Fairchild*, 189 F.3d 769 (8th Cir. 1999).  Furthermore, the probable cause required for the issuance of a wiretap order is the same that is necessary to obtain the issuance of a search warrant. *United States v. Talbert*, 706 F2d. 464, 467 (4th Cir. 1983); *United States v. Falcone*, 505 F.2d 478, 481 (3rd Cir. 1974).  "In applying for an order authorizing interception of electronic communications it is not necessary for the applicant to prove beyond a reasonable doubt that the communications concerning the offense will be obtained, but only that there is a fair probability thereof." *United States v. Depew*, 932 F.2d 324, 327 (4th Cir. 1991) (emphasis added).  Only the probability and not a prima facie showing of criminal activity is the standard of probable cause. *United States v. Lyons*, 507 F.Supp. 551, 555 (D. Md. 1981).

"Applications for electronic surveillance orders, like search warrants, are to be read 'in a common sense and realistic fashion.' ... Assessments concerning probable cause are to be made after the 'totality of the circumstances' test has been used to determine the adequacy of the application." *United States v. Errera*, 616 F.Supp. 1145, 1149 (D.Md. 1985) (citations omitted).

It is axiomatic that such affidavits "must be tested and interpreted by magistrates in a common sense and realistic fashion . . . Technical elaborate specificity once exacted under common law pleadings have no proper place in this area." *United States v. Ventresca*, 380 U.S. 102, 108 (1965). "It is sufficient that the information in the affidavit, when assessed in its totality, was sufficient to support a reasonable belief that evidence of criminality by the subject of surveillance would be obtained." *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988). When an issuing judge makes a finding of probable cause, a reviewing court should not review that decision in a "hypertechnical, rather than common-sense manner." *Ventresca*, 380 U.S. at 109. A reviewing court is not to substitute its judgment as to probable cause, but need only determine whether there was a substantial basis for the issuing court's determination of probable cause. *Gates*, 462 U.S. at 238-39.

The affidavit for the initial wire, **Exhibit A**, sets forth detailed evidence of narcotics trafficking and the use of target facilities to conduct the narcotics trafficking. *See* **Exhibit A** at 16-36. On June 7, 2013, United States District Judge William D. Quarles, Jr. signed an order, **Exhibit B**, authorizing interception of cellular telephone numbers utilized by Miles.[2] Among the persons likely to be intercepted in addition to Miles included Wiggins, Blanks and Bates, among others.[3] **Exhibit B** at 7.

---

[2] Judge Quarles subsequently signed orders related to additional phones on July 9, 2013, and August 7, 2013, as well as signing orders for extensions of wires he had previously authorized. All orders were supported by affidavits as well. Copies of those affidavits and orders were provided as part of discovery to defense counsel. They will not be reproduced here. Each of those affidavits describes drug related calls over the target facilities as well.

[3] The wiretap exhibits have certain redactions due to an ongoing investigation by the FBI of individuals who have not been indicted at this time. Should the Court require an unredacted copy of the wiretap documents, the Government will provide those materials to the Court for an *in camera* review. S*ee United States v. Danovaro*, 877 F.2d 583 (7th Cir.1983); *United States v.*

In analyzing a motion to suppress the wiretaps, two additional principles are important. First, the burden is on the defendant challenging the electronic surveillance to show illegality. *United States v. Matlock*, 415 U.S. 164, 177 (1974); *see also* Fishman and McKenna, *Wiretapping and Eavesdropping*, §23.5 (rule that party seeking suppression of evidence has burden of proof by preponderance that evidence was illegally seized should govern motion to suppress eavesdropping evidence).  Likewise, the Supreme Court has held that in a close case a reviewing court should resolve doubts in favor of upholding a search warrant.  *Ventresca*, 380 U.S.  at 109; *see also United States v. Lofton*, 518 F. Supp. 839, 843 (S.D.N.Y. 1981), aff'd. without op., 819 F.2d 1130 (2d Cir. 1987).

The second principle is that the "determinations by an issuing judge are accorded substantial deference" when reviewing wiretap orders.  *United States v. McKinney*, 785 F. Supp. 1214, 1220 (D. Md. 1992).  In *McKinney*, Chief Judge Black further explained:

> The function of this Court, which is essentially reviewing the previous findings of [the issuing judge], is "not to make de novo determinations of sufficiency as if it were [an issuing judge], but to decide if the facts set forth in the application were minimally adequate to support the determination that was made."  *United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir. 1977).

*See also, Errera*, 616 F. Supp. at 1149, "Applications for electronic surveillance orders, like search warrants, are to be read 'in a common sense and realistic fashion.' . . .Where electronic surveillance has been authorized by a judicial officer, the fact that the issuing judge found probable cause is itself a substantial factor tending to uphold the validity of the order issued."

Therefore, there was probable cause to issue the order for the interception of communications over the targeted cellular telephones, and Judge Quarles did not err in

---

*Yoshimura*, 831 F.Supp. 799 (D. Hawaii 1993); *United States v. Saltares*, 2004 WL 213154 (S.D. NY 2004).

concluding that probable cause existed to support issuing the wiretap orders.  Accordingly, the intercepts were proper.

(ii)     *There Was No Violation Of The Court's Minimization Requirements.*

The Defendants also complain that the investigators failed to comply with the minimization requirements under 18 U.S.C. §2518(5).  Judge Quarles' orders  explicitly stated that monitoring of conversations was to cease when it was determined that the conversations were unrelated to communications subject to interception under Chapter 119, Title 18 of the United States Code.  *See e.g.* **Exhibit B** at 9.  Judge Quarles' orders provided, however, that the agents should spot check conversations that were minimized to ensure that the conversation had not turned to criminal matters.  *Id.*

In addition, the minimization guidelines, **Exhibit C**, required monitors to take precautions to minimize interception of conversations that did not relate to criminal activity, but if the monitoring indicated it was of an innocent nature it needed to be minimized.  **Exhibit C** at 3.  Furthermore, monitors were instructed that spot monitoring for a reasonable period of time up to two minutes was permissible to determine the identity of the parties to the conversation, as well as whether the conversation concerned criminal activities.  *Id* at 14.

The Defendants complain that there was a failure to minimize.  In point of fact there was not.  The minimization requirement does not leave all innocent communications unheard.  Unnecessary intrusions are to be reduced as much as possible but efforts at minimization must be reasonable under the circumstances and reviewed on a case-by-case basis when testing compliance.  The Fourth Circuit indicated the rule for this circuit in *United States v. Clerkley*, 556 F.2d 709 (4th Cir. 1977):

> In analyzing a given case, the federal courts have considered three principal factors: (1) the nature and scope of the alleged criminal enterprise; (2) the government's reasonable expectation as to the content

of, and parties to, the conversations; and (3) the degree of judicial supervision while the wiretap order is being executed.

*Id.* at 716.

While *Clerkley* involved the investigation of illegal gambling, these same factors are applicable to a narcotics conspiracy.   In *Clerkley* the Fourth Circuit observed: "When law enforcement officials are confronted with a large, far-flung and on-going criminal activity involving multiple parties, they are afforded greater latitude in conducting wiretaps." *Id.*  The Seventh Circuit, in considering a drug conspiracy, held that "[l]arge and sophisticated narcotics conspiracies may justify considerably more interception than would a single criminal episode. This is especially so where, as here, the judicially approved purpose of the wiretap is not so much to incriminate the known person whose phone is tapped as to learn the identity of far-flung conspirators and to delineate the contours of the conspiracy."  *United States v. Quintana*, 508 F.2d 867, 874 (7th Cir. 1975).

Here, as is evidenced by the indictment, there were numerous individuals associated with the conspiracy, whose identities and roles at the time interception was authorized were not readily determinable.

According to the minimization guidelines in place, agents were permitted to listen to or spot monitor calls that were less than two minutes in duration.  **Exhibit C** at 14.  In not every instance will the conversants immediately launch into a discussion about narcotics.  As such, the monitors were permitted, even in calls that were initially minimized, to listen further to determine whether or not the conversation continues to be that which would be non-pertinent to the investigation.  As the Eighth Circuit in *United States v. Cox*, 462 F.2d 1293 (8th Cir. 1972) noted:

> [W]here as here, the investigation is of an organized criminal conspiracy conversing in a colloquial code, surveillance of most of the telephone calls

> made during several days does not constitute a failure to minimize simply
> because in retrospect it can be seen that a substantial portion of them had
> no evidentiary or investigative value.

*Id* at 1300-01.

Indeed, it is impossible to determine at the outset whether a particular conversation is irrelevant until it has been terminated. "It is all well and good to say, after the fact, that certain conversations were irrelevant and should have been terminated. However, monitoring agents are not gifted with prescience and cannot be expected to know in advance what direction a conversation will take." *United States v. LaGorga*, 336 F. Supp. 190, 196 (W.D. Pa. 1971).

Because there is no inflexible rule to determine reasonableness, many circumstantial factors must be considered, including the number of short calls intercepted, whether the surveillance target is part of a widespread conspiracy, what type of telephone line is being monitored, at what point in the investigation the interception took place, and whether the conversation being intercepted is ambiguous. *See Scott v. United States* 436 U.S. 128, 140-42 (1978). Several of the factors recognized in the case law are germane to this case.

First, when an investigation involves a drug ring of unknown proportion, "the need to allow latitude to eavesdroppers is close to its zenith." *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000). Compared to a single criminal episode, "[l]arge and sophisticated narcotics conspiracies may justify considerably more interception." *Quintana*, 508 F.2d at 874. Allowing leeway is especially important when "the purpose of the intercept order(s) is to learn the identities of far-flung conspirators and define the reach of the conspiracy, as well as to incriminate the person whose phones are tapped." *United States v. Daly*, 535 F.2d 434, 441 (8th Cir. 1989); *see also United States v. Earls*, 42 F.3d 1321, 1325 (10th Cir. 1994).

In this case, at the time when the wiretaps began, investigators knew Miles was using the target telephones in furtherance of his drug trafficking activities. There, however, were many

unknowns.  The investigators, for example, did not know the source of heroin supply.  In many instances investigators did not know the identities of numerous co-conspirators that were working with Miles to obtain, store, and sell the drugs, and investigators had a scarce understanding of the conspiracy's day-to-day operations.

The call volume was high.  Furthermore, the calls generally were short, less than two minutes in duration, including ring and connection time.  Moreover, co-conspirators rarely referred to one another by their legal names.  Rather, agents had to keep track of street names often used by apparent participants in the illegal activity who also were using cellular telephones subscribed to fictitious persons or third parties.  Each time the FBI intercepted a person who appeared to be involved in the drug activity, agents tried to gather sufficient information from the intercepted conversations and elsewhere to identify that person and determine his/her role in the conspiracy.  This bedrock investigative task required close listening not just to conversations between Miles and the unknown party, but also to conversations between Miles and third parties in which the conversation touched on the activities of other individuals and co-conspirators.

The contents of the intercepts themselves posed additional complicating factors.  Courts have recognized that when conspiracies utilize "codes and specialized jargon, making criminal conversations more difficult to detect and decipher, there is yet [another] reason for affording investigators some leeway."  *United States v. Uribe,* 890 F.2d 554, 557 (1st Cir. 1989); *see also*, *United States v. Sanchez*, 961 F.2d 1169, 1179 (5th Cir. 1992); *Daly,* 535 F.2d at 441.

Additionally, monitored conversations occasionally started with discussion of non-criminal matters, a fact that did "not require the government to plug its ears." *United States v. Wilson*, 835 F.2d 1440, 1445 (D.C. Cir. 1987), *abrogated on other grounds by Bloate v. United States*, 130 S. Ct. 1345 (2010); *see also United States v. Mansoori*, 304 F.3d 635, 645 (7th Cir. 2002).  Because participants in a conspiracy may "often discuss[] personal and criminal

14

matters in the same conversations," *Wilson*, 835 F.2d at 1445, it is unreasonable for monitoring agents to cease monitoring every time non-criminal matters are mentioned.

The thoroughness of the Government precautions to bring about minimization and the degree of judicial supervision over the surveillance practices, both of which provide strong circumstantial evidence of a reasonable effort to minimize interception of innocent conversation. *Charles*, 213 F.3d at 22; *see also United States v. Carter*, 449 F.3d 1287, 1296-97 (D.C. Cir. 2006) (noting that the prosecutor instructed agents on minimization and reviewed call records for compliance); *United States v. Eiland*, 398 F. Supp.2d 160, 175 (D.D.C. 2005) (citing government's procedures and judicial supervision as factors tending to show government's compliance with minimization requirement).

First, the Government took a number of reasonable precautions to minimize the possibility of intercepting non-pertinent conversations. Before a monitor intercepted any communications, s/he was required to read all of the affidavits which contained the details of the investigation and the identities of the suspected targets. **Exhibit C** at 2. Monitors also were required to read and understand Judge Quarles' orders authorizing the interceptions. *Id.* Before performing the duties as a monitor, each monitor was required to either attend a meeting with the lead prosecutor in the case, view a videotape of that meeting, or speak personally with one of the supervising AUSAs. In these meetings and during these conversations, the prosecutors explained, among other things, the authorized objectives of the investigation, the offenses and known individuals under investigation, the sorts of calls that were anticipated, and, most critically for present purposes – the importance of identifying patterns of involvement and non-involvement, and of minimizing and "spot checking" non-pertinent conversations. This verbal guidance was memorialized in memoranda for each wiretap that each monitor was required to read before monitoring. These memoranda were left in the wiretap room along with

15

the affidavits and Judge Quarles' orders, so that monitors could review these materials again as needed.

With respect to the extent of judicial supervision, "[w]here the authorizing judge has required and reviewed ... reports at frequent intervals, a reviewing court may take such supervision through reports into consideration in determining whether a reasonable effort to minimize was attempted." *United States v. Armocida*, 515 F.2d 29, 44-45 (3rd Cir. 1975) (citing *United States v. James*, 494 F.2d 1007, 1021 (D.C. Cir. 1974)); *see also United States v. Cleveland*, 964 F. Supp. 1073, 1093 (E.D. La. 1997).   In this case, Judge Quarles' orders required that the Government make periodic reports every 10 days regarding the progress of the investigation, *see* 18 U.S.C. § 2518(6), and the Government submitted periodic reports as required.  These reports, see e.g. **Exhibit D,** advised the judge of statistical data including the total number of activations, the number of pertinent calls, the number of minimized calls, and the number of calls greater than two minutes in length.  The reports also included descriptions of many of the pertinent calls, which provided Judge Quarles with continuing probable cause to support the ongoing interceptions.  Every report ended with an "Authorization" that Judge Quarles signed to confirm his review of the report and his agreement that continued interception was warranted.  Accordingly, the degree to which Judge Quarles supervised these wiretaps ought to inform the Court's assessment of the Government's reasonable efforts to minimize. *See Eiland*, 398 F. Supp. 2d at 175.

In assessing a defense minimization challenge, courts generally draw a line at the two- or three-minute mark and exclude such short-duration calls from consideration. *See, e.g.*, *United States v. Yarborough*, 527 F.3d 1092, 1098 (10th Cir. 2008) ("[C]onsistent with Supreme Court and Tenth Circuit precedent, in analyzing the reasonableness of the government's minimization efforts, we exclude calls under two minutes."); *United States v. Homick*, 964 F.2d 899, 903 (9th

Cir.1992) (court was reluctant to conclude that listening to all calls for two minutes or less irrespective of relevance violated minimization requirements); *Cleveland*, 964 F. Supp. at 1092-94 (excluding calls less than three minutes in duration). *See also United States v. Dumes*, 313 F.3d 372, 380 (7th Cir. 2002) ("Following *Scott*, some courts have held that calls less than two minutes do not require minimization. We certainly agree that minimization of short calls is not required."); *United States v. Hinton*, 543 F.2d 1002, 1012 (2d Cir.1976) (monitoring all calls for a maximum of five minutes not unreasonable where interceptees frequently communicated in code and where discussions initially personal often turned later to criminal conduct). Particularly in a case as this one, the rationale for listening to the first several minutes of a conversation is that "even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." *Scott*, 436 U.S. at 142.

Even <u>if</u> this Court were to find that there was a failure to minimize some of the calls, the remedy should not be the suppression of <u>all</u> the intercepted conversations. *See Cox*, 462 F.2d at 1301-1302; *United States v. Sisca*, 361 F.Supp735, 746-747 (S.D.N.Y. 1973); *United States v. Mainello*, 345 F. Supp. 863, 874-877 (E.D. N.Y. 1972). Rather, at most what would be suppressed is any call that a Defendant has identified and the Court concludes should have been minimized but was not.

> (iii)    *The Investigators Complied With The Exhaustion Provisions*
> *Of 18 U.S.C. §2518(3)(c).*

The Defendants next argue that the agents did not demonstrate in their affidavits that the investigators failed to exhaust other investigative procedures. Such a claim demonstrates a fundamental misunderstanding of the law.

As noted, the investigation and wire authorizations in this case were conducted under the supervision of Judge Quarles. 18 U.S.C. § 2518(1)(c) requires that all wiretap applications contain a statement regarding exhaustion of other investigative techniques.

Once again, considerable deference is to be given to the issuing judge's determination that the wiretap applications provided sufficient information to satisfy the exhaustion requirement of 18 U.S.C. § 2518(3)(c). A district judge in reviewing the issuing judge's determination under 18 U.S.C. § 2518(3)(c) is to apply a common sense approach to that review.

The Fourth Circuit has held that the appellate court owes "considerable deference" to the district court's determination that the exhaustion requirement of 18 U.S.C. § 2518(3)(c) was satisfied. *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995); *United States v. Smith*, 31 F.3d 1294, 1298 (4th Cir. 1994) (declining to announce a standard of review but, after reviewing various standards applied in other circuits, holding that the standard should be one that gives the issuing judge's exhaustion determination "considerable deference"*). United States v. Corrado*, 227 F.3d 528, 539 (6th Cir. 2000) (same). Accordingly, Judge Quarles properly determined that the exhaustion requirement was satisfied and that determination should be accorded the highest degree of deference.

 Sections 2518(1)(c) and (3)(c) of Title 18 were designed "to ensure that the relatively intrusive device of wiretapping was not routinely employed as the initial step in an investigation nor resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Smith*, 31 F.3d at 1297; *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). The Fourth Circuit has held that while wiretaps are an extraordinary investigative tool, they are also necessary tools of law enforcement and that § 2518(1)(c) should not be read in an overly restrictive manner. *Leavis*, 853 F.2d at 220. The Fourth Circuit has also repeatedly observed that, "[T]he burden that these provisions impose upon the government to show the inadequacy of

18

normal investigative techniques is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion'...that does not unduly hamper the investigative powers of law enforcement agents." *Smith*, 31 F.3d at 1297, quoting *Clerkley*, 556 F.2d at 714.   The Government has never been required to show that other investigative methods have been wholly unsuccessful or that it has exhausted "*all* possible alternatives to wiretapping." *Smith*, 31 F.3d at 1297 (emphasis in original);  *Clerkley*, 556 F.2d at 222;  *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989) (law enforcement official not required to exhaust all conceivable investigative procedures before seeking wiretap);  *United States v. Bankston*, 182 F.3d 296, 306 (5th Cir. 1999) 306, *rev'd on other grounds* (exhaustion of every conceivable investigative option need not be shown);  *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000) (wiretap necessary to learn full extent of drug operation despite attainment of degree of success with traditional investigative methods).

The language of § 2518(1)(c) is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Kahn*, 415 U.S. at 153, n.12, (1974).   "These procedures were not to be routinely employed as the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515 (1974).  At the same time the purpose "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir. 1974).  Nor need a wiretap be used only as a last resort. *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir. 1975).  Rather, Congress intended that the showing envisioned by § 2518(1)(c) be tested "in a practical and common sense fashion."  S. Rep. No. 1097, 1968 U.S. Code Cong. & Ad.News, p. 2190.

Courts have also held that, in assessing the need for a wiretap, affiants are authorized to rely upon, and courts are entitled to consider, their knowledge, training and experience as to whether a particular investigative technique will fail. *See Smith*, 31 F.3d at 1299 (issuing court may take into account affirmations which are founded in part on experience of specially trained agents). Furthermore, it is permissible for affiants to opine as to whether a particular procedure will succeed or fail. *Clerkley*, 556 F.2d at 715 (reasonable conclusions about the productivity of certain techniques were sufficient to show need).

      (iv)    *The Wiretap Orders Were Not General Warrants In Violation Of The Fourth Of The Fourth Amendment.*

Bates argues that the wiretap orders were flawed because they did not contain an "authorized objective" but rather permitted the agents to "continue searching until, in the sole discretion of law enforcement, they had enough evidence." Bates' Motion at 8 (Document # 279). He further argues that the FBI was given "unbridled authorization to search and intercept communications, allotted in thirty day increments which …crossed the line by the Particularity Clause of the Fourth Amendment and converted the surveillance into a general search." *Id.*

The problem with Bates' argument is that it overlooks or ignores that the decision as to continue the use of electronic surveillance was not an "unbridled authorization" given to the FBI. Rather, it was Judge Quarles who determined whether continued electronic surveillance was authorized. Periodic progress reports were given to Judge Quarles every 10 days. Judge Quarles read and reviewed those reports and then authorized the continued interceptions. Moreover, at the expiration of each 30 day period, the FBI was required to submit affidavits to Judge Quarles in support of further interception. The court's orders authorizing both the initial and continued interception of the target telephones included explicit probable cause findings that the listed target interceptees were committing and would continue to commit violations of federal law,

namely 21 U.S.C. § § 841, 843, and 846, and 18 U.S.C. §§ 1956-57.  **Exhibit B** at 1-3.     The orders also included explicit probable cause findings that the target interceptees' communications "will concern specifics of the above offenses," and the orders listed ten specific objectives that directly related to the investigation of those statutory violations.  **Exhibit B** at 2-3.  Finally, the orders contained several additional checks on law enforcement discretion.

Bates also argues that the wiretap orders violated the Fourth Amendment's particularity requirement.  The Fourth Amendment's particularity requirement prohibits the issuance of a "general warrant" that does not contain a "particular description" of the things to be seized.  *Andresen v. Maryland*, 427 U.S. 463, 480 (1976).  In *Andresen*, the Supreme Court considered whether the particularity requirement was violated by a search warrant whose list of documents to seize included a phrase, "together with other fruits, instrumentalities, and evidence of crime at this [time] unknown."  427 U.S. at 479.  The Court noted that this phrase was "not a separate sentence," but instead appeared at the end of a list of specific items.  *Id.* at 480.  The Court concluded that the general phrase had to be read in the context of the preceding items, and that, when so read, the phrase clearly referred to other evidence of that particular scheme.[4]  *See id.* at 480-815.  On the basis of this reading, the Court held that the warrant was not impermissibly general.  *See id.*

---

[4] The Court in *Andresen* noted that the warrant it was considering – even with its catch-all phrase – contrasted sharply with the absence of particularity in  *Berger v. New York*, 388 U.S. 41 (1967), on which Bates relies.  *Andresen*, 427 U.S. at 481 n.10.  *Berger* involved a state eavesdropping statute that authorized surveillance "without requiring belief that any particular offense has been or is being committed; nor that the 'property' sought, the conversations, be particularly described."  Furthermore, the statute in that case provided authorization in 60-day increments, and extensions of this period on a showing merely that an extension was "in the public interest."  Congress enacted Title III to meet the constitutional requirements for electronic surveillance enunciated in *Berger* and *Katz v. United States* 389 U.S. 347 (1967).  *See Mitchell v. Forsyth*, 472 U.S. 511, 532 (1985).  The court's orders here were issued pursuant to and fully compliant with Title III.  As such, Bates' reliance on *Berger* is misplaced.

In assessing Bates' challenge to Judge Quarles' orders, there is an additional factor that must be considered – the very nature of electronic surveillance.  "A conversation, unlike physical evidence, cannot be described with precision, nor can it be immediately determined upon 'observing' it whether it is subject to the warrant or order."  *United States v. Dorfman*, 542 F. Supp. 345, 386 (N.D. Ill. 1982).  With these precepts in mind, it is clear that court's orders were not general warrants in violation of the Fourth Amendment.  The wiretap affidavits in this case set out the alleged offenses in considerable detail.  Judge Quarles' orders must be read in connection with those affidavits.  The particularity requirement also is addressed by the orders' requirements that monitoring be conducted in such a way as to minimize the interception of irrelevant communications.  Given these factors and the orders as a whole, they are not "general warrants."

Finally, even if this Court were to conclude that Judge Quarles' orders were deficient, which they were not, the exclusionary rule does not apply when law enforcement acts in objectively reasonable reliance on a warrant later held invalid.  *See  Davis v. United States*, 131 S.Ct. 2419, 2427 (2011);  *United States v. Leon*, 468 U.S. 897, 922 (1984).  In this case, each and every wiretap application, affidavit, and order was approved first by the Department of Justice and then by Judge Quarles before interceptions were conducted.  Thus, even assuming *arguendo* that Judge Quarles' orders constituted "general warrants," the FBI acted in good faith reliance on them and suppression is not warranted.

As such, the affiants were entitled to rely on facially valid wiretap orders that the resulting evidence would be admissible pursuant to the "good faith" exception of *Leon*.  *Leon* has been applied to admit electronic surveillance evidence.  *See United States v. Brewer*, 204 Fed. Appx. 205 *3 (4th Cir. 2006) (unreported) (even if affidavit lacked probable cause or exhaustion requirements had not been met, affiants were entitled to rely on facially valid wiretap order);

*United States v. Moore*, 41 F.3d 370 (8th Cir. 1994) (good faith doctrine required that suppression of wiretap evidence be denied, despite defect in order allowing electronic surveillance).  Were the affidavits invalid, which the Government does not concede they were, the evidence may properly be received under the good faith exception to the exclusionary rule.

**(D)     Goode's Motion for Disclosure of Statements of Co-Defendants and Co- Conspirators Intended to be Used Pursuant to Fed. R. Evid. 801(d)(2)(E), as Adopted by Co-Defendants.**

Goode filed a motion to compel the Government to identify, disclose and produce any statements of any co-defendant or co-conspirator that the prosecution intends to offer against Goode or any co-defendant under Federal Rule of Evidence 801(d)(2)(E).  Goode has signed a plea agreement and is no longer pursuing the motion but his motion has been adopted by co-defendants.  As part of discovery, statements made by any of the defendants in this case have already been turned over.  Moreover, the Fourth Circuit has held that statements of conspirators is governed by the Jencks Act, 18 U.S.C. § 3500, rather than Federal Rule of Criminal Procedure 16(a)(1)(A).  Goode's counsel has signed a discovery agreement in which the parties agreed that Jencks material would be turned over one week prior to trial.  The Government intends to abide by the provisions of the discovery agreement.  Therefore, Goode's motion is moot or, at best, premature.

**(E)     Goode's Motion for Disclosure Pursuant to Fed. R. Crim. P. 12, as Adopted by Co-Defendants.**

Goode filed a motion to compel the Government to disclose its intention to use any evidence that may be subject to a motion to suppress under Federal Rules of Criminal Procedure 12(b)(3)(c) and 12(b)(4)(B) which provides that the defendant may, "in order to have an opportunity to move to suppress evidence under Rule 12(b)(3)(c), request notice of the government's intent to use (in its evidence-in-chief at trial) any evidence that the defendant may

be entitled to discover under Rule 16." Goode has signed a plea agreement and is no longer

pursuing the motion but his motion has been adopted by co-defendants.

Federal Rule of Criminal Procedure 12(b)(4)(B) has a limited purpose:

> Rule 12(b)(4)(B) is not designed or intended to be used to obtain more specific
> discovery than that provided by Rule 16 nor is it designed to aid the defendant in
> ascertaining the Government's trial strategy . . . Rather, Rule 12(b)(4)(B) is
> intended to facilitate efficient suppression motion practice by allowing the
> defendant to avoid filing a motion to suppress when the Government does not
> intend to use the evidence at issue.

*United States v. Barret*, 824 F. Supp. 2d 419, 459-60 (E.D.N.Y. 2011) (internal citations

omitted). *See also*, *United States v. de la Cruz-Paulino*, 61 F.3d 986, 994 (1st Cir. 1995) (stating

that Federal Rule of Criminal Procedure 12(b)(4)(B)'s predecessor Rule 12(d) "was not designed

to aid the defendant in ascertaining the Government's trial strategy"); *United States v. Ishak*,

277 F.R.D. 156,158 (E.D. Va. 2011) ("Put differently, defendants cannot invoke Rule

12(b)(4)(B) 'to force the government to decide precisely which documents provided in discovery

it will offer at trial and to prevent it from using any that it does not so designate as a matter of

trial tactics.'").

Moreover, Federal Rule of Criminal Procedure 12(b)(4)(B)'s "core purpose is to ensure that

a defendant '*can make his motion to suppress prior to trial*' by 'requesting the government to

give notice of its intention to use *specified evidence* which the defendant is entitled to discover

under rule 16.'" *Ishak*, 277 F.R.D. at 158. (emphasis in original). Therefore, in order to trigger

Rule 12(b)(4)(B)'s notice obligation, "the defendant's request must identify potentially

suppressive evidence with specificity." *Id* at 159. In *Ishak*, the court denied the defendants'

requests under Rule 12(b)(4)(B) as being "insufficiently specific" because the defendants had

simply requested that the government "designate its evidence and any calls, transcripts, and

physical evidence pertaining to the defendant." *Id* at 159.

Here, Goode has specifically asked for (1) statements or "admissions by conduct" made by Goode, including during any polygraph; (2) items, objects or information received as the product of a search executed by government agents; (3) recordings made pursuant to wiretaps; (4) recordings made pursuant to consensual recordings; (5) pre-trial identification procedures including line-ups; (6) any evidence arguably obtained in violation of federal, state, or local law; (7) grand jury testimony that the Government has reason to suspect was perjured; and (8) any other information or material which might come under this rubric.  The Government has turned over in discovery items responsive to the first, second, and third specific requests.  The fourth and fifth specific requests are inapplicable in this case.  The sixth and seventh specific requests fall within the Government's *Brady* and *Giglio* obligations.  The Government has complied with its *Brady* and *Giglio* obligations and is aware of its ongoing responsibility to turn over such materials.

Regarding, the eighth request, it is simply too broad to comply with the requirements of Federal Rule of Criminal Procedure 12(b)(4)(B).  To the extent the remaining Defendants are adopting this motion, the request basically asks the Government to designate any evidence that might come under the "rubric" of  Federal Rule of Criminal Procedure 12(b)(4)(B).  Such a broad and vague request does not follow the purpose of Rule 12(b)(4)(B).  Therefore, the eighth request in the motion should be denied as well.

**(F)    Goode's Motion to Require Prosecution to Review and Confirm Witness Backgrounds, as Adopted by Co-Defendants.**

Goode filed a motion to compel the Government to verify that it has "vetted" and "confirmed" the backgrounds, qualifications, honesty and other pedigree information of Government witnesses.  Goode has signed a plea agreement and is no longer pursuing the motion but his motion has been adopted by co-defendants.  The Government has complied with its

*Brady* and *Giglio* obligations and is aware of its ongoing responsibility to turn over such materials.  In addition, the Government will turn over *Jencks* material shortly before trial.

    **(G)**    **Blanks' Motions To Suppress Evidence.**

    *(1)*    *Search of Blanks' person, December 21, 2011. (Docket # 246)*

On December 21, 2011, members of the Baltimore City Police Department (hereinafter "BPD") applied for and received a search warrant for Blanks' person, his residence located at 118 N. Howard St., Apt. # 811, as well as  Blanks' Ford F-150 pick-up truck.  **Exhibit E**.  As the affidavit for the search warrant reveals, members of the BPD had been conducting an investigation of Blanks for narcotics trafficking, including observing Blanks conducting drug deals where heroin was recovered from one of Blanks' customers.  *See* **Exhibit E** at 7-9.  The affidavit also details additional information about Blanks' drug activities.  As a result, a search warrant was issued for Blanks' person.  Upon Blanks' leaving his residence on December 21, 2011, members of the BPD stopped Blanks, and a search of his person revealed approximately 150 gel caps containing heroin.  Contrary to Blanks' argument that the search was conducted without a warrant, that was not the case.  Accordingly, Blanks' motion as set forth in Docket # 246 should be denied.

    *(2)*    *Search of 118 North Howard Street, December 21, 2011. (Docket # 247)*

As noted, *supra.*, on December 21, 2011, members of the BPD applied for and received a search warrant for Blanks' residence located at 118 N. Howard St., Apt. # 811.  **Exhibit E**.  While Blanks argues, without elucidation, that the warrant lacked probable cause, failed to establish an adequate nexus between the residence and probable cause, that there was no probable cause to believe the items sought to be seized would be found there, and that the warrant was a general warrant and was facially deficient, thereby precluding good faith.  Even the most cursory reading of **Exhibit E** demonstrates the fallacy of such arguments.  The affidavit

clearly sets forth probable cause to believe that not only was Blanks engaged in drug trafficking, but that there was probable cause to believe that Blanks was utilizing his residence at 118 Howard Street to engage in illegal drug activity.  **Exhibit E** at 7-10.

In the case of drug dealers, a number of other courts of appeals have held that evidence of involvement in the drug trade is likely to be found where the dealers reside.  *See United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir.1999) (reasonable to suppose that drug dealer stored evidence of dealing at home, even though no drug trafficking was observed to occur there);  *United States v. Cruz*, 785 F.2d 399, 406 (2d Cir.1986) (probable cause for search of drug dealer's apartment, even though he was not seen using the apartment);  *United States v. Hodge*, 246 F.3d 301, 304 (3rd Cir. 2001) (probable cause can be and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment, and the normal inferences about where a criminal may hide fruits of crime);  *United States v. Williams*, 974 F.2d 480, 481-82 (4th Cir.1992) (totality of facts establishes fair probability that drug paraphernalia will be found in drug dealer's motel room);  *United States v. Davidson*, 936 F.2d 856, 859-60 (6th Cir.1991) (police had probable cause for the issuance of a search warrant since the affidavit revealed a substantial basis for concluding that a search of the defendant's residence would uncover evidence of wrongdoing);  *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir.1999) ("[I]n issuing a search warrant, a magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept ... and ... in the case of drug dealers evidence is likely to be found where the dealers live.") (quoting *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir.1996));  *United States v. Luloff*, 15 F.3d 763, 768 (8th Cir.1994) (observations of drug trafficking occurring away from the dealer's residence, coupled with officer's statement in his affidavit that drug dealers often store evidence of drug dealing in their residences, provided probable cause for search of dealer's house);  *United States v. Henson*, 123 F.3d 1226, 1239 (9th

27

Cir.1997) ("In the case of drug dealers, evidence is likely to be found where the dealers live.")
(quoting *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir.1986)); *United States v. Thomas*, 989 F.2d 1252, 1255 (D.C.Cir.1993) (per curiam) (observations of drug trafficking away from dealer's residence can provide probable cause to search the dealer's house). *See also, United States v Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) (affidavit seeking a warrant to search a murder suspect's home need not contain any particular facts showing that the murder weapon is located in the home).

> The rationale underlying these cases are evidence associated with drug dealing needs to be stored somewhere, and that a dealer will have the opportunity to conceal it in his home.  After all, a dealer logically could conclude that his residence is the best, and probably the only, location to store items such as records of illicit activity, phone books, address books, large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold.

*United States v. Whitner,* 219 F.3d 289, 298 (3rd Cir. 2000).   Accordingly, Blanks' motion, Docket # 247 should be denied.

>    *(3)     Search of Harley Davidson F-150 pick-up truck, March 30, 2013. (Docket # 244)*

The Government does not intend to offer any evidence seized/recovered from the stop of Blanks' Harley Davidson F-150 pick-up truck on March 30, 2013.  Accordingly, Blanks' motion should be denied as moot.

>    *(4)     Search of Harley Davidson F-150 pick-up truck, September 10, 2013. (Docket # 249)*

During the months of July and August 2013, members of the BPD received information as a result of debriefing a confidential source that an individual known to it as "Enzo" was selling a large amount of heroin throughout Baltimore City and that "Enzo" drove a black Ford F-150 Harley Davidson pick-up truck with Maryland agricultural tags.  On September 10, 2013, officers with the BPD observed a vehicle matching that description and noticed that its windows

were darkly tinted, in violation of MD. Trans. Art. 22 § 22-406(i)(1).  Upon attempting to stop

Blanks' vehicle, officers activated their emergency lights and pulled in front of the truck.  Blanks

immediately placed the truck in reverse and rammed into another police vehicle, which was

occupied, in an attempt to flee.  The officers observed Blanks making what appeared to be

furtive gestures, but due to the dark tint on Blanks' truck were unable to see what he was

reaching for.  Concerned that he may be reaching for a weapon, officers approached the truck

and opened the door and ordered Blanks out of the truck, at which time they could see Blanks

stuffing a clear plastic bag containing numerous clear gel caps containing tan powder (suspected

heroin) in his pants.  Upon Blanks exiting the vehicle, members of the BPD observed clear

plastic gel caps hanging out of Blanks' waistband.  Blanks was handcuffed and two clear plastic

bags containing 150 gel caps with suspected heroin in each bag were recovered.

Blanks was placed under arrest and advised of his *Miranda*[6] rights, which he indicated he

understood.  Blanks informed the officers that he had just come out of 301 West Madison Street,

Apartment 612, where he stayed with his girlfriend (co-defendant Rebecca Belete) and there

was no more heroin in the apartment, only "paraphernalia."  Blanks executed a consent to search

form.  **Exhibit F**.  Upon the officers searching the apartment, they located additional quantities

of heroin, drug paraphernalia, including a digital scale with residue and packaging materials.

The seizure of the drugs originated as a result of the traffic stop of Blanks.  A decision to

stop an automobile is reasonable where a police officer has probable cause to believe a traffic

violation has occurred, regardless of how minor the traffic offense may be.  *Whren v. United*

*States*, 517 U.S. 806, 810 (1996);  *Delaware v. Prouse*, 440 U.S. 648, 659 (1979);  *Pennsylvania*

*v. Mimms*, 434 U.S. 106, 109(1977).  *See also, United States v. Rusher*, 966 F.2d 868, 875-76

---

[6] *Miranda v. Arizona,* 384 U.S. 436 (1966)

(4th Cir. 1992) (state trooper's stop of automobile for two traffic violations, failure to wear seatbelt and faulty license plate, was proper);  *United States v. Jeffus*, 22 F.3d 554 (4th Cir. 1994) (police officer's stop of vehicle with cracked windshield, broken taillight and headlight was justified); *United States v. Bullock*, 94 F.3d 896 (4th Cir. 1996) (state trooper's stop of vehicle with cracked windshield and traveling six miles over posted speed limit was valid).  The tint violation provided a basis for the officers to stop the vehicle Blanks was operating at the time, as well as opening the door of the vehicle.  *See United States v. Stanfield*, 109 F.3d 976, 982-83 (4th Cir. 1997); *Pennsylvania v. Mimms*, 434 U.S. at 111 (1977) (where police officers on routine patrol observed defendant driving an automobile with an expired license plate and lawfully stopped vehicle for purpose of issuing a traffic summons, order of one of officers that defendant get out of automobile was reasonable and thus permissible under Fourth Amendment).

Moreover, the seizure of the drugs and paraphernalia inside apartment 612 was lawful, given that Blanks executed a written consent to search the apartment.  There has been no allegation that Blanks was threatened or coerced into signing the consent form.  Indeed, directly above Blanks' signature appears the following: "This written permission is being given by me to the above-named officer voluntarily and without threats or promises of any kind." **Exhibit F**.  Accordingly, Blanks' motion seeking to suppress the heroin and related drug paraphernalia arising out of the traffic stop on September 10, 2013 should be denied.

(5)     *Search of 11 S. Eutaw Street, Apt. 1607, September 13, 2013. (Docket # 248)*

As a result of Blanks arrest on September 10, 2013, two days later, investigators sought a search warrant for Blanks' apartment at 11 S. Eutaw St., Baltimore, Maryland.  **Exhibit G**.  As the affidavit sets forth, a cell phone call was made by Blanks and intercepted pursuant to a court a court-authorized wiretap.  In the call, Blanks was heard instructing his girlfriend, Belete, to go to his apartment and retrieve money.  As the affidavit further states, investigators were

30

conducting an investigation into Blanks' drug activities, including the facts of his most recent arrest for 444 capsules of heroin, along with a digital scale and cutting agents.  A district court judge in Baltimore City, upon reviewing the affidavit authorized a search of Blanks' apartment, which resulted in the recovery of evidence relevant to the investigation.  Once again, without any specifics, Blanks argues, *inter alia,* that the warrant lacked probable cause and was facially deficient.  Contrary to Blanks' boiler plate arguments, the affidavit clearly sets forth probable cause to support a search of Blank's apartment and therefore, his motion to suppress should be denied.

(6)     *Search of Harley Davidson F-150 pick-up truck, October 7, 2013. (Docket # 250)*

On October 7, 2013, as a result of a search warrant, **Exhibit H,** authorized by United States Magistrate Judge Stephanie A. Gallagher, a search warrant was executed on Blanks' truck.  Blanks, once again, seeks suppression of evidence seized from inside the truck, arguing a lack of probable cause and that the warrant was facially deficient.  And once again, Blanks fails to articulate any facts to support his argument.  The search warrant affidavit presented to Judge Gallagher details extensive information to justify probable cause to search the vehicle.  *See* **Exhibit H** at ¶ 20, 51.

Finally, as a general matter, evidence obtained as a result of the execution of a search warrant that is not supported by probable cause need not be suppressed so long as the investigators acted in good faith.  *Leon*, 468 U.S. at 922-23.  Here, even if the Court were to conclude that any of the search warrants were not supported by probable cause, the Court should nevertheless reject Blanks' motions to suppress evidence seized from the search warrants, because it plainly was reasonable for law enforcement officers to rely in good faith on the search warrants.

(7)     *Blanks' motion to suppress in-court and out-of-court identification (Docket # 245)*

Blanks has also sought to suppress any identification of him by a FBI confidential source known as "CW-1." Blanks argues that because CW-1 was only shown a single photograph of him, any in-court or out-of-court identification is impermissible. What Blanks fails to inform the Court of is the fact that CW-1 had multiple occasions over a more than five month period to be physically present with Blanks and other co-conspirators and observe their activities. The fact that he was shown a single photo of Blanks by the FBI was done to confirm the individual he saw, knew, or heard referred to as "Zo" was indeed Blanks.

To the extent that Blanks objects to the use of pretrial identification as evidence at trial or to testimony about pretrial identification, he must first show that the identification procedure was impermissibly suggestive. *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977). CW-1 had ample and repeated opportunities to observe Blanks. Reliability, not the showing of the photograph is the linchpin in determining admissibility of identification testimony. The factors to be considered are set out in *Neil v. Biggers,* 409 U.S. 188, 199-200 (1972). These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed any alleged corrupting effect of the showing of the single photograph. *See United States v. Johnson*, 114 F.3d 435, 442 (4th Cir. 1997) (in court identification permitted notwithstanding unduly suggestive single photograph display where witness had adequate opportunity to observe defendant). Furthermore, '[t]he exclusion of evidence from the jury is, however, a drastic sanction, one that is limited to identification testimony which is manifestly suspect." *Harker v. Maryland*, 800 F.2d 437, 443 (4th Cir. 1986). Evidence that is not so impermissibly suggestive as to give rise to a substantial likelihood of irreparable identification is

for the jury to weigh, as "evidence with some element of untrustworthiness is customary grist for the jury mill." *Manson*, 432 U.S. at 116. Given the opportunity CW-1 had to observe Blanks, Blanks' motion to suppress both in-court and out-of-court identification should be denied.

### (H) MOTION FOR DISCLOSURE PURSUANT TO RULE 404(b) AND RULE 609.

Defendants Wiggins, Blanks, Miles, Bates, have entered pleas of not guilty and deny the allegations contained in the indictment. Each of these remaining defendants has had prior convictions relating to drug trafficking.

### *THE PRIOR CONVICTIONS*

Wiggins: Wiggins has previously been convicted in 2000 in the U.S. District Court for the District of Maryland, Case Number AMD-99-01583, of conspiracy to possess with intent to distribute cocaine and cocaine base, for which he received a 13 year sentence and five years' supervised release. In that case, Wiggins pled guilty to being a member of a conspiracy that transported kilograms of cocaine, which was later cooked into crack cocaine, from New York to Baltimore to be sold in Baltimore. On one occasion, Wiggins supplied a confidential witness and an undercover agent with 174.1 grams of powder cocaine in exchange for several Rolex watches. On another occasion, Wiggins supplied an undercover agent with 193.6 grams of crack cocaine in exchange for a Rolex watch.

Blanks: Blanks has previously been convicted in 2012 in Circuit Court for Baltimore City, Case Number 112012039, of possession with intent to distribute heroin, for which he received a suspended 15 year sentence and five years' probation that expires on April 9, 2017.[7] This case stemmed from a search and seizure warrant that was executed on Blanks' residence

---

[7] Blanks was on probation during the instant narcotics conspiracy.

(118 N. Howard Street, Apt. 811) on December 21, 2011.  At the residence, the same residence

that Blanks was residing at and from which he was distributing narcotics in the instant

conspiracy, law enforcement recovered heroin in gel caps; pellets containing heroin; empty gel

caps; capsule filler trays; a razor with suspected heroin residue; metal strainers with suspected

heroin residue; a grinder with suspected heroin residue; a bent metal spoon with suspected heroin

residue; mannite; an electronic scale with suspected heroin residue; a metal sifter with suspected

heroin residue; and U.S. currency.  On Blanks' person, law enforcement recovered a clear plastic

bag with 150 gel caps containing heroin.

Miles:  Miles has previously been convicted in 2005 in Circuit Court for Baltimore City,

Case Number 07K05000275, of possession with intent to distribute marijuana, for which he

received four years' imprisonment, with two years suspended, and two years' probation.  During

a traffic stop of a vehicle in which Miles was a passenger, Miles provided law enforcement with

a fake name and then attempted to flee, striking an officer during his attempted flight.  When law

enforcement arrested Miles, they recovered 146 grams of marijuana from Miles.  At the time of

Miles' arrest, he had two open Baltimore City warrants and an open federal warrant.  Miles was

also convicted in 2005 in the U.S. District Court for the District Court of Maryland, Case

Number RDB-04-0168, for possession of a firearm in furtherance of a drug trafficking crime, for

which he received 96 months' imprisonment and five years' supervised release that expires on

March 1, 2017.[8]  In that case, a confidential witness ordered crack on multiple occasions from a

co-defendant and Miles delivered the crack to the confidential witness.  During one of those

transactions, Miles showed the confidential witness a Glock .40 caliber semi-automatic handgun

---

[8] Miles was on supervised release during the instant narcotics conspiracy.

and described the type of ammunition he used in that firearm.  The firearm was recovered from a stash house used by Miles and his co-defendant.

Bates:  Bates has previously been convicted in 2006 in Circuit Court for Baltimore City, Case Number 106069039, of conspiracy to possess with intent to distribute heroin, for which he received three years' imprisonment, with two years and six months suspended, and one year probation.  In that case, Bates was arrested after a bag containing numerous heroin gel caps fell out of his pants pocket when he opened the driver's side door during a traffic stop.  In plain view in the cup holder were 263 heroin gel caps.  The passenger was also arrested.  Bates was also convicted in 2009 in the U.S. District Court for the District Court of Maryland, Case Number WDQ-08-0183, for conspiracy to distribute and possess with intent to distribute heroin, for which he received 46 months' imprisonment and three years' supervised release.[9]  In that case, Bates admitted to conspiring with a number of other individuals to distribute and possess with intent to distribute more than 40 grams, but less than 60 grams, of heroin, on behalf of the Black Guerilla Family[10] inside the Maryland Correctional System and Baltimore City Jail.

Defendants Goode and Bates, who have now indicated they will plead guilty, have moved the Court for notice of the Government's intention to use Rule 404(b) or Rule 609 evidence as it relates to any of the Defendants charged in this instant action.  *See* Docket Nos. 273, 280.  The Government intends to adduce this prior conviction evidence at trial pursuant to Federal Rules of Evidence 404(b) and 609.

Given that Wiggins, Blanks, Miles, and Bates, have entered pleas of not guilty in the instant case, they have placed squarely before the jury each and every element of the crimes with

---

[9] Bates was on supervised release during the instant narcotics conspiracy.

[10] As noted in the statement of facts in Bates' plea agreement, the Black Guerilla Family is known to be a violent, prison-based gang engaged in narcotics trafficking and acts of violence both within the Maryland correctional system and on the streets of Baltimore.

which they have been charged.  Specifically, as to Count One, the Government is required to prove beyond a reasonable doubt that Wiggins, Blanks, Miles, and Bates (and others) conspired to distribute heroin; in Counts Two and Eleven, that Blanks possessed with intent to distribute heroin; in Count Four that Wiggins possessed with intent to distribute heroin; in Count Eight that Blanks distributed heroin; and in Count Nine that Miles distributed heroin.

Rule 404(b) permits the admission of extrinsic acts where they are (1) relevant to an issue other than character, (2) necessary, and (3) reliable.  *United States v. Mark*, 943 F.2d 444, 447 (4th Cir. 1991).  The Fourth Circuit has long held that Rule 404(b) is an <u>inclusionary</u> rule that permits the admission of all evidence of other crimes relevant to an issue in a trial, except that which tends to prove only criminal disposition.  *United States v. Sanchez*, 118 F.3d 192, 195 (4th Cir. 1997); *United States v. McMillon*, 14 F.3d 948, 953 (4th Cir. 1994); *United States v. Bailey*, 990 F.2d 119, 121 (4th Cir. 1993); *Mark*, 943 F.2d at 447; *United States v. Watford*, 894 F.2d 665, 671 (4th Cir. 1990); *United States v. Masters*, 622 F.2d 83, 85 & n.2 (4th Cir. 1980). Moreover, courts have held that the admission of "other crimes" evidence under Rule 404(b) is particularly appropriate where, as in the case here, criminal intent or knowledge is at issue.  *See Huddleston v. United States*, 485 U.S. 681, 685 (1988) (finding that "extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct"); *United States v. Queen*, 132 F.3d 991, 996 (4th Cir. 1997), (finding that "[o]nce an act is assumed to be done, 'the prior doing of other similar acts . . . is useful as reducing the possibility that the act in question was done with innocent intent.").  The trial court has broad discretion with respect to the admission of extrinsic act evidence, and the Court of Appeals will defer to the lower court's decision "unless it is an arbitrary or irrational exercise of discretion."  *United States v. Greenwood*, 769 F.2d 49, 53 (4th Cir. 1986).

The Fourth Circuit has established a three part test to determine whether extrinsic act evidence is admissible under Fed. R. Evid. 404(b).  The evidence is admissible if the court finds that (1) the evidence is relevant to some issue other than character; (2) it is necessary; and (3) it is reliable.  *United States v. Queen*, 132 F.3d 991 (4th Cir.1997);  *United States v. Rawle*, 845 F.2d 1244, 1247 (4th Cir. 1988);  *United States v. Hadaway*, 681 F.2d 214, 217 (4th Cir. 1982). Once the threshold requirements of Rule 404(b) are met, the Court must then consider whether the probative value of the evidence is outweighed by the potential for unfair prejudice under Rule 403.  *Mark*, 943 F.2d at 448; *Masters*, 622 F.2d at 87.

*(1) The Evidence is Relevant.*

Here, the proffered evidence meets all three parts of the Fourth Circuit's test for admissibility under Rule 404(b).  The evidence of prior drug trafficking activities by Wiggins, Blanks, Miles, and Bates is relevant because it is probative with regard to both their knowledge and intent.  A defendant's knowledge and intent are elements which the prosecution must prove to establish possession with intent to distribute narcotics in violation of 21 U.S.C. § 841(a)(1). *Mark*, 943 F.2d at 448.  These elements are placed in issue in a narcotics case simply by a plea of not guilty.  *Sanchez*, 118 F.3d at 195; *United States v. Brewer*, 1 F.3d 1430, 1433 (4th Cir. 1993); *see also*, *United States v. McLamb*, 985 F.2d 1284, 1289 (4th Cir. 1983) (plea of not guilty places defendant's state of mind in issue).

Evidence that Wiggins, Blanks, Miles and Bates have previously been convicted of conspiracy, distribution, and possession with the intent to distribute controlled substances is plainly relevant to establish both knowledge and their intention to conspire to distribute narcotics, as alleged in Count One; to possess with the intent to distribute narcotics as alleged in Counts 2, 4, 5, and 11; and to distribute narcotics as alleged in Counts 8 and 9.

In *Mark*, the defendant was charged with participation in a 1989 narcotics trafficking conspiracy involving the sale of five kilograms of cocaine to an undercover DEA agent.  As part of the conspiracy, Mark traveled with a co-conspirator in a BMW automobile (containing a large amount of cash) to a hotel where they were to pay for and pick up the cocaine from the undercover agent, with the intention to thereafter deliver it to an awaiting buyer.  Prior to reaching the hotel, the co-conspirator dropped Mark off at a nearby gas station, where he was to be picked up after the sale was consummated.  The co-conspirator was arrested at the hotel.  Mark and the buyer were subsequently arrested by police.  Mark admitted to police that he rode in the BMW with the co-conspirator and that he knew that there was a large amount of money in the car, but he denied any involvement in the drug transaction.  943 F.2d at 446-47.

During the Government's case in chief, the district court allowed the prosecution to admit evidence under Rule 404(b) of the defendant's prior cocaine dealing activities beginning in 1984, five years prior to the date of the charged conspiracy.  The 404(b) evidence in that case showed that in a five year period prior to the indictment, the defendant distributed between 80-100 kilograms of cocaine, and it was admitted to show Mark's intent and knowledge with respect to the charged conspiracy.  *Mark,* 943 F.2d at 448.

The Fourth Circuit affirmed, noting that the Rule 404(b) evidence was relevant and admissible to show Mark's intent and knowledge.  The Court in *Mark* stressed that the evidence was necessary inasmuch as it supported the prosecution's central theory that Mark was not an innocent rider in the BMW, but rather a drug dealer who knowingly participated in a cocaine distribution conspiracy.  *Id.*

In this case, as in *Mark*, evidence of Wiggins', Blanks', Miles' and Bates' prior convictions for conspiracy, distribution, and possession with intent to distribute narcotics is necessary to prove intent and knowledge and to rebut any suggestion by any of them that they

38

were not aware of the nature of the substances they are alleged to have conspired to possess; or that they lacked the intent to conspire to distribute.

Case law from the Fourth Circuit as well as all other circuits supports the proposition that both prior and subsequent narcotics trafficking activities are admissible under Rule 404(b) in a narcotics prosecution to prove knowledge, intent, and lack of mistake.  *See Sanchez*, 118 F.3d at 195 (evidence of prior cocaine dealing admissible to show defendant's knowledge and intent in narcotics conspiracy case);  *United States v. Ramey*, 791 F.2d 317, 323 (4th Cir. 1986) (evidence of prior marijuana trafficking admissible to show intent in subsequent marijuana prosecution); *Rawle*, 845 F.2d at 1246-47 (allowing admission of prior marijuana dealing in subsequent marijuana prosecution);  *United States v. King*, 768 F.2d 586 (4th Cir. 1985)  (allowing evidence of prior cocaine convictions in prosecution for possession with intent to distribute PCP);  *United States v. Hines*, 717 F.2d 1481, 1489 (4th Cir. 1983) (evidence of prior marijuana dealing and subsequent cocaine distribution admissible to show intent in cocaine conspiracy).

*(2) The Evidence is Necessary.*

The element of necessity is likewise met here.  Evidence is necessary and admissible where it supplies useful proof of the elements of knowledge and intent.  *Hadaway*, 681 F.2d at 218; see also *Mark*, *supra*.  Here, the 404(b) evidence is necessary to show knowledge and intent and to show a lack of accident or mistake.  As noted above, the Defendants may attempt to disavow any knowledge of the conspiracy or their membership in the conspiracy.   The Government accordingly should be permitted to adduce all relevant evidence on the issue of the defendants' knowledge and intent and lack of accident or mistake.

*(3) The Evidence is Reliable.*

Finally, the proffered evidence here satisfies the element of reliability.  The evidence that led to Wiggins', Blanks', Miles' and Bates' convictions established their guilt beyond a

reasonable doubt.  Rule 404 (b) merely requires proof of the occurrences of the underlying acts

by a preponderance of the evidence.  *See Huddleston v. United States*, 485 U.S. 681 (1988)

(standard of proof for prior acts under Rule 404(b) is preponderance of the evidence).  For all of

these reasons, the Government's proffered extrinsic act evidence meets the requirements for

admissibility under Rule 404(b).

*(4) The Evidence is Not Unduly Prejudicial.*

Once evidence of extrinsic acts is found to be admissible under Rule 404(b), the Court

must still consider whether its probative value is substantially outweighed by its prejudicial

effect.  *Morgan v. Foretich*, 846 F.2d 941, 944 (4th Cir. 1988).  Evidence found to be relevant

and probative under Rule 404(b) should be excluded under Rule 403 only in those instances

where the trial judge believes there is a genuine risk that the emotions of the jury will be excited

to irrational behavior, and that this risk is disproportionate to the probative value of the proffered

evidence.  *Id*. at 945; *see also United States v. Powers*, 59 F.3d 1460 (4th Cir. 1995) (evidence

that defendant repeatedly raped his daughter was not unduly prejudicial and hence was

admissible under Rule 404(b) in prosecution for aggravated sexual abuse of a minor – evidence

was highly probative and judge gave limiting instruction thereby obviating potential for

prejudice);  *Bailey*, 990 F.2d at 123;  *United States v. Masters*, 622 F.2d 83, 87 (4th Cir. 1980).

"Rule 403 is a rule of <u>inclusion</u>, generally favoring admissibility."  *United States v. Udeozor*, 515

F.3d 260, 264-65 (4th Cir. 2008) (internal quotation marks and alteration omitted) (emphasis

added).  Where the evidence is probative, "the balance under Rule 403 should be struck in favor

of admissibility, and evidence should be excluded only sparingly."  *United States v. Lentz*, 524

F.3d 501, 525 (4th Cir. 2008).

It is also clear under Fourth Circuit case law that the admission of extrinsic act evidence

does not result in unfair prejudice under Rule 403 where it does not involve conduct any more

sensational or disturbing than the crimes with which the defendant was charged. *United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995); *see also United State v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992); *United States v. Roldan Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Here, the extrinsic act evidence merely involves allegations of additional acts of conspiracy to distribute, distribution, and possession with the intent to distribute controlled dangerous substances – the same type of allegations that are the subject of the indictment itself. It is inconceivable that this additional evidence would evoke such an emotional reaction against the Defendants that the jury would be excited to irrational behavior. *Mark*, 943 F.2d at 449 n.1.

The extrinsic act evidence relating to other narcotics violations by Wiggins, Blanks, Miles, and Bates is therefore admissible under both Rule 404(b) and Rule 403. The Government would request that the Court give the jury a cautionary instruction concerning the permissible uses of extrinsic act evidence, both when the evidence is admitted and then again at the close of the case. *See Powers*, 59 F.3d at 1467 ("[A]s to prejudicial effect, cautionary or limiting instructions generally obviate any such prejudice.").

**(I)    MOTION FOR DISCOVERY.**

Goode and Bates, who have indicated they will be pleading guilty, have moved the Court to compel the Government to provide discovery in accordance with the terms of the discovery agreement in this case without any basis whatsoever to suggest that the Government is not fully complying with its obligations in this case. *See* Docket No. 277 at 1; Docket No. 280. Instead, the motion cites issues entirely unrelated to this case. The Government is well aware of its obligations and, as Goode acknowledges, "considerable discovery has been provided." Docket No. 277 at 1. In this consolidated motions response, the Government has provided notice—three months in advance of trial—of its intent to use 404(b) evidence. As of yet, none of the Defendants have requested expert witness notice and, thus, none has been provided. However,

the Government will provide notice of its expert witnesses and will do so well in advance of trial.

At this time, the Government intends to call a drug expert witness and will provide the name of

the witness and a written summary of the testimony as required by Rule 16.  Additionally,

although already in the discovery agreements, the Government again requests reciprocal

discovery.  The Government also requests notice of any expert witnesses that the Defendants

intend to us.

   To the extent that Goode is requesting *Jencks* material at this time, the request should be

denied.  As the Defendants surely know, *Jencks* material is not discoverable until <u>after</u> the

relevant witness testifies.  Indeed, Title 18 U.S.C. § 3500(a) expressly provides:

> In any criminal prosecution brought by the United States, no statement or report
> in possession of the United States, which was made by a Government witness or
> prospective Government witness (other than the defendant) shall be the subject of
> . . . discovery . . . or inspection until said witness has testified on direct
> examination in the trial of the case.

18 U.S.C. § 3500; *see also* Fed. R. Crim. P. 26.2 (requiring disclosure only after the witness

testifies).  In interpreting the *Jencks* Act, the Fourth Circuit has stated, again and again, that a

district court "may not require the government to produce Jencks Act material relating to one of

its witnesses until after a witness has testified."  *United States v. Lewis*, 35 F.3d 148, 151 (4th

Cir. 1994); *United States v. Peterson*, 524 F.2d 167, 175 (4th Cir. 1975), (noting that "a Jencks

Act request is wholly inappropriate in a pretrial motion for discovery");  *United States v.

Trevino*, 89 F.3d 187, 189 n.2 (4th Cir. 1996).  Accordingly, any request for materials which falls

within the scope of the *Jencks* Act or Rule 26.2 should be denied.  The Government, however,

will provide *Jencks* material at the appropriate time, consistent with the discovery agreements.

   Without any showing that the Government has neglected its obligations with regard to its

discovery obligations, this motion should be denied.

**(J)    MILES' MOTION TO SUPPRESS STATEMENTS AND TANGIBLE EVIDENCE.**

Defendant Miles has moved to suppress statements made by Miles to law enforcement officials as well as tangible evidence seized from Miles that the Government intends to use at trial.  *See* Docket No. 263 at 1.  Miles contends that the statements were made in violation of his *Miranda* rights and that the tangible evidence was seized without consent or probable cause. Miles' contentions are incorrect.

*(1)    Miles' Motion to Suppress Statements Should Be Denied.*

Miles has moved to suppress any statements that may have been made by him to law enforcement officials that the Government intends to use at trial, claiming they were made in violation of his *Miranda* rights.  At the time of his arrest, Miles made no statements to law enforcement.  Miles did, however, make recorded statements to a confidential informant during the course of the conspiracy.  These statements were all made with one-party consent pursuant to law enforcement purposes and therefore were lawful.  *See* 18 U.S.C. § 2511(2)(c) ("It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such party is a party to the communication or one of the parties to the communication has given prior consent to such interception."); *see e.g., United States v. Caceres*, 440 U.S. 741, 749-50 (1979) (holding that consensual recordings do not violate an unwitting participant's statutory or constitutional rights).  Because the recorded statements were lawful, Miles' motion to suppress should be denied.

*(2)    Tangible Evidence.*

Miles also has moved to suppress items seized from him by law enforcement that the Government intends to introduce at trial, claiming that they were seized without consent or probable cause.  The Government seized items from Miles' home ("the residence") (located at

43

3406 Brendan Avenue, Baltimore, Maryland) pursuant to a search and seizure warrant and his vehicle (a 2007 Mercedes Benz Brabus) pursuant to a seizure warrant, both of which were authorized by a federal magistrate judge.  **EXHIBITS H-1 & I-1.**

It is well-settled that a search warrant, when supported by probable cause, is a lawful means by which law enforcement officers can seize physical evidence of a crime.  When a district court reviews a magistrate judge's determination that a search warrant was properly supported by probable cause, "great deference" should be accorded to the magistrate judge's assessment of the facts.  *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992) (reversing suppression of evidence seized pursuant to a search warrant and faulting the district court for not giving proper deference to the magistrate judge's probable cause determination).  Indeed, a district court, when deciding a motion to suppress the fruits of a search, should limit its inquiry to whether the magistrate judge made a "common sense determination of whether 'there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  Moreover, in assessing whether a search warrant was properly issued, a district court need only be satisfied that the facts presented to the magistrate judge in applying for a search warrant would have "'warrant[ed] a man of reasonable caution' to believe that evidence of a crime [would] be found" on the premises to be searched." *Williams*, 974 F.2d at 481 (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

The affidavits for the warrants were sworn by Special Agent Eric Nye of the Federal Bureau of Investigation.  For the search warrant, Special Agent Nye described in detail how Miles often met with a confidential informant at the residence for the purpose of distributing heroin and then collecting heroin proceeds.  The affidavit described in detail the place to be searched, the connection to Miles, and the connection to drug trafficking.  As detailed in the affidavit, on several occasions, Miles, who was carrying heroin or heroin proceeds, had the

confidential informant pick him up from or drop him off at the residence.  *See* **EXHIBIT H-2** ¶¶ 7, 8, 10, 11, 12, 16, 18, 19, 26.  On each occasion, Miles either left the residence carrying heroin or heroin proceeds or was dropped off at the residence with heroin or heroin proceeds.  *Id*.  For example, on February 15, 2013, when the confidential informant arrived to pick up Miles from the residence, Miles came out of the residence carrying a black bag.  *Id.* ¶ 10.  They then drove to a McDonald's fast food restaurant to meet Keya Dean, a co-conspirator.  *Id*.  Dean entered the vehicle and Miles gave her heroin, which she placed inside of her pants.  *Id*.  On another occasion, Miles called the confidential informant for a ride from the residence.  *Id*. ¶ 12.  When the confidential informant arrived, Miles was not at the residence yet.  *Id*.  A few minutes later, Miles arrived and walked up to the residence and entered it.  *Id*.  A few minutes later, Miles exited the residence, entered the vehicle, and explained to the confidential informant that Miles was "dirty" and to take the highway.  *Id*.  Thus, there was sufficient evidence for Magistrate Judge Stephanie A. Gallagher to conclude that there was a fair probability that contraband or evidence of a crime would be found in the residence.  The motion to suppress as to the residence should therefore be denied.

Similarly, for the seizure warrant, Special Agent Nye described in detail how Miles was engaged in heroin trafficking and that his vehicle (the Mercedes Benz Brabus) was purchased with the proceeds of that illegal activity, and therefore was forfeitable to the United States.  The affidavit and the attached exhibit (which was the affidavit for the search and seizure warrant for 3406 Brendan Avenue, **Exhibit H-2**, as described above) described in detail the item to be seized, the connection to Miles, and the connection to drug trafficking.  *See* **EXHIBIT I-2** and **Exhibit H-2** ¶¶ 7, 8, 10, 11, 12, 16, 18, 19, 26.  Further, the affidavit included the fact that Miles was the true owner of the vehicle, despite having no listed income with the State of Maryland.  *See* **Exhibit H-2** ¶ 8.  Thus, there was sufficient evidence for Judge Gallagher to conclude that

the vehicle was purchased with the proceeds of Miles' heroin trafficking.  The motion to suppress as to the vehicle should therefore be denied.

Moreover, even if this Court were to find that the federal magistrate judge made a mistake in her determination of probable cause, the motion to suppress should be denied based on the *Leon* good faith exception because law enforcement reasonably relied on the judge's search and seizure warrant and seizure warrants.  *See Leon*, 468 U.S. at 908, 913.  The exclusionary rule is a "prudential," rather than a constitutional, rule intended solely to deter future violations of the Fourth Amendment.  *Davis v. United States*, ---U.S.---, 131 S.Ct. 2419, 2426 (2011).  Thus, when "an officer act[s] with objective good faith within the scope of a search warrant issued by a magistrate," suppression of the evidence obtained in the search does not serve the deterrence objective of the exclusionary rule, as the officer has attempted to comport with the law.  *United States v. Perez*, 393 F.3d 457, 461 (4th Cir. 2004).  "Evidence obtained pursuant to a search warrant issued by a neutral magistrate does not need to be excluded if the officer's reliance on the warrant was 'objectively reasonable.'"  *Perez*, 393 F.3d at 461 (quoting *Leon*, 468 U.S. at 922).  The Defendants have not contended that law enforcement's reliance on the warrants was anything but objectively reasonably.  Therefore, the motion to suppress should be denied.

**III.**       <u>**CONCLUSION**</u>

For all of the above reasons, and other than those motions for which the Government has

no objection, the Government respectfully requests that the Defendants' pre-trial motions be

denied.

Respectfully submitted,
ROD J. ROSENSTEIN
United States Attorney

By:        _____/s/_____
Seema Mittal
Christopher J. Romano
Assistant United States Attorneys
36 S. Charles St., 4th Fl.
Baltimore, Maryland 21201

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this __28th__ day of July, 2014, a copy of the foregoing Government's Response to Defendants' Pre-Trial Motions was electronically filed with notice to all counsel of record:

_____/s/_____

Christopher J. Romano
Assistant United States Attorney
