## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION )<br>OF THE UNITED STATES OF AMERICA )<br>FOR AN ORDER AUTHORIZING THE )<br>INTERCEPTION OF WIRE )<br>COMMUNICATIONS TO AND )<br>FROM T-MOBILE TELEPHONE NUMBER )<br>(443)857-5428 AND SPRINT TELEPHONE )<br>NUMBER (443)416-7632 ) | MISC. NO.<br><br>UNDER SEAL |

### AFFIDAVIT

Eric Nye, Special Agent (SA), Federal Bureau of Investigation (FBI), Baltimore Division

(BA), Baltimore, MD, being duly sworn, states the following:

### INTRODUCTION

1.   I am an investigative or law enforcement officer of the United States within the meaning

of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is

empowered by law to conduct investigations and to make arrests for offenses enumerated in 18

U.S.C. § 2516.

2.   Your affiant is a Special Agent with the Federal Bureau of Investigation (FBI) and has

been so employed since 2006.  I have authored, executed, and or participated in over 50 search

and seizure warrants for illegal narcotics and related paraphernalia.  I have participated in the

operation and execution of over fifteen Federal and State Title III orders.  I have arrested and or

participated in the arrest of over 50 persons for violations of State and Federal narcotics statutes.

I am currently assigned to investigate violent gangs in the Baltimore metropolitan area as a

1

W1-0017

member of the FBI's Safe Streets Task Force and have received over 100 hours of specialized training in the area of illegal narcotics.

3. Through instruction and participation in investigations, I have become familiar with the manner in which narcotics traffickers conduct their illegal business, and the methods, language, and terms which are used to disguise conversations about their narcotics activities. From experience and training I have learned that narcotics traffickers frequently use cellular telephones to further their illegal activities by, among other things, remaining in constant or ready communication with one another without restricting either party to a particular location at which they might be subject to physical surveillance by law enforcement authorities. I also have learned that narcotics traffickers rarely refer to heroin, cocaine, cocaine base, also known as crack, phencyclidine (PCP), or other illegal drugs expressly by name. Instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, narcotics traffickers routinely refer to drugs, drug quantities, and drug prices by using seemingly innocuous words or phrases. I also know that drug traffickers frequently have access to several cellular telephones and that they periodically use newly acquired cellular telephones, all in an effort to avoid detection and to avert law enforcement efforts. I also know that drug traffickers communicate by use of text messaging to discuss types, quantities, prices of narcotics, as well as to discuss meeting locations, all in an effort to elude detection and to impede the efforts of law enforcement.

## TARGETS AND OFFENSES

4. Based on the investigation I have participated in, and for the reasons set forth herein, there is probable cause to believe that ANTHONY MILES, WAYNE CLAYTON JONES, JR.,

2

W1-0018

ENZO BLANKS, ANTOINE WIGGINS, ▓▓▓▓▓▓ MARLOW BATES, KEYA DEAN, ROBERT LOMAX III, ▓▓▓▓▓▓ and others yet unknown (collectively, the "target subjects") have committed, are committing, and will continue to commit the following offenses in the District of Maryland, and elsewhere, which are among the offenses enumerated in 18 U.S.C. § 2516: (i) possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (ii) conspiracy to commit such offenses, in violation of 21 U.S.C. § 846; (iii) use of communications facilities to facilitate the commission of the above offenses involving controlled substances, in violation of 21 U.S.C. § 843(b); (iv) the laundering of proceeds of specified unlawful activity; i.e., distribution of controlled substances, in violation of 18 U.S.C. §§ 1956 and 1957 (collectively, the "target offenses"). This investigation began in the District of Maryland. I believe that MILES, JONES, BLANKS, WIGGINS, ▓▓▓▓ BATES, DEAN, LOMAX, ▓▓▓▓ and possibly others yet unknown are located in the District of Maryland, and the cellular telephones described below are being used in the District of Maryland. Monitoring, if authorized, of the cellular telephones described below will take place at the FBI, Baltimore Field Office.

## DESIGNATED FACILITIES

5. I make this affidavit in support of an Application that seeks authorization to intercept wire communications to and from cellular telephone number (443)857-5428, with International Mobile Subscriber Identification (IMSI) number 310260561379154, subscribed to by In Prepaid None Customer, with no address listed, with service provided by T-Mobile (hereinafter "target telephone #1 or TT1") and (443)416-7632, with Electronic Serial Number (ESN) 268435459800466198, subscribed to by Tony Mites, 2128 Vine Street, Baltimore, Maryland,

W1-0019

with service provided by Sprint (hereinafter "target telephone #2 or TT2"). Both phones are used by ANHONY MILES.

6. Cellular telephones need not be used at any particular premises. For that reason, the exact location or premises where the above-described criminal activity will be discussed over the target telephones cannot be determined. Nonetheless, the investigation detailed below reveals that MILES is utilizing TT1 and TT2 to discuss and facilitate drug trafficking in the Baltimore area. Accordingly, this affidavit is made in support of an Application that seeks authorization to intercept wire communications of the target subjects and others, as yet unknown, including background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use. It is also requested that, in the event that either TT1 or TT2 is transferred outside the territorial jurisdiction of this Court, interceptions of the transferred facility may continue to take place in the District of Maryland where all communications will be heard or read and minimized regardless of where the wire and/or electronic communications are placed to or from. The authorization given is intended to apply not only to the target telephone numbers listed above, but also to any other telephone number or telephone accessed through the above-referenced IMSI number, and to any other IMSI number accessed through the target telephone number referenced above, and to any other telephone number subsequently assigned to or used by the instrument bearing the same electronic serial number used by the other target telephone, within the thirty (30) day period. The authorization is also intended to apply to the target telephone numbers referenced above regardless of service provider, and to background conversations intercepted in the vicinity of the target telephones while the telephones are off the hook or otherwise in use.

4

W1-0020

## OBJECTIVES

7.   The types of communications sought to be intercepted are wire communications evidencing (i) the nature, scope, extent, and methods of operation of the narcotics trafficking activities in which the target subjects and others, as yet unknown, are engaged; (ii) the identities, roles, and telephone numbers of co-conspirators, accomplices, aiders and abettors, and other participants in such illegal activity; (iii) the source, distribution, transfer, and location of the narcotics and money involved in those activities; (iv) the existence and location of additional apartments, residences, businesses and other premises used in the furtherance of the illegal activity; (v) the existence and location of records of the illegal activity; (vi) the existence, location, and source of the resources used to finance the illegal activity; (vii) the existence, location, and disposition of proceeds from the illegal activity; (viii) the existence and location of any other item or means used in furtherance of those illegal activities; (ix) the dates, times, and details for the continued commission of the above-mentioned offenses; and (x) other evidence necessary for the successful prosecution and conviction of the above-described criminal activity. In addition, the communications are expected to constitute admissible evidence of the commission of the target offenses.

8.   Additionally, based upon my training and experience, and based upon conversations with service providers of wire communications, I know that when a cellular telephone is in use, signals are transmitted and received by cellular towers and that the location of the cellular towers utilized by the telephone is recorded by the service provider, in this case, T-Mobile and Sprint (hereinafter the "service provider"). The service provider can supply this information on an ongoing basis. Knowing the location of cellular towers activated by a specific cellular telephone provides the general geographic location of the cellular telephone. Moreover, by using

W1-0021

additional technology legally mandated for all cellular telephones manufactured for use in the United States, the service provider can provide geolocation information regarding the location of a cellular telephone within a relatively small geographical area at specific times. This information can be obtained upon a specific request at a particular time. There is probable cause to believe that the locations of the target telephones will provide relevant evidence of the offenses listed above. Specifically, knowledge of the location of the target telephones will enable law enforcement to focus investigative efforts, including surveillance, in certain geographical areas. Law enforcement agents can use geolocation information in connection with other investigative techniques to find the target telephones, at least within a relatively small geographic area, at specific times, which in turn will assist agents in identifying stash locations, meeting spots, and developing other relevant information to achieve the objectives listed above.

9. Except where otherwise noted, the information set forth in this affidavit has been provided to me directly or indirectly by special agents of the FBI, special agents of the Drug Enforcement Administration (DEA), troopers of the Maryland State Police (MSP), officers of the Baltimore City Police (BPD), officers of the Baltimore County Police Department (BCPD), special agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF), or other law enforcement officers. Unless otherwise noted, whenever in this affidavit I assert that a statement was made, it was an instance in which the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) with whom I have spoken or whose report I have read and reviewed and determined to be reliable. Such statements are among many statements made by others and are stated in substance, unless otherwise indicated. Similarly, information resulting from surveillance may not always set forth my personal

W1-0022

observations, but rather represent information provided directly or indirectly by other law enforcement officers who conducted such surveillance.

10. Because this affidavit is being submitted for the limited purpose of seeking authorization for the interception of wire communications, I have not set forth each and every fact learned during the course of this investigation, nor have I necessarily set forth all facts which support the authorization sought. Nor do I request that this Court rely upon any facts not set forth herein in reviewing this affidavit in support of the Application for the interception of wire communications.

## PERSONS LIKELY TO BE INTERCEPTED

11. The known "target subjects," who are also the "target interceptees," are:

(a)   ANTHONY MILES, aka "BIGS", is a black male, DOB ██████████████████ MILES is a major distributor of heroin and is working for ANTOINE WIGGINS, ██████ ██████ and ENZO BLANKS. MILES distributes his heroin to MARLOW BATES. A public source database query, surveillance, and Maryland Motor Vehicle Administration records, showed the active address for MILES to be 3406 Brendan Avenue, Baltimore, Maryland. A search of criminal history records revealed the following for MILES:

| Date of Arrest | Charge(s) | Location | Disposition |
|---|---|---|---|
| 8/20/2002 | CDS: Possession-Marijuana | Baltimore | PBJ |
| 11/19/2003 | Poss.w/int Marijuana | Baltimore | Nolle Prosequi |
| 2/13/2004 | Dist. Of Marijuana<br>Dist. Of Marijuana | Baltimore | Nolle Prosequi<br>Nolle Prosequi |
| 2/17/2005 | 1.CDS Poss w/int to Dist<br>2. CDS: Poss Marijuana<br>3. Assault Sec Degree | Maryland State Police<br>(Cecil County, MD) | 1. GUILTY<br>2. Nolle Prosequi<br>3. GUILTY |

7

W1-0023

| | | | |
|---|---|---|---|
| | 4. Assault Sec Degree | | 4. Nolle Prosequi |
| | 5. Assault Sec Degree | | 5. Nolle Prosequi |
| | 6. Resist/Interfere with Arrest | | 6. Nolle Prosequi |
| | 7.False Statement to Peace Off | | 7. Nolle Prosequi |
| 3/17/2005 | 1. Poss Firearm during drug Traff (18 USC 924C) <br> 2. Conspiracy Commit Viol (18 USC 924O) <br> 3.Consp to Dist CDS (21 USC 846 <br> 4. Poss W/Intent to Distr CDS (21 USC 841A1) | Baltimore ATF | 1. GUILTY (96 Mos Prison, 60 Mos Supervised Release) |
| 11/24/2012 | 1.CDS Poss w/int to Dist <br> 2. CDS Poss – Marijuana <br> 3.CDS Poss-Not Marijuana | Baltimore | Pending |

(b)   WAYNE CLAYTON JONES, JR.,  aka"WEEZY", is a black male, DOB 10/15/1984,

FBI#38831EC9, has a last known address of 3434 Cliftmont Avenue, Baltimore, Maryland.

JONES is an associate of MILES and distributes large amounts of marijuana.  A search of

criminal history records revealed the following for JONES:

| Date of Arrest | Charge(s) | Location | Disposition |
|---|---|---|---|
| 1/16/2007 | Possession Marijuana | Baltimore | Guilty |
| 6/27/2011 | Poss/w int Narc <br> CDS Poss Marijuana <br> CDS Poss Marijuana | Baltimore | Stet |
| 8/10/2011 | CDS Packaging <br> CDS Poss Marijuana | Baltimore | Nolle Prosequi |

W1-0024

(c)     ENZO BLANKS, aka "ZO", is a black male, ████████████████████ has a

last known address of 128 Maybin Circle, Owings Mills, Maryland.  BLANKS is a lieutenant in

the ANTOINE WIGGINS heroin organization.  BLANKS distributes WIGGINS' heroin to

ANTHONY MILES.  A search of criminal history records revealed the following for BLANKS:

| Date of Arrest | Charge(s) | Location | Disposition |
|---|---|---|---|
| 4/29/2001 | Handgun | Baltimore | No Disposition |
| 9/30/2003 | Poss of Marijuana | Baltimore | Stet |
|  | Attempted CDS Manu/Distr |  | Stet |
| 9/04/2008 | CDS Poss not Marijuana | Baltimore | PBJ |
| 12/21/2011 | CDS possession para | Baltimore | Nolle Prosequi |
|  | CDS distribution |  | Nolle Prosequi |
|  | CDS poss w/int |  | Nolle Prosequi |
|  | CDS poss. Not marijuana |  | Nolle Prosequi |
|  | CDS poss.w/int manu/dist |  | GUILTY (5 years probation) |

(d)     ANTOINE WIGGINS, aka "TWIZZY", is a black male, DOB 6/03/1976, FBI#

415691WA6, has a last known address of 5258 Darien Road, Baltimore, Maryland.  WIGGINS

is the leader of a Baltimore based heroin distribution organization.  WIGGINS, along with

BLANKS and ████████████████ distribute large volumes of heroin that he receives from his

supplier, EUGENE THOMAS, out of Atlanta, Georgia.  A search of the criminal history records

revealed the following for WIGGINS:

| Date of Arrest | Charge(s) | Location | Disposition |
|---|---|---|---|
| 8/23/1994 | 1. Assault-Strong-arm | Baltimore | Nolle Prosequi |

W1-0025

| | | | |
|---|---|---|---|
| | 2.Robbery Strong-arm<br>3. Theft<br>4. Theft Shoplifting Poss w/int Deprive | | |
| 1/05/1995 | 1. Handgun on Person | Baltimore County | GUILTY (3 Years) |
| 7/27/1995 | 1. Arson<br>2. Mal/Dest Property | Baltimore County | 1. Nolle Prosequi<br>2. Nolle Prosequi |
| 1/05/1997 | 1. Poss w/int Manf/Distr<br>2. CDS Unlawful Possession | Baltimore | 1. GUILTY (1 year)<br>2. Criminal Jeopardy |
| 1/12/1998 | 1. Poss w/int Cocaine | Baltimore | 1. GUILTY (1 year) |
| 1/22/1998 | 1.CDS Poss Marijuana<br>2.Narc:Production Equip<br>3.CDS Poss not Marijuana<br>4.CDS Poss Marijuana<br>5.CDS Poss Not Marijuana<br>6. CDS Poss Paraphernalia | Baltimore County | 1.Dismissed<br>2.Dismissed<br>3. Dismissed<br>4.Stet<br>5.Stet<br>6. Stet |
| 1/21/2000 | 21 USC Section 846<br>21 USC Section 841<br>18 USC Section 2 | Baltimore FBI | Pled GUILTY<br>(11 years) |



W1-0026



W1-0027

(f)     MARLOW BATES, aka "LOW", is a black male, ██████████████████

has a last known address of 2817 Presbury Street, Baltimore, Maryland.  BATES is supplied with

large quantities of heroin from ANTHONY MILES.  BATES runs multiple heroin corners/shops

in west Baltimore.  BATES is a known member of the Black Guerilla Family (BGF) gang.  A

search of criminal history records revealed the following for BATES:

| Date of Arrest | Charge(s) | Location | Disposition |
| --- | --- | --- | --- |
| 9/30/2003 | Poss Marijuana | Baltimore | Nolle Prosequi |
| 1/02/2004 | 1. Theft Over $500<br>2.Unauthorized Use<br>3. Unlawful taking automobile | Baltimore | Nolle Prosequi |
| 3/02/2004 | 1. CDS Conspiracy to Dist<br>2.Attempt CDS Manuf<br>3.CDS Possession Not Marijuana | Baltimore | Nolle Prosequi |
| 7/21/2004 | 1.CDS Manuf/Dist/-Narc<br>2.CON-CDS Manu/Dist<br>3.CDS Poss w/int<br>4.CDS Not Marijuana | Baltimore | STET |
| 10/29/2004 | 1.Theft plus $500<br>2. Unlawful taking Vehicle | Baltimore County | Nolle Prosequi |
| 10/30/2004 | 1.Hire Minor Distr CDS<br>2.CDS Poss Not Marijuana | Baltimore | Nolle Prosequi |

(g)     KEYA RENEE DEAN, is a black female, DOB 9/28/1974, FBI#38818VA7, has a last

known address of 520 N Rock Glen Road, Baltimore, Maryland.  DEAN is an associate of

12

W1-0028

MARLOW BATES.  DEAN collects heroin from MILES on behalf of MARLOW BATES.  A

search of the criminal history records revealed the following for DEAN:

| Date of Arrest | Charge(s) | Location | Disposition |
|---|---|---|---|
| 5/19/2004 | Assault 2nd Degree | Baltimore | Nolle Prosequi |
| 6/25/2004 | Arson 2nd Degree<br>Malicious burning 1st<br>VOP | Baltimore | GUILTY (2 years probation)<br>Nolle Prosequi<br>GUILTY (2 years probation) |
| 6/13/2005 | Assault 2nd Degree | Baltimore | Nolle Prosequi |
| 12/10/2005 | Theft $500 plus | Baltimore | PBJ |
| 6/02/2006 | Fraud/Illegal use of credit card | US Secret Service | No Disposition |
| 10/09/2006 | Theft less than $500 | Baltimore | Nolle Prosequi |
| 2/07/2011 | Theft less $1000 | Baltimore County | GUILTY (probation) |
| 6/10/2011 | Theft less $1000 | Howard County | GUILTY (probation) |

(h)     ROBERT LOMAX, III, is a black male, DOB 1/17/1983, FBI# 528093RB8, has a last

known address of 603 Gold Street, Baltimore, Maryland.  LOMAX is an associate of ENZO

BLANKS and ▇▇▇▇▇▇▇▇ and distributes heroin for them.  His residence was being

used as a heroin stash house.  A search of the criminal history records revealed the following for

LOMAX:

| Date of Arrest | Charge(s) | Location | Disposition |
|---|---|---|---|
| 1/18/2001 | CDS Poss Not Marijuana<br>Att CDS Manu/Dist-Narc<br>Con CDS Manu/Dist-Narc | Baltimore | Nolle Prosequi |

13

| 10/11/2001 | Assault 2nd | Baltimore | Stet |
|---|---|---|---|
| 2/21/2002 | CDS Poss Not Marijuana<br>Att CDS Manu/Distr-Narc | Baltimore | GUILTY<br>GUILTY |
| 11/4/2002 | CDS Unlawful Poss etc | Baltimore | Nolle Prosequi |
| 4/6/2003 | CDS Manu/Dist/-Narc<br>CDS Manu/Dist/-Narc<br>CDS Manu/Dist/-Narc<br>CDS Manu/Dist/-Narc<br>CDS Unlawful Possession<br>CDS Unlawful Possession | Baltimore | GUILTY<br>Criminal Jeopardy<br>Criminal Jeopardy<br>Criminal Jeopardy<br>Criminal Jeopardy<br>Criminal Jeopardy |
| 4/14/2004 | CDS Manu/Dist/-Narc<br>CDS Poss w/Int Man/Dist<br>CDS Unlawful Possession<br>CDS Manu/Dist/-Narc<br>CDS Poss w/Int Man/Dist<br>CDS Unlawful Possession | Baltimore | Nolle Prosequi |
| 7/13/2004 | Assault 2nd<br>Deadly Weapon – Int/Injure | Baltimore | Stet |
| 6/21/2006 | Car Theft<br>U/U Livestock MV<br>Theft $500 plus<br>Traffic Violation<br>Traffic Violation<br>Traffic Violation | Baltimore | Criminal Jeopardy<br>Criminal Jeopardy<br>Criminal Jeopardy<br>Criminal Jeopardy<br>Criminal Jeopardy<br>GUILTY |
| 4/15/2007 | Attempt 1st Murder<br>Attempt 2nd Murder<br>Assault 1st<br>Assault 2nd<br>Handgun Use in Committing<br>Handgun on Person | Baltimore | STET |

14

W1-0030

| | Reckless Endangerment | | |
|---|---|---|---|
| 4/19/2013 | CDS Poss w/intent Dist Narc<br>CDS Poss w/int to Distr<br>CDS Poss-not marijuana<br>CDS Poss Marijuana<br>CDS Poss Paraphernalia<br>CDS Poss Paraphernalia<br>CDS Poss Large Amount | Baltimore<br>(FBI SSTF) | No Disposition |



### PRIOR APPLICATIONS

12. On May 16, 2013, I caused the records of the FBI, Drug Enforcement Agency (DEA), the Bureau of Alcohol, Tobacco, and Firearms, and the Bureau of Immigrations and Customs Enforcement (ICE) to be searched as to MILES, JONES, BLANKS, WIGGINS, ███████ BATES, DEAN, LOMAX, █████ telephone number (443)857-5428, IMSI 310260561379154, and telephone number (443)416-7632, ESN 268435459800466198.

13. On the basis of those searches, I represent that I am not aware of any previous applications that have been made to any judge of competent jurisdiction for the authorization to

15

W1-0031

intercept or for the approval of the interception of wire, oral and electronic communications involving any of the same persons, facilities, or places specified herein.

## FACTS AND CIRCUMSTANCES

### A. Overview

14. This investigation began in November 2012 in east Baltimore with the targeting of WAYNE CLAYTON JONES, also known as "WEEZY," who was believed to be dealing large quantities of high-grade marijuana. JONES was known to frequent/live in the 3400 block of Cliftmont Avenue in Baltimore. Based on a well-placed Confidential Witness, hereinafter referred to as CW1, your affiant was able to determine that there was not only distribution of marijuana but also the distribution of large quantities of heroin involving many more individuals. CW1, cooperating entirely of his/her own accord, initially provided general information as to the criminal behavior of JONES but soon provided very detailed and accurate intelligence concerning others described below[1]. CW1 is not pending any criminal charges and is not being provided any consideration for any court proceeding. CW1 is being provided monetary compensation for his time and the intelligence provided.

15. On November 8, 2012, CW1 made your affiant aware of an unknown male associate of JONES, known only as "BIGS." CW1 explained that BIGS was selling heroin in Baltimore and that he was looking for a new source of supply. CW1 also explained that BIGS was supposedly

---

[1] CW1 has been providing accurate and timely information to your affiant for approximately seven months. During that time your affiant has been able to corroborate almost all reporting made by CW1 as a recording device was used in a significant portion of his meetings with subjects of this investigation. Additionally, your affiant has obtained third party confirmation of CW1's reporting by obtaining private business and government surveillance video that corresponded to the CW's reporting. Lastly, CW1's reporting has been corroborated through the multiple pen registers and the associated geopositioning data, mentioned infra. Your affiant considers CW1's reporting extremely reliable. CW1's criminal history consists of one arrest for assault in the second degree in 2007.

W1-0032

on Federal supervised release for a previous Federal drug conviction. Eventually your affiant

identified "BIGS" as ANTHONY MILES and determined that he was on federal supervised

release from the 2005 conviction for possession of a firearm during the trafficking of CDS.

CW1 further explained that MILES was bragging that he worked for his cousin, later identified

as ENZO BLANKS, and that if CW1 had a heroin supplier his cousin would be able to pay for 1

1/2 kilograms up front. Your affiant knows, through training, knowledge, and experience, that

the wholesale price of heroin coming into Baltimore is anywhere from $60,000 to $70,000 per

kilogram. MILES also provided CW1 with his cellular telephone number of (240)559-7700.

Continued reporting from CW1, based on statements from MILES, provided clarity as to the

heroin distribution network of BLANKS and MILES. CW1, as explained below, provided

accurate and timely intelligence concerning the heroin distribution by MILES and BLANKS.

16. On November 24, 2012, ANTHONY MILES was stopped by the Baltimore Police for

having a tinted front windshield in the 3400 block of Kentucky Avenue. When the officers

approached the vehicle they could smell the odor of marijuana. The officers could see in plain

sight a bag of suspected marijuana on the back seat of the vehicle. They instructed MILES to

exit the vehicle. Upon exiting the vehicle, MILES pushed the officer to the ground and fled on

foot. While pursuing MILES on foot, the officers witnessed MILES discarding items that he was

retrieving from his pants pockets. After MILES was detained, the officers returned to the area

where MILES was discarding items and were able to recover two plastic bags of suspected

heroin. The officers recovered over a pound of marijuana from the vehicle and $4,574 from

MILES's pocket. The Baltimore Police laboratory analyzed the evidence and determined it to be

2.41 grams of heroin. This case is currently pending in state court and has not yet been

scheduled for trial.

17

17. On January 11, 2013, MILES, utilizing (240)559-7700, placed a call to CW1 asking for a ride. CW1 picked up MILES in front of MILES's mother's residence at 3406 Brendan Avenue. CW1 and MILES drove somewhere on the west-side possibly off of North Avenue and met with an unknown male, later identified as MARLOW BATES. MILES provided something to BATES and BATES asked if it was "got good." MILES replied that it was good. When MILES got back into the vehicle he showed CW1 a stack of what he claimed was $10,000. Based on training, knowledge, and experience your affiant believes that the money referenced by CW1 is drug proceeds.

18. On January 18, 2013, CW1 reported[2] that ANTHONY MILES met with an unknown black male, later identified as MARLOW BATES, near the intersection of Franklin Street and Warwick Street. During this meeting BATES provided MILES with $10,000 in cash. CW1 explained that originally they were supposed to meet BATES near his stash house but when they got to the house there was a heavy police presence. Because of the police presence they went to a gas station at the previously mentioned intersection and called BATES. BATES arrived and assured MILES that there was nothing to worry about and showed MILES that he had another $10,000 on him. BATES calmed MILES by explaining that if he was concerned about law enforcement presence he would not be driving around with all of this cash. From this meeting MILES took the money and drove immediately over to the vicinity of the Lexington Market in downtown Baltimore. MILES met an unknown black male, later identified as ENZO BLANKS[3], on the street. MILES provided BLANKS with a bag containing $8,000. MILES complained to

---

[2] CW1's reporting was verified by audio and/or video, which was reviewed by your affiant, except for reporting in paragraphs 18-21, 23-26, 32-33, 35, 47 and 48. In those instances the information was obtained through debriefings of CW1.
[3] CW1 was shown a picture of ENZO BLANKS and identified him as the person he knew to be ANTHONY MILES "cousin."

18

W1-0034

BLANKS about not being able to get a hold of another unknown male. CW1 explained that

BLANKS provided MILES with a telephone number for this unknown person (UM1) and

MILES placed a call to UM1. MILES left BLANKS and traveled to ████████████████

████████████████████████████████████████████████████████████████████

████████████████████ When he returned he told CW1 to drive carefully because

he was "filthy." CW1 understood this to mean that MILES was in possession of drugs as a

common street phrase for driving while in possession of drugs is driving "dirty." MILES then

returned directly to his mother's residence located at 3406 Brendan Avenue, Baltimore, MD.

Based on training, knowledge, and experience your affiant believes that UM1, later identified as

████████████████ residing at ████████████████████████████ is

working in conjunction with ENZO BLANKS and specifically is providing heroin to MILES.

19. On January 29, 2013, MILES, utilizing (240)559-7700, placed a call to CW1 requesting

that he pick him up. CW1 met MILES at 3406 Brendan Avenue. CW1 and MILES drove to the

apartment building, ██████████████████████████████████████████████

███████ While driving to the location CW1 could hear MILES counting money in the back of the

vehicle. At one point MILES asked, "What's forty times eighty?" Based on training,

knowledge, and experience, your affiant believes that MILES was figuring what he needed to

pay UM1 ████████ for 40 grams of heroin at $80 per gram. At approximately 7:30 p.m., they

arrived outside of the apartment and MILES, placed a call to UM1 (████████ and told him they

were there. UM1 ████████ explained to MILES that he needed to come up to the apartment and

that he was not coming outside. MILES went inside of the apartment building to meet UM1.

████████████████████████████████████████████████████████████████████

W1-0035

CW1 did not see this meeting. MILES was inside for a few minutes and then returned to the car. When MILES got back into the car he received a call from another unknown male (UM2) asking where he was. MILES explained that he was just around the corner and that he would be right there. CW1 and MILES drove over to Baltimore Street and Custom House Avenue and parked in front of the strip club Norma Jeans. MILES got out of the car and walked back a few cars and got into a black Chevrolet Impala. MILES was in the vehicle for a few minutes and then returned to CW1's vehicle. MILES instructed CW1 to drive him to his mother's house but to be careful because he was "filthy." Again, based on training, knowledge, and experience, your affiant knows that "filthy" or "dirty" are common terms used by drug dealers to explain that they have drugs on their person or in the vehicle they are driving. Additionally, CW1 verified that in the context of his conversation with MILES the CW knew him to be referring to being in possession of drugs. A check of the City Watch camera system confirmed the reporting of CW1. Both of these meetings were captured on video and were placed into evidence.

20. On February 3, 2013, at approximately 11:57 p.m., ANTOINE WIGGINS was pulled over by the Baltimore Police driving his 2013 black Honda Accord, Maryland registration 80282CE. During the traffic stop a K9 was called for to scan the vehicle. While waiting for the K9, the officers explained that WIGGINS drove away at a high rate of speed and began throwing a large quantity of gel capsules out the car window. The officers pursued the vehicle but eventually lost visual contact of WIGGINS. The officers notified Baltimore County Police of the incident and provided a description of the vehicle and the area where the vehicle was last seen. At approximately 12:14 a.m. on February 4, 2013, the Baltimore County Police located WIGGINS's Honda Accord abandoned in front of 1436 Dartmouth Avenue. Near the driver's side door they found gel capsules, later positively tested as heroin. They followed the path

W1-0036

through the lawn and discovered more gel capsules of heroin and $845.00 in cash. The officer

noted that the heroin gel capsules and money were strewn about in a manner indicating that the

subject was running from the vehicle. When inspecting the vehicle closely, the officers found

gel capsules littering the driver side seat and floor board area. In total the BCPD recovered 138

gel capsules of heroin on the ground, 39 capsules in the vehicle, and $845.00 in cash on the

ground.

21. On February 4, 2013, CW1 reported that he picked up MILES at 3406 Brendan Avenue

and drove him to the Edmondson Village Shopping Center in west Baltimore. They met

MARLOW BATES, who at the time was driving a black Honda Accord with Maryland

registration 2AV2717. BATES got into the car with CW1 and MILES. During their

conversation BATES asked CW1 if he could get him cocaine connect and that if the price was

right he would buy two to three kilograms at a time. During this meeting MARLOW BATES

identified himself to CW1 as "LOW." A check of the vehicle registration revealed that

MARLOW BATES had been arrested in the vehicle previously. A picture of BATES was

obtained and shown to CW1 at which time he identified him as "LOW."

22. On February 6, 2013, MILES, utilizing (240)559-7700, placed a call to CW1 and asked

that he pick him up at 3406 Brendan Avenue. CW1 met MILES and drove him to the

intersection of Edmondson Avenue and Kingston Street. When they arrived on Kingston Street

there was a black Honda Accord (MD: 2AV2717) already there. MARLOW BATES exited the

passenger seat of the Accord and got into CW1's vehicle. A video/audio recording device placed

inside of the vehicle recorded the conversation. On the drive over BATES called MILES

multiple times in frustration because MILES was late. When MILES arrived he stated, "LOW

what the fuck is wrong with you? BATES replied, "I ain't even got time to talk…it's 8700."

W1-0037

MILES replied, "8750 Yo! Where's my 50 dollars?" Your affiant, through training, knowledge, and experience knows that an average street price for heroin in Baltimore is anywhere between $80, to $95 per gram. After providing BATES with 100 grams of heroin, MILES was headed back to east Baltimore when he received a call from BATES explaining that he needed another 20 grams. When MILES got off of the phone CW1 asked, "You come back and see him?" MILES replied, "Yeah, he want 20 more. He just bought 100." MILES continued back to his mother's residence at 3406 Brendan Avenue and retrieved the additional heroin. MILES and CW1 then returned to west Baltimore to meet BATES. They parked on Kingston Street and BATES pulled in behind them and walked up to the window and took the heroin from MILES. MILES stated, "What's this yo?" BATES replied, "It's 18." Based on training, knowledge, and experience your affiant knows that MILES was charging BATES $85 to $90 per gram of heroin and that 20 grams would cost approximately $1800.

23. On February 9, 2013, MILES, utilizing (240)559-7700, placed a call to CW1 asking for a ride. CW1 picked MILES up at 3406 Brendan Avenue and drove him to the intersection of Fayette Street and Calvert Street in downtown Baltimore. When they arrived MILES placed a call, at approximately 5:45 p.m., to an unknown male UM1 ███████ to tell him that he was at the apartment. A check of the pen register data revealed that MILES placed a call to (410)963-5549. When UM1 ███████ arrived MILES met him out on the street. A few minutes later MILES got back into CW1's vehicle and told CW1 that he just picked up 50 grams and that it was a "missile." Based on training, knowledge, and experience, your affiant knows that when MILES referred to the heroin as a "missile" he was implying that it was of high quality. MILES then placed a call to MARLOW BATES. A check of the pen register data revealed that the telephone number being utilized by BATES was (443)759-1041. MILES then traveled to the

22

W1-0038

vicinity of Edmondson Avenue and Kingston Street where they met an unknown male driving a Lexus. MILES provided the heroin to the driver of the Lexus but did not receive any money for the heroin. MILES and CW1 then returned to MILES's mother's house at 3406 Brendan Avenue.

24. On February 12, 2013, CW1 reported that he received a call from MILES from (240)559-7700, to come pick him up at 3406 Brendan Avenue. CW1 picked up MILES and they drove over to the vicinity of the Edmondson Avenue and Kingston Road, on the western border of Baltimore City, near Catonsville. When they arrived they parked on Edmondson Avenue in front of a hair salon. An unknown female (UF), whom CW1 knew as MARLOW BATES's sister, came out of the salon and got into the car with MILES and CW1. The UF was later identified as KEYA RENEE DEAN. MILES provided an unknown amount of heroin to the DEAN. MILES then placed a call to BATES. MILES received instructions from BATES to meet him at the Applebee's restaurant on Reisterstown Road. When they arrived they met in the parking lot at which time BATES provided MILES with the money for the heroin that had just been provided to DEAN. CW1 and MILES then drove back to 3406 Brendan Ave. Later that night, at approximately 11:00 p.m., MILES called CW1 and asked him to pick him up again. MILES and CW1 drove to the Edmondson Avenue in the vicinity of Kingston Road and again met with KEYA DEAN, known to CW1 at the time as BATES's sister. DEAN was driving beige colored Jeep Cherokee. MILES met DEAN on the street and CW1 was not privy to the conversation. When MILES was done meeting with DEAN they drove to Arundel Mills Mall. MILES walked inside of the movie theater lobby to meet BATES. CW1 never saw them meet but MILES had explained to CW1 that he was meeting "LOW." CW1 and MILES then drove back to 3406 Brendan Avenue.

W1-0039

25. On February 15, 2013, CW1 reported that he picked up MILES at 3406 Brendan Avenue and drove him to the parking garage for the Redwood Apartments located on Eutaw Street near the Lexington Market. When they arrived MILES went into the garage and picked up his Mercedes. MILES told CW1 that he needed to go get air in the tires and instructed him to wait. When MILES returned they headed back to Brendan Avenue when MILES, on (240)217-4060, received a call from MARLOW BATES. MILES told CW1 to take him to his mother's house (3406 Brendan Avenue). MILES went inside of 3406 Brendan Avenue and a few minutes later came outside with a black plastic bag. MILES and CW1 then drove over to the McDonald's restaurant located on Route 40 near the intersection of Academy Road in Baltimore County. When they arrived they met KEYA DEAN. She was driving a Jeep Cherokee. She met MILES inside of CW1's car and when MILES gave her the heroin she placed it inside of her pants. When they departed the area, MILES placed a call to ENZO BLANKS to find out where he was. MILES met BLANKS at the Loafer's bar on Caton Avenue in Baltimore. When they arrived at Loafer's, BLANKS was already there, parked in a white convertible Bentley. MILES got into the Bentley and spoke with BLANKS for approximately ten minutes. The security cameras at Loafer's were examined and the footage of this meeting was secured as evidence. MILES and CW1 then drove over to west Baltimore and met MARLOW BATES at the intersection of Saratoga Street and Bruce Street. BATES was driving a black Honda Accord with Maryland registration 2AV2717. BATES got into the vehicle with MILES and asked him if they were safe to be meeting here and BATES replied that this was his block. BATES provided cash to MILES and stated, "This is 42." MILES replied, "It's supposed to be 44." Based on training, knowledge, and experience, your affiant knows that drug dealers often refer to monetary values in a truncated fashion and in this instance they were referring to $4,200 and $4,400. After

24

exchanging money, MILES explained to BATES that he was going to get a "missile" tomorrow. BATES replied that was what he needed. Again, based on training, knowledge, and experience, your affiant knows that "missile" was being used as a reference to high quality heroin. During this same trip, CW1 explained that MILES at one point, raised up a large stack of cash, holding it with both hands, and screamed that he just made $20,000 in an hour. MILES continued to emphatically slap his legs and exclaim that it was a good day and things were going well.

26. On February 16, 2013, CW1 reported that he picked up MILES at 3406 Brendan Avenue and MILES again explained that he needed to drive safely because he was "dirty." MILES and CW1 drove to the McDonald's restaurant located on Route 40 near the intersection of Academy Road in Baltimore County. When they arrived KEYA DEAN was not there yet. MILES, utilizing (240)217-4060, placed a call to BATES asking when he expected his sister to arrive. BATES then placed a three way call to KEYA DEAN. Shortly after the call, DEAN arrived at the McDonald's driving a minivan with Maryland handicap plates. DEAN got into the vehicle with MILES. MILES provided the heroin to DEAN at which time she placed the heroin inside of her pants. She returned to her own vehicle and departed the area. When MILES and CW1 left the parking lot MILES placed a call, utilizing (240)217-4060, to BATES at (443)759-1041. MILES explained to BATES that one was 85 and the "missile" was 90. Based on training, knowledge, and experience your affiant knows that 85 and 90 are references to $85 and $90 per gram and that "missile" is a reference to higher quality heroin. CW1 explained that MILES was instructed by BATES to meet them later that night at a strip club and that "ZO" (ENZO BLANKS) would be there as well. During the ride back to 3406 Brendan Avenue, MILES explained to CW1 that the money that he was making selling heroin was "chump change" compared to the money that ENZO BLANKS was making. MILES claimed that BLANKS was

W1-0041

making $150,000 a day "with his eyes closed." MILES also relayed to CW1 that there was a rumor going around that someone was going to rob MILES. MILES explained that this ended up not being true but he explained that if anyone did try to rob him he was ready and that specifically he had an M16 with a "fifty round clip" inside of his house. MILES bragged that if they came to rob him he would go outside shoot them and then go back in and rest. MILES also made reference to having a shotgun that you don't need to pump (auto-loading shotgun).

    27. On February 18, 2013, MILES placed a call to CW1 asking for a ride. When CW1 arrived at 3406 Brendan Avenue MILES was not yet there. A few minutes later MILES walked up to the house and entered the residence. A few minutes later MILES exited the residence and got into CW1's vehicle. MILES explained to CW1 that he was "dirty" and to take the highway. While driving to west Baltimore, MILES placed a call from (240)217-4060 to MARLOW. BATES explaining that he had, "mixed three of them." Based on training, knowledge, and experience, your affiant knows that heroin dealers often mix different supplies of heroin together to improve the overall quality of the heroin. CW1 and MILES eventually stopped at the corner of Kingston Road and Edmondson Avenue. They were met by KEYA DEAN. DEAN got into the car with MILES. MILES gave her heroin and DEAN placed the heroin inside of her pants. CW1 and MILES then returned to Brendan Avenue. During the ride back MILES explained that MARLOW BATES was a high ranking member of BGF (Black Guerilla Family).

    28. On February 19, 2013, your affiant met with agents with the DEA, at which time they informed your affiant that they had conducted an investigation into the drug activities of ENZO BLANKS in 2011. They explained that they had information from a cooperator, hereinafter referred to as CW2, that ENZO BLANKS, aka ZO, and ANTOINE WIGGINS, aka TWIZZY, were involved in large scale heroin trafficking. CW2 provided BLANKS telephone number as

W1-0042

(443)280-0184, which your affiant knows to still be in use by BLANKS to contact ANTHONY

MILES at (443)416-7632 (TT2).  Your affiant confirmed that TT2 is a phone being utilized by

MILES by conducting pen register analysis, gps analysis of known meetings reported by CW1,

and a review of the surveillance videos obtained by CW1 which provided accurate times

concerning calls made from TT2.  These times were compared with pen register data.  Records

for this phone revealed that the subscriber was listed as "ANTHONY MITES."  During this

meeting with the DEA your affiant was not aware of TT2.  Although the DEA's information

concerning BLANKS' telephone number was already known by your affiant it assisted in the

eventual identification of TT2 as a phone utilized by MILES.  The DEA explained that during

their investigation, and without their knowledge or direction, the Baltimore Police executed a

search warrant at 118 N. Howard Street, Apt 811, Baltimore, Maryland, the residence of ENZO

BLANKS.  When the Baltimore Police approached the apartment to execute the warrant,

BLANKS was coming out of the apartment.  He was stopped and detained and notified of the

warrant.  On his person was found 150 gel capsules of heroin (net weight 20.17g).  During the

execution of the warrant, the BPD detectives discovered multiple bags containing empty gel

capsules, four capsule filler trays, one capsule filler tray containing 50 gel capsules of heroin (net

weight 9.40g), one capsule filler tray containing 48 gel capsules of heroin (net weight 8.39g), a

clear zip lock bag containing quinine (net weight 85.93g), a clear plastic bag containing heroin

(net weight 54.11g), and a clear plastic bag containing three heroin compressed pellets (net

weight 44.63g).  In addition, BPD detectives found multiple items indicative of narcotics

trafficking including a blender, scale, sifter, strainers, cups, razor blade, spoon, and cups, all of

which tested positive for heroin residue.  BLANKS refused to cooperate with law enforcement

W1-0043

and went to trial. BLANKS was found guilty and given a sentence of 15 years of which 15 years was suspended. BLANKS was given five years probation.

29. On February 23, 2013, officers with the Baltimore Police Department and the Baltimore County Police Department, based on the events of February 3rd and 4th (explained in paragraph 20) executed a search and seizure warrant at 4150 Brown Bark Circle, Randallstown, Maryland, the residence of WIGGINS in Baltimore County. Detectives were able to seize one gel capsule of heroin, $81,133 in US currency, two money counters, a police scanner, multiple cellular telephones, plastic baggies with residue, and documents pertaining to businesses and a boat slip rental. WIGGINS refused to cooperate with law enforcement. This case is still pending and has not been scheduled for trial.

30. On February 23, 2013 MILES placed a call from (240)217-4060 to CW1 requesting a ride. CW1 met MILES at 3406 Brendan Avenue at approximately 7:47 p.m. CW1 and MILES took I95 over to Caton Avenue and worked their way up to Edmondson Avenue. They took Edmondson Avenue into the city and stopped at the Edmondson Village Shopping Center. Specifically, they parked near the Popeye's Chicken restaurant. Five minutes later KEYA DEAN, BATES' sister, arrived in her Jeep Cherokee. CW1 exited the vehicle and was not privy to any conversation between DEAN and MILES[5]. CW1 got back into the car at which time MILES received a call from BATES. BATES asked MILES to meet him at the Giant grocery store across the street. CW1 drove MILES across Swan Street over to the Giant parking lot.

---

[5] Contrary to explicit instructions provided by your affiant that he be present when a recording device was active, CW1 was not present, inside of the vehicle, during this segment of the recording between DEAN and MILES, and therefore there was no consenting party. CW1 briefed your affiant to this fact immediately following these events. Your affiant placed the original audio disk in FBI evidence and has not reviewed this section of the recording. Additionally, because this segment of the recording has not been reviewed, it does not contribute to your affiant's assertion of probable cause concerning the heroin conspiracy of MILES and DEAN and/or the use of TT1 and TT2 in furtherance of that conspiracy.

W1-0044

BATES was driving a brand new 2013, dark grey, Honda Accord with Maryland temporary tags. There was an unknown black male in the passenger seat of the Accord. BATES got out of the Accord and got into the CW1's vehicle with MILES. BATES provided MILES a stack of rubber- banded money. CW1 explained that it was in plain sight and that it was not in a bag or wrapped up. When BATES gave MILES the money he explained that was all he had. When MILES and BATES finished meeting CW1 drove MILES back to east Baltimore. During this meeting a recorder was placed in the vehicle. This recording revealed that the female that got into the vehicle identified herself as "KEYA," and the male that got into the car identified himself as "MARLOW."

31. An arrest warrant was issued in Baltimore County for ANTOINE WIGGINS, and on February 27, 2013 that warrant was executed. Detectives of the Baltimore County Police Department traveled to 4150 Brown Bark Circle, Randallstown, Maryland, where they witnessed WIGGINS attempting to back out of the driveway in his Honda Accord. Detectives arrested WIGGINS and at the time of his arrest he was found to be in the possession three bundles of U.S. currency that were banded together with small rubber bands. When asked how much money was in his pockets, WIGGINS replied, "that's three grand. I own my company and I was going to buy computers." On the way to the precinct the officers explained that they were going to count and verify the seized currency, and WIGGINS was again asked how much currency he had on him during his arrest. At this time WIGGINS stated, "it's $7,500." The currency was counted at the precinct and found to be $7,456.00. The currency was placed into a brown bag at which time a K-9 scan was conducted in the room. The dog indicated the presence of narcotics · on the bag of money. Based on training, knowledge, and experience, your affiant knows that drug dealers often are in possession of large amounts of U.S. currency, and the currency is

29

W1-0045

usually packaged with small rubber bands to provide for ease of counting and transfer of large quantities of funds. Additionally, your affiant knows higher level, or more sophisticated drug dealers maintain front companies to launder, or legitimize, the source of their income. Specifically it has been determined that WIGGINS maintains a company, 360 Telecom Solutions, as his front company. A check of this business address has revealed an almost completely empty office suite indicating to your affiant that the business is being utilized to launder drug proceeds.

32. On March 9, 2013, MILES placed a call to CW1 asking for a ride. CW1 picked up MILES at 3406 Brendan Avenue. MILES and CW1 drove to the intersection of Kingston Road and Edmondson Avenue in west Baltimore. MILES attempted to contact BATES but he would not answer the telephone. Eventually MILES called KEYA DEAN and she arrived and met with MILES. MILES provided her with 150 grams of heroin. DEAN placed the heroin in her pants. Once she left the vehicle, CW1 and MILES drove to Saratoga Street and Bruce Street and met MARLOW BATES. BATES got into the vehicle and handed a stack of cash to MILES and stated, "This is five." BATES further explained, "I owe you $9,800 more, plus an additional three." BATES further explained, "Let's just call it ten grand, cause I wipe my ass with ten grand." MILES angrily stated, "You let me drive over here with 150 grams and you don't answer your phone!" Based on training, knowledge, and experience, your affiant knows that the reference to 150 grams is a reference to 150 grams of heroin.

33. On March 16, 2013 CW1 explained that at approximately 1:00 p.m. ANTHONY MILES called CW1 and requested a ride. CW1 arrived at 3406 Brendan Avenue a few minutes later. When MILES got into the car he was in possession of a clear plastic bag of what CW1 believed to be heroin. While in the car MILES was actively shaking the bag so as to mix up the contents.

W1-0046

They traveled over to the intersection of Kingston Road and Edmondson Road and met with KEYA DEAN. She was there waiting for them but this time she walked to the corner and did not take the Jeep Cherokee. When she got into the car she took possession of the heroin and put it in her pants. They then met with MARLOW BATES at the gas station on Franklin Street across from the McDonald's. BATES pulled up in a blue Honda Accord with an unknown black male. BATES and MILES went inside of the store and BATES provided him the cash. A video was retrieved from the store that confirmed this meeting between BATES and MILES. Shortly after leaving the area with MILES, CW1 received a call from BATES. BATES questioned CW1 regarding the deal that they had discussed previously concerning introducing him to a cocaine supplier. CW1 pulled over and agreed to meet with BATES and to call his cocaine supplier. CW1 explained that he called EVERTON LNU, to meet them concerning the cocaine. EVERTON explained to BATES that he could provide him with a kilogram of cocaine at $37,800. BATES agreed to the price. BATES explained to CW1 that he was frustrated with the quality of heroin that MILES was providing. BATES said he had a few other suppliers that had better heroin but MILES was the only one that fronted the heroin. BATES wanted to know if EVERTON could provide him heroin as well as cocaine. MILES remained in the CW's vehicle during this conversation between CW1, BATES, and EVERTON.

34. On March 27, 2013, MILES called CW1, utilizing (443)857-5428 (TT1), and asked CW1 to pick him up. This call was confirmed by pen register data. CW1 called your affiant and informed him that he was on the way to pick up MILES. Based on this information, surveillance was established at the vicinity of Kingston Road and Edmondson Avenue at approximately 5:34 p.m. At approximately 5:43 p.m., your affiant witnessed CW1's vehicle pull onto Kingston Road from Edmondson Avenue and park on the corner. Approximately four minutes later

31

W1-0047

KEYA DEAN was seen walking west bound away from the vicinity of 520 Rock Glen Road. DEAN approached the vehicle and entered the rear driver side door. DEAN closed the door and was seated in the vehicle for approximately six seconds. DEAN got out of CW1's vehicle and stood at the door and spoke with MILES for a few seconds and walked away. CW1 explained that DEAN was returning 100 grams of heroin to MILES on behalf of MARLOW BATES because the heroin was still wet and needed to be dried before they could sell it. CW1 explained that once MILES picked up the heroin from DEAN they went back to 3406 Brendan Avenue. A review of the body recording revealed that MILES explained to CW1 that "it was good" but DEAN gave it back because none of them knew how to dry it. MILES indicated that he was going to dry it for them. Based on training, knowledge, and experience your affiant knows that when cutting agents are added to heroin the contents are often moistened.

35. On March 28, 2013, MILES called CW1, utilizing (443)857-5428 (TT1), and asked CW1 to pick him up. This call was confirmed by pen register data. CW1 picked up MILES at 3406 Brendan Avenue and took MILES to the mall to get shoes. MILES eventually received a call from MARLOW BATES, on TT1, explaining that he was ready. MILES explained to CW1 that BATES stated he was ready and instructed CW1 to take him back to the house. They returned to 3406 Brendan Avenue and MILES entered the residence and a short time after that returned to the car. MILES instructed CW1 to take him the intersection of Kingston Road and Edmondson Avenue. When they arrived they were met by KEYA DEAN. DEAN got into the vehicle and was provided with 100 grams of heroin. MILES explained to CW1 that this was the 100 grams that DEAN had returned to MILES on the previous day because it was not dried properly. She placed the heroin in her waist band and exited the car. CW1 and MILES then drove to the intersection of Fayette Street and Gilmore Avenue, behind an apartment building in an alley,

32

where they met MARLOW BATES.  BATES provided MILES with money for the heroin

previously provided to DEAN.  BATES stated, "It's good this time?"  CW1 explained that this

was a reference to the heroin not being wet like the last time when they had to return it to

MILES.



W1-0049



37. An open source database check revealed that ROBERT VERNON LOMAX, III, black male, date of birth January 17, 1983, was a resident of 603 Gold Street.  LOMAX was listed as a former employee of 360 Telecom Solutions, a company owned and operated by ANTOINE WIGGINS.  A check of Maryland wage records confirmed that LOMAX at one time was an employee of 360 Telecom Solutions.

38. On April 1, 2013, a pen register order was authorized by the Honorable Pamela White for (443)857-5428 (TT1).  Based on reporting by CW1 on March 16, 2013, this number was known to your affiant to be a telephone number utilized by ANTHONY MILES.  Through analysis of the toll records your affiant was able to verify that MILES was utilizing this telephone (TT1) to contact all of the same contacts which your affiant has determined to be involved in a criminal conspiracy with MILES.

39. On April 1, 2013, a pen register order was authorized by the Honorable Pamela White for (443)280-0184.  This number was known to your affiant to be a telephone number utilized by ENZO BLANKS.

40. On April 8, 2013, a pen register, with geopositioning, was authorized by the Honorable Magistrate Judge Beth Gesner of the District of Maryland, for telephone number (443)925-9111. This telephone number is subscribed to, and used by, ███████████████████████ ███████████████████████████████████ s in contact with MILES, BLANKS, and WIGGINS.  ██████ s also presenting himself as an associate of BLANKS on Facebook.  Your

34

W1-0050

affiant has not identified any specific criminal activity of ███████.  Your affiant knows, through

telephone records, social media, and photographic evidence, that ███████ has decided to

associate with known violent drug dealers while ██████████████████████████████

Interceptions on TT1 and TT2 are necessary to provide clarity as to the extent of and the exact

role of ███████ in this conspiracy.

41. On April 10, 2013, a trash pull was conducted at 603 Gold Street, Baltimore, Maryland.

A review of the trash revealed plastic bags containing suspected heroin residue.  Based on

training, knowledge, and experience, your affiant knows that when heroin is delivered in bulk it

is maintained in plastic bags.  When it is delivered to a cut house, it is emptied out of those bags

so as to add more adulterant or cutting agent to increase the quantity of narcotic for retail

purposes.  The plastic bags that contained the original heroin are often discarded into the trash.

42. On April 10, 2013, the Honorable Nathan Braverman, of District Court of Maryland for

Baltimore City, authorized a search and seizure warrant for 603 Gold Street, Baltimore,

Maryland.

43. On April 12, 2013, a pen register was authorized by the Honorable Brooke Murdock for

(443)416-7632 (TT2).  Based on pen register/toll record analysis your affiant determined that

this telephone was being utilized by ANTHONY MILES.[6]  Additionally, Judge Murdock

authorized a pen register for (443)759-1041.  Based on information provided by CW1 this

telephone number was known to your affiant to be a telephone number utilized by MARLOW

BATES.

44. On April 18, 2013, a search and seizure warrant was executed at 603 Gold Street,

Baltimore, Maryland.  Just prior to executing the warrant surveillance witnessed ROBERT

---

[6] Later geopositioning data and CW1 reporting verified that this phone, registered to ANTHONY
MITES, was being utilized by ANTHONY MILES.

W1-0051

LOMAX exit the residence and enter a Chrysler minivan. The minivan was stopped and LOMAX was returned to the residence. A search of his person revealed a large sum of U.S. currency. LOMAX explained that it was $2,000. LOMAX explained that there was more cash in the house and some marijuana in the basement. LOMAX repeatedly denied have any other narcotics in his residence. A search of the residence discovered a Gucci bag in the master bedroom which contained 14 rubber- banded bundles of US currency totaling $14,000. Additionally, on the dresser in the master bedroom was $1,000. A search of the basement revealed a cooler that contained two vacuum sealed bags of marijuana and a false bottom vegetable can that contained multiple plastic bags of suspected heroin. When questioned, LOMAX explained that it was his and that it was heroin. He stated that it was about 70 grams. The Baltimore Police Laboratory confirmed that the substance was heroin and that its net weight was 78.16 grams. He explained that he sells it by the gram and that he does it to supplement his income from his employment. LOMAX was placed under arrest and charged with possession with the intent to distribute. Additionally, $16,835 in U.S. currency was seized. In LOMAX's master bedroom photographs were discovered that depicted him with ENZO BLANKS and with ANTOINE WIGGINS. A search of his phone revealed a contact, "ZO," with telephone number (443)280-0184. Your affiant knows this nickname and telephone number to be associated with ENZO BLANKS. Additionally there were handwritten telephone lists found in LOMAX's bedroom that listed telephone number (240)559-7700, which your affiant knows to be used by ANTHONY MILES. This telephone number has been referenced extensively in this affidavit as an earlier phone utilized by MILES. Based on training, knowledge, and experience, your affiant knows that drug dealers frequently change their telephone numbers to avoid detection by law enforcement.

36

45. On April 26, 2013, CW1 received a call from MILES on TT1 requesting a ride.  This call was verified by pen register data.  CW1 picked up MILES at WAYNE CLAYTON JONES's house on Cliftmont Avenue.  CW1 took MILES directly to the intersection of Kingston Road and Edmondson Avenue and met with KEYA DEAN.  DEAN got into the vehicle and MILES provided her with a baggie of tan colored powder he knew to be heroin.  DEAN placed the bag inside of her waist band of her pants and got out of the vehicle.  CW1 was uncertain of the amount of heroin but stated that MILES was hitting it against his leg on the way over in an attempt to mix up the contents.  After meeting with DEAN, they drove over to the Loafer's bar on Route 40 in Catonsville where they met with MARLOW BATES.  BATES provided MILES with $7,000 and explained that he would have the rest for him tomorrow.  During this meeting BATES provided CW1 with telephone number (443)310-9005.  BATES explained that it was his new number and asked if CW1 could get talk to his cocaine supplier and see if he could again try and get a kilogram of cocaine.  Based on training, knowledge, and experience your affiant knows that heroin is sometimes distributed as a tan colored powder.  Additionally, based on multiple recordings of MILES and BATES, your affiant knows that BATES has explained that he buys "fifty grams of dope a day" from MILES.  Your affiant knows, based on training, knowledge, and experience, that in Baltimore heroin is referred to as dope.

46. On April 30, 2013, the CW1 received a call from MILES on TT1 requesting a ride.  CW1 picked up MILES at 3406 Brendan Avenue and took him to the intersection of Maryland Avenue and 24th Street.  When they arrived CW1 witnessed ██████████████ arrive at the location driving a Honda Odyssey minivan.  MILES entered the minivan to speak with ███████  They were in the van for a few minutes, and then ██████ got out of the vehicle and entered 2401 Maryland Avenue.  ████████ returned a short time later and got back into the van with MILES.  A

37

W1-0053

few minutes later MILES exited the van and got back into the vehicle with CW1. They drove to the intersection of Kingston Street and Edmondson Avenue and met with KEYA DEAN. DEAN got into the vehicle and MILES provided her with a baggie of heroin. She exited the vehicle and CW1 drove around the corner where they waited for MARLOW BATES to arrive. A few minutes later BATES arrived and walked up to CW1's car and handed a large stack of money to MILES. CW1 then drove MILES back to 3406 Brendan Avenue.

47. On May 3, 2013, CW1 received a call from MILES (TT1) requesting a ride. This call was verified by pen register data. CW1 picked up MILES and took him to the Redwood Apartments located at the intersection of Eutaw Street and Redwood Street in downtown Baltimore. CW1 parked the car and witnessed MILES meet with ENZO BLANKS who was parked on the street in a silver Ford Edge with Tennessee registration E80-14Z (registered to EAN Holdings, LLC). MILES and BLANKS met inside of the vehicle for approximately five minutes. MILES exited the vehicle and walked back over to CW1's vehicle. Geopositioning data revealed that MILES (TT2) was in the general vicinity of the Redwood Apartment at 6:12 p.m. At 6:37 p.m. MILES, utilizing TT2, placed a call to BLANKS and spoke with him for one minute. CW1 and MILES departed downtown and MILES placed a call to BATES. BATES instructed him to go meet with KEYA DEAN. CW1 drove MILES to the intersection of Kingston Street and Edmondson Avenue and met with DEAN. A check of geopositioning data revealed that MILES (TT2) was at this intersection at 6:54 p.m. She got into the vehicle with MILES and CW1 and MILES provided her with a baggie of heroin. DEAN got out of the vehicle and they looped around the block to leave and CW1 saw that MARLOW BATES's silver Honda Accord was parked at DEAN's residence. Pen register data confirmed that MILES placed a call, utilizing TT1 at 7:01 p.m., to BATES at which time BATES instructed him to go to

38

W1-0054

his mother's house to meet him. CW1 drove to the 2700 block of Presbury Street and waited approximately 15 minutes for BATES to arrive. When BATES arrived he walked into 2817 Presbury Street. A few minutes later MILES received a call from BATES requesting that he come inside. When MILES returned to CW1's car, he explained that he picked up seven stacks. A check of pen register data revealed five calls between MILES (TT1) and BATES between 7:38 p.m. and 8:20 p.m. Geopositioning data confirmed that MIELS (TT2) was in the 2800 block of Presbury at 7:14 p.m. Based on training, knowledge, and experience, your affiant knows that "stack" is a coded reference to $1,000, and that MILES's reference to seven stacks was $7,000. Again, a check of geopositioning data, collected pursuant to a court authorized pen register, for TT2 verified that MILES did travel to the vicinity of the Redwood Apartments. The data also indicated that after this meeting MILES traveled to the intersection of Kingston Road and Edmondson Avenue. Toll records for TT2 also verified that MILES did contact BLANKS utilizing TT2. Based on training, knowledge, experience, and the reporting of CW1, your affiant believes that TT2 was utilized by MILES to coordinate the collection of heroin from BLANKS and TT1 was utilized to coordinate that heroin's distribution to BATES.

48. On May 5, 2013, CW1 received a call from MILES (TT1) requesting a ride. This call was verified by pen register data. CW1 picked up MILES at WAYNE CLAYTON JONES's residence, which is located at 3434 Cliftmont Avenue. CW1 and MILES traveled downtown to the intersection of Eutaw Street and Redwood Street. When they arrived, BLANKS was waiting for them in the same Ford Edge. MILES left CW1 and got into the vehicle with BLANKS. CW1 explained that MILES met with BLANKS at approximately 6:18 p.m. They sat in the vehicle for approximately ten minutes. BLANKS got out of the vehicle and entered the apartment building. BLANKS returned ten minutes later and met with MILES in the vehicle

W1-0055

again. CW1 explained that BLANKS then handed something to MILES. CW1 was uncertain

what BLANKS gave to MILES but suspected that it was heroin. MILES exited BLANKS

vehicle and then got back into the CW1's vehicle. CW1 and MILES left the area and traveled

over to the intersection of Kingston Road and Edmondson Avenue. When they arrived they met

with KEYA DEAN. DEAN got into the vehicle and MILES gave her a baggie of heroin and she

placed it in her waist band. DEAN got out of the vehicle and CW1 drove MILES over to the

Bank of America at the Mondawmin Mall in northwest Baltimore. They met BATES, and

BATES provided MILES with cash and stated, "This is for fifty." A check of the "City Watch"

camera system revealed that MILES did meet BLANKS in the vicinity of the Redwood

Apartments. A check of geopositioning data for TT2 verified that MILES did travel to the

Redwood Apartment building to meet BLANKS at 6:18 p.m., and then traveled west to meet

DEAN at the intersection of Kingston Road and Edmondson Avenue, and then traveled to

Mondawmin Mall to meet BATES. TT2 records revealed that MILES made contact with

BLANKS prior to his arrival. Based on training, knowledge, and experience, and the reporting

of CW1, your affiant believes that MILES coordinated, using TT2, with BLANKS to collect

heroin and then utilized TT1 to coordinate the sale of the heroin with BATES.

   49. On May 11, 2013, MILES called CW1, utilizing (443)857-5428 (TT1), and asked CW1

to pick him up. This call was verified through pen register data. CW1 picked up MILES at 3406

Brendan Avenue. CW1 placed a call to your affiant informing him of MILES's request to be

picked up. Your affiant established surveillance in the vicinity of Kingston Road and

Edmondson Avenue at approximately 2:30 p.m. CW1 and MILES drove to the intersection of

Kingston Road and Edmondson Avenue. At approximately 2:39 p.m., CW1 and MILES parked

on Kingston Road. A video and audio recording was being produced inside of the vehicle in

W1-0056

addition to your affiant's physical surveillance. The video inside and pen register data revealed that at approximately 2:41 p.m., MILES, on (TT1), received a call from (443)310-9005. MILES was instructed to come down the street. Your affiant witnessed the vehicle driving down Kingston Road. The video inside of the vehicle confirmed that when MILES drove down the street he met MARLOW BATES, who was waiting in his Honda Accord. BATES got into CW1's vehicle with MILES. BATES handed a large stack of money to MILES, and MILES asked, "What's that?" BATES replied, "forty-two fifty." They discussed money owed to MILES and BATES replied, "Hey, I just bought some motherfucking grams man, waiting on you. I hate going on hold my nigga. That shit, it be flippin' my stomach yo! I hate going on hold." BATES, while exiting the vehicle, stated, "I got shit to do. I'm getting ready to call you 'bout another, 'bout like 75 yo." MILES replied, "Alright." BATES stated, "Keep bullshittin' nigga. I sell dope nigga!" Based on training, knowledge, and experience, your affiant knows that BATES pays MILES $85 per gram of heroin and that the payment of $4,250 was for 50 grams of heroin. MILES handed BATES a small baggie of heroin that was consistent with a 50 gram bag. BATES's reference to calling about "75" was a warning to MILES that he would probably need another 75 grams of heroin soon. BATES's reference to "going on hold" was a reference to running out of heroin and having to shut down his shop because BATES had to wait for MILES to resupply him with more heroin.

50. On May 20, 2013, MILES called CW1, utilizing (443)857-5428 (TT1), and asked CW1 to pick him up. CW1 picked up MILES at 3406 Brendan Avenue and drove him downtown. Just before arriving, MILES placed a call and explained to the person on the telephone that they were on their way downtown. CW1 overheard the other person on the line stating that they were at the same spot as yesterday. MILES instructed CW1 to go to the intersection of N. Paca Street

41

and W. Franklin Street. A review of the covert video and audio recording inside of CW1's vehicle by your affiant revealed that at approximately 5:06 p.m. MILES placed a call and explained that he was there and the person instructed him to come up one more block. A check of the pen register data for this time for TT1 and TT2 did not reveal any calls. Approximately one minute later, MILES received a call on a different phone, determined through pen register data to be TT2, and placed the phone on speaker. The caller, using telephone (909)205-4407, stated, "Hey, Yo...can I get two cases tomorrow?" MILES replied, "I got you, yo!" The unknown male replied, "Alright, I'm on, so as soon as you get 'em I'll come grab 'em." MILES replied, "Alright." When they pulled over, CW1 witnessed ENZO BLANKS walking across the street carrying a small paper bag. CW1 described the bag as a bag you might get if you bought a small item in the mall. CW1 explained that he then saw ███████████ minivan parked on the street. ██████ eventually got out of the vehicle and waved to MILES. ██████ got back into the minivan and MILES went over and got into the front passenger seat. They were in the minivan for just a few minutes. MILES returned to CW1's vehicle. A review of the video inside of CW1's vehicle clearly depicted MILES holding in his hand a baggie that was consistent with a baggie containing approximately 50 grams of heroin. CW1 explained that MILES had three different phones in the back of CW1's vehicle. A review of the video, pen register records, and geopositioning data confirmed that MILES was in possession of TT1, TT2, and an unidentified telephone. Once they had met with ██████ MILES instructed CW1 to travel west on Route 40 to Kingston Road. MILES, using TT1, placed a call to MARLOW BATES and explained he was on his way to meet him. MILES and CW1 eventually met with MARLOW BATES at the intersection of Kingston Road and Edmondson Avenue. The video clearly depicts MILES counting a large sum of money after meeting with BATES. Based on training, knowledge, and

W1-0058

experience your affiant knows that MILES is buying, and will continue to buy, heroin from

ENZO BLANKS and ████████████ selling that heroin to MARLOW BATES and

utilizing TT1, TT2, and other unidentified phones to facilitate these heroin deals. Additionally,

your affiant knows that MILES is also distributing large amounts of marijuana to other

unidentified persons. Based on training, knowledge, and experience, your affiant believes that

the call that MILES received on TT2, and subsequently placed on speaker, was in reference to

ordering two pounds of marijuana. On May 20, 2013, while your affiant was debriefing CW1

about the above described events, MILES, utilizing TT1, called CW1. CW1 placed the call on

speaker. MILES asked the CW1 if remember what he had asked him about earlier. MILES went

on to say that he needed "two of 'em." MILES also clarified that the price was $1050 for each

pound. MILES also clarified that, "I got paperwork in hand." Based on training, knowledge,

experience, and information provided by CW1, your affiant knows that MILES was ordering two

pounds of "regular" marijuana at $1,050 per pound and was telling CW1 that he had the money

to pay for them. Your affiant believes that these two pounds are the ones that were agreed upon

by MILES and an unknown male on TT2 earlier that afternoon. Your affiant knows that MILES

called CW1 in reference to this deal because the marijuana dealers are associates of CW1.

### B. Identification of MILES:

51. On November 8, 2012, CW1 explained to your affiant that a male, going by the street

name of "BIGS," was selling large quantities of heroin. BIGS had explained to CW1 that he was

on Federal supervised release.

52. As mentioned infra, CW1 has, on numerous occasions, picked up or dropped off MILES

at 3406 Brendan Avenue, Baltimore, Maryland, which is listed to MILES's mother, MARILYN

W1-0059

GOODE. MILES listed her as his mother in his booking information with Baltimore Police Department.

53. On January 22, 2013, CW1 identified the MVA photograph, of ANTHONY MILES as the man he knew as "BIGS."

### C. Identification of MILES's Role Within the Drug Conspiracy:

54. CW1, has indicated that MILES is a distributer of narcotics in the Baltimore area, and that he utilizes his mother's residence at 3406 Brendan Avenue as a stash house to facilitate this activity.  Surveillance, and other investigations mentioned infra, have identified MILES's heroin suppliers as ENZO BLANKS and ███████████.  Surveillance has also established that MILES has multiple contacts within Baltimore and that MARLOW BATES is simply one of those contacts.

55. As discussed infra, CW1 has witnessed multiple heroin transactions between MILES and BATES, some of which have been recorded as evidence.  These transactions occurred, and continue to occur, approximately two to three times a week and consist of upwards of 150 to 200 grams of heroin at a time.

56. Your affiant believes based on his training and experience, this investigation has shown MILES to be a major dealer of heroin in Baltimore, who is receiving large quantities of heroin from ENZO BLANKS and his associates in Baltimore and who is selling that heroin to MARLOW BATES and others.

### D. Identification of BLANKS's Role Within the Drug Conspiracy:

57. As discussed infra, CW1 has witnessed multiple meetings between ENZO BLANKS and ANTHONY MILES.  MILES meets with BLANKS to provide him with cash proceeds from the

W1-0060

sale of heroin, and on occasion has picked up the heroin from BLANKS prior to delivering it to KEYA DEAN and MARLOW BATES.

58. Additionally, your affiant has spoken to DEA agents in the Baltimore office and has confirmed that they had, as recently as 2012, identified ENZO BLANKS as a major heroin dealer in association with ANTOINE WIGGINS. Additionally, on December 21, 2012, BLANKS's apartment was searched and 248 heroin gel capsules, a plastic bag containing powder heroin with a net weight of 54.11 grams, three plastic bags containing heroin with a net weight of 44.63 grams, a plastic bag containing mannitol with a net weight of 85.93 grams, seven bars of mannite, multiple capsule filling trays, grinders, scales, strainers, and other packing materials were recovered. At the time of this search BLANKS was found to be exiting the apartment and on his person was found 150 gel capsules of heroin (of the above total 248).

59. Your affiant believes, based on his training and experience, that this investigation has shown BLANKS to be a major dealer of heroin, distributing large quantities of heroin in the Baltimore area.

**E.  Identification of BATES's Role Within the Drug Conspiracy:**

60. MARLOW BATES was identified by CW1 as the primary heroin customer of ANTHONY MILES. As discussed infra, CW1 has witnessed multiple, and consistent, meetings between ANTHONY MILES and MARLOW BATES. These meetings usually consisted of BATES providing cash payment for heroin that had just recently been delivered to KEYA DEAN on his behalf.

61. On May 5, 2013, MILES met with BATES to collect payment for heroin. This meeting was recorded both audio and video. During this meeting BATES explained, multiple times, that

W1-0061

he purchased 50 grams of heroin every day and was upset with MILES charging him $85 a gram. MILES explained that he buys it at $80 a gram.

62. Based on the above- referenced information provided by CW1, and the body recordings of conversations with BATES, your affiant believes BATES to be running multiple heroin shops in west Baltimore and is supplied with this heroin from MILES, and others yet identified.

## ANALYSIS OF TOLL AND PEN REGISTER RECORDS OF TT1:

63. A review of toll records shows a large number of telephone numbers are in contact with TT1. Pertinent call activity from March 15, 2013, to May 21, 2013 on TT1 is as follows

| Phone Number | Subscriber | User | Number of calls (date of first and last call) |
|---|---|---|---|
| (410)488-6570 | Tania Jones, 3434 Cliftmont Ave, Baltimore 21213 | Wayne Jones | 65  (4/3/13-5/14/13) |
| (443)280-0184 | Farrah Johnson, 128 Maybin Cir, Owings Mills, 21117 | Enzo Blanks | 1  (3/18/13) |
| (443)310-9005 | Prepaid Customer | Marlow Bates | 317 (4/16/13-5/20/13) |
| (443)360-8509 | Yasmin Rajpaul, 6217 Chinquapin Pkwy, Baltimore 21239 | Wayne Jones | 77  (4/3/13-5/20/13) |
| (443)759-1041 | Prepaid Customer | Marlow Bates | 234 (3/15/13-4/16/13) |

## ANALYSIS OF TOLL AND PEN REGISTER RECORDS OF TT2:

64. A review of toll records shows a large number of telephone numbers are in contact with TT2. Pertinent call activity from October 11, 2012 to May 21, 2013 on TT2 is as follows:

46

W1-0062

| Phone Number | Subscriber | User | Number of calls (date of first and last call) |
|---|---|---|---|
| (443)280-0184 | Farrah Johnson, 128 Maybin Circle, Owings Mills, MD 21117 | Enzo Blanks | **538** (12/15/12-5/20/13) |
| (443)360-8509 | Yasmin Rajpaul, 6217 Chinquapin Pkwy, Baltimore, MD 21239 | Wayne Jones | **21**(12/24/12-4/30/13) |
| (443)472-0296 | Unknown  (Phone seized by BCPD) | Antoine Wiggins | **28** (12/15/12-1/04/13) |
| ███████████ | ███████████ | ███████████ | ███████████ |
| (909)205-4407[7] | Lee Lang, 26125 23rd St, Highland, CA | UNKNOWN | **153** (3/25/13-5/21/13) |

## NECCESSITY FOR THE WIRETAP

65. "Traditional" investigative techniques have produced some admissible evidence, but the techniques have not produced enough admissible evidence so as to allow investigators to identify all of the participants nor the full scope and nature of this criminal conspiracy, and those techniques are not likely to do so if employed in the future.  Based upon my training and experience, as well as the experience of other law enforcement officers consulted, and based upon all the facts set forth herein, the interception of wire communications over the target telephones is the only reasonable method of developing evidence of the full scope of the suspected violations being committed by the target subjects and others as yet unknown.  This is because normal investigative procedures have been tried and have failed (as described herein), it

[7] The user of this telephone is unknown.  On May 20, 2013, the user of this phone called TT2 and asked MILES for two pounds of marijuana.  This discussion is mentioned in paragraph 53.

W1-0063

appears reasonably unlikely to succeed if continued, or are too dangerous to employ further in this investigation.   The traditional techniques that have been utilized are each more fully discussed below.   Additionally, the reason for not using a particular technique has also been more fully discussed below.

### Physical Surveillance

66. Physical surveillance has proved valuable in identifying multiple members of the conspiracy and in observing the patterns of, at least, some of those target subjects.  However, it has not always been a viable tool during the investigation.  Without the wire intercept, investigators would not be certain of the purpose of a meeting, or of the individual's relationship to MILES.  Absent other information, to include the interception of wire communications, physical surveillance provides little direct evidence of the significance of meetings between the target subjects.  Even with the assistance of CW1, not all meetings are made in CW1's presence and not all illegal activity is made clear during their conversations in the presence of CW1.  Additionally,  physical surveillance cannot capture all of the interactions between target subjects as a number of the meetings between MILES and ▇▇▇▇▇ have occurred within the building, specifically inside of the ▇▇▇▇▇ apartment, and not within the presence of CW1 or in the view of any surveillance.  Furthermore, while physical surveillance allows investigators to observe the interaction between the target subjects, that interaction without additional information, does not constitute illegal activity.  Without the interception of wire communications, it is difficult, if not impossible, to know the purpose of the meetings between the target subjects.  Furthermore. CW1 does not have access to certain target subjects.  Without the interception of wire communications, investigators will be unaware of meetings between target subjects in instances where CW1 is not present.  Physical surveillance, while a valuable

48

W1-0064

tool, has limitations, and those limitations have been reached. Without the interception of wire communications, physical surveillance alone will not expose the higher levels of this conspiracy. The interception of wire communications are necessary to move up the chain of supply in this heroin conspiracy.

67. While physical surveillance continues to be an effective investigative tool, physical surveillance alone - without the interception of wire communications - will not allow the FBI to fully achieve all of the objectives of the investigation. That is because, first and foremost, absent other information to include the interception of wire communications, physical surveillance provides little direct evidence of the significance of a meeting.

68. As described in paragraph 34, physical surveillance on March 27, 2013, assisted in identifying KEYA DEAN as she met with MILES at the corner of Edmondson Avenue and Kingston Road. Without this physical surveillance, agents would not have been able to successfully identify DEAN and her stash house located at 520 N. Rock Glen Road. Again, while this instance shows physical surveillance continues to be an effective investigative tool, physical surveillance alone - without the interception of wire communications - will not allow the FBI to fully achieve all of the objectives of the investigation. That is because, first and foremost, absent other information to include the interception of wire communications, physical surveillance provides little direct evidence of the significance of instances such as this. Even with the assistance of CW1, not all meetings are made in CW1's presence and not all illegal activity is made clear during their conversations in the presence of CW1.

69. On multiple occasions agents of the FBI retrieved video footage from the Baltimore City "City Watch" camera system. This footage, specifically concerning the camera located at the corner of Fayette Street and Calvert Street, revealed that ANTHONY MILES was meeting with

W1-0065

███████████████ who resided ██████████████████████ ███████ has

been identified as the supplier of heroin to MILES and is doing so on behalf of ENZO BLANKS.

Although this camera clearly depicts these meetings, and confirms the reporting of CW1, it does

not allow for your affiant to determine that content of the meeting between MILES and ██████.

In addition these meetings usually occur within the building, specifically inside of the ████████

apartment, and not within the presence of CW1 or in the view of any surveillance. Although this

surveillance technique has proved to be a valuable tool it does not allow the FBI to fully achieve

all of the objectives of the investigation. This tool will only prove to be of value with the context

added by the interception of wire communications.

70. In addition, your affiant believes that sustained physical surveillance of MILES without

the support of electronic surveillance requested herein would compromise this investigation.

Having conducted multiple surveillance operations on several members of this conspiracy, your

affiant believes that they have shown that they are surveillance conscience and that safe and

effective surveillance requires the assistance of electronic monitoring. For example, on May 11,

2013, while your affiant was on surveillance, BATES instructed MILES to move from their

normal location. BATES then got into CW1's vehicle and MILES and BATES conducted the

heroin deal while the vehicle was mobile with a follow car. When the deal was over he

instructed CW1 to stop the vehicle at which time BATES got out and returned to his own

vehicle. BATES then parked and went into DEAN's residence before your affiant knew that

they had met. Your affiant believes that because of MILES's reliance on meeting both BLANKS

and ████████ inside of their apartments it would severely hinder the chances of effectively

identifying possible co-conspirators. Additionally, both BLANKS and ████████ never initially

have any heroin on their person when they meet with MILES. They meet with MILES and then

W1-0066

go to their apartment to get the heroin.  Based on training, knowledge, and experience, your

affiant believes that they are avoiding law enforcement efforts to catch them holding heroin.

They have an expectation that if law enforcement would take action upon their meeting that they

would do it when they both get in the car.  With this expectation they meet for a few minutes to

determine if they were followed or if law enforcement is going to make contact with them.  Once

they determine that they are not being monitored by law enforcement they retrieve the heroin and

provide it to MILES.

## Cellsite Tracking and Geolocation Data

71. The collection of prospective cell site and geolocation information, used in conjunction

with physical surveillance, has been useful in furthering the investigation.  Moreover, since the

inception of this investigation, the collection of geolocation information has been extremely

useful insofar as it has assisted agents in the determination of when MILES is making a trip to

west Baltimore, the identity of MILES's stash house, discerning patterns of MILES's travels, and

in locating and documenting MILES's whereabouts between surveillance efforts.  Accordingly,

as part of this Title III Application and affidavit, law enforcement requests approval for use of

this investigative technique on TT1 and TT2.  However, similar to physical surveillance, cell

site and geolocation tracking has significant limitations.  Use of geolocation has been invaluable

as it has verified that TT2 is being utilized to coordinate with higher level members of the

conspiracy while TT1 is being utilized to distribute the heroin to BATES.  Geolocation data for

TT2 has also been helpful in validating reports made by CW1.  The collection of such location

information cannot provide information as to whom MILES meets with, the context of his

interactions with them, or his relationship to them.  The method used to determine the location of

the target telephone also has inherent technical limitations.  Cell site information for the target

W1-0067

telephone is imprecise insofar as it narrows the location of the target telephone to an area that may still be greater than a square mile. Even when the service provider discloses more precise geolocation information for the target telephones, a degree of uncertainty is associated with every set of coordinates that are produced by the cellular service provider, which at times can frustrate surveillance efforts.

## Use of Undercover Police Personnel

72. Based on my experience and information received during this investigation, I believe there are no undercover police officers or agents who can infiltrate the conspiracy at a level high enough to identify all members of the conspiracy or otherwise satisfy all the goals of this investigation. An individual like MILES is less susceptible to infiltration by police informants or undercover officers. Given his position as a wholesale drug supplier, MILES only needs to deal with relatively few people who are known to him, who differs from the street-level retail dealers and suppliers who deal with many more people, and who are more susceptible to infiltration by law enforcement. Your affiant is not aware of any undercover officer or agent who can deal with MILES or his associates.

## Use of Cooperating Witness and/or Confidential Informants

73. Your affiant is currently in contact with a cooperating witness (CW1) that can report on some of the drug activities of MILES. CW1, although very well placed to report on the actual deliveries of heroin to BATES, is not in a position to consistently report on the meetings of MILES with suppliers such as ENZO BLANKS. CW1, even while collecting valuable intelligence on the distribution of heroin, is not in a position to discuss details of the supply of heroin with MILES, and most likely would never be introduced to BLANKS. However, your

W1-0068

affiant still believes that CW1 is extremely reliable and credible and that information provided

by CW1 has been shown to be consistent with the investigation to date.  CW2, a DEA

cooperating witness, as described above, was familiar with BLANKS and WIGGINS on a social

basis.  CW2 was not engaged in the narcotics trade with BLANKS and/or WIGGINS.  CW2

was in a position to obtain and provide telephone numbers, but did not have access to BLANKS

and/or WIGGINS in a way that would generate intelligence on the distribution of heroin and was

not in a position to discuss details of the supply of heroin.



75. In sum, the FBI does not have any informants at this time able to make detailed inquiries

concerning other purchasers, sources of supply, shipment of drugs, stash locations, and methods

of operations, or  who are in a position to gain access to BLANKS, ▮▮▮▮ WIGGINS or other

high-level co-conspirators.

## The Grand Jury

76.  The use of a federal grand jury does not appear to be a promising method of

investigation.  Witnesses who could provide additional evidence to the grand jury as to the

activities, the sources of supply, the buyers, and the identities of other conspirators are the very

W1-0069

same individuals who are involved in the conspiracy at the highest levels. It is unlikely that these people would testify voluntarily, and instead would invoke their Fifth Amendment privilege not to testify. It would not be desirable at this time to seek immunity for any of the known or suspected conspirators and compel their testimony. Immunizing them would thwart the public policy that individuals with the level of culpability of MILES, BLANKS, BATES and the others involved in the distribution scheme should be held accountable for their illegal narcotic activity. Moreover, it is likely that, even if immunized, these subjects would refuse to testify against close associates and relatives. Accordingly, the issuance of grand jury subpoenas to other individuals, even if they could be identified at this time, likely would not lead to the discovery of critical information and undoubtedly would alert the target subjects and other conspiracy members to the nature and pendency of the investigation. Such disclosure might cause the target subjects to become more cautious in their activities, to flee to avoid investigation or prosecution, to destroy evidence, to threaten the lives of individuals believed to be cooperating with the investigation, or to otherwise compromise the investigation. I also believe, based upon my experience and the results of this investigation so far, that any responses by others closely associated with the target subjects would likely contain a significant number of untruths, which would divert or otherwise frustrate the investigation with false leads.

### Interviews of Subjects or Associates

77. Based upon my training and experience in this and other investigations, it is believed that interviews of the target subjects or their known associates would produce insufficient information as to the identities of all of the persons involved in the conspiracy, the source of the drugs, the identities of all of the conspirators, the manner by which the conspirators are transporting the drugs, the location of the drugs and records of illegal activity, the location of

54

apartments, residences, and buildings utilized by the conspirators to store illegal contraband and proceeds, and other pertinent information regarding the named crimes. I also believe that any responses to the interviews would contain a significant number of untruths (as demonstrated in paragraph 44, by LOMAX's denial of having narcotics, other than marijuana, in his residence when in fact heroin was recovered), diverting the investigation with false leads or otherwise frustrating the investigation. Additionally, such interviews also would have the effect of alerting the target subjects and other members of the conspiracy, thereby compromising the investigation and resulting in the possible destruction or concealment of documents and other evidence, and the possibility of harm coming to the CW whose identity may become known or whose existence may otherwise be compromised. Additionally, as documented in paragraphs 28 and 29, both BLANKS and WIGGINS have been arrested after search warrants were executed at their residences. Although significant evidence was recovered, neither BLANKS nor WIGGINS decided to cooperate with law enforcement. As documented in paragraph 44, the residence of ROBERT LOMAX was searched and heroin and cash were recovered but LOMAX decided to not cooperate with investigators.

78. Subjects, associates and witnesses are all reluctant to cooperate with law enforcement. Baltimore is a nationally ranked violent city with a high rate of shootings and homicides. The majority of these violent acts are a direct result of drug trafficking and gang activity. Individuals who cooperate with law enforcement or are suspected of cooperating with law enforcement are especially targeted for violence. The drug culture in Baltimore is such that cooperators are viewed as "sinners" and they are targeted for retaliation by others on "general principles," even in the absence of any personal connection between the defendant, cooperator and the assailant. Baltimore is where two Stop Snitching DVDs were created and spread nationwide in an effort to

W1-0071

suppress community cooperation with law enforcement.  There are numerous incidents where witnesses have been targets of violence.  The most notorious of these incidents is the murder by arson of seven members of the Dawson family on October 16, 2002, because of the family's cooperation with law enforcement against neighborhood drug dealers.

### Search Warrants

79. Although surveillance operations to date have identified a possible stash location being utilized by the target subjects, it would be premature at this time to conduct a search of MILES's mother's residence, DEAN's residence, or ███████ residence.   It is not presently known with certainty where and when drugs are being stored at this location by MILES and his co-conspirators.  Even if I obtained information about the timing and location of drugs being stored at these particular locations and search warrants were executed there, this would not come close to capturing the full scope of the conspiracy.   Seizures from this location, at this time, would not identify the source of supply and the other principals involved in this criminal conspiracy. Search warrants would alert the target subjects to the existence of the investigation and would prevent the identification of other co-conspirators and/or the seizure of substantial contraband. Moreover, investigative methods used to date do not by themselves seem likely to yield additional information about the storage and packaging locations. Without interception of wire communications, it would be difficult to know when and where narcotics transactions are to occur, which would be essential to the successful execution of any search warrant that would result in a substantial seizure of contraband.   Additionally, as documented in paragraphs 28 and 29, both BLANKS and WIGGINS have been arrested after search warrants were executed at their residences.  Although significant evidence was recovered, neither BLANKS nor WIGGINS decided to cooperate with law enforcement.  As documented in paragraph 44, the residence of

W1-0072

ROBERT LOMAX was searched and heroin and cash were recovered but LOMAX decided to not cooperate with investigators.

## Trash Pulls

80. Although this investigation, as stated in paragraph 41, has shown the effectiveness of trash pulls as an investigative step in identifying stash houses and obtaining probable cause for a search warrant, your affiant believes that the houses that the investigation has currently identified, and not searched, are either not logical trash pull locations or a trash pull would serve a limited purpose in that other investigative means have produced sufficient probable cause to obtain a search warrant for those locations. Your affiant believes, as was stated in the paragraph titled "Search Warrants," that conducting searches at these locations would be premature, expose the investigation, and would not fully identify the scope of this conspiracy.

## Analysis of Pen Registers and Airtime Records

81. The use of pen registers and airtime records have been valuable in providing investigative leads and intelligence, but are limited in their use. I know from experience that such records provide only limited evidence of narcotics dealing between individuals. Such records in and of themselves are useful mainly in establishing relationships and patterns of operations, and provide little direct evidence of the significance of the telephone calls. For example, the pen register data for the target telephone confirms that the target telephone is in contact with other pertinent numbers, including suspected numbers of several individuals with extensive drug-related criminal histories. But without access to the content of the conversations, law enforcement agents cannot know for certain whether calls to or from the target telephone involve drug customers or other conspirators. Real-time information from wire interceptions about when customers or suppliers are contacting the target telephone would allow agents to learn the

W1-0073

significance of what is observed during surveillance and would allow agents to identify

customers, suppliers, co-conspirators, and the locations where drugs, money and/or weapons are

stored. The information gained from the wire interceptions is also expected to allow law

enforcement agents to pursue fruitfully other, more traditional, investigative techniques against

the immediate targets of the investigation, as well as others.

### Necessity for Title III Intercepts

82.    In summary, "traditional" investigative techniques have not produced significant

admissible evidence as to identify all of the participants nor the full scope and nature of this

criminal conspiracy, and they are not likely to do so if employed in the future. Based upon my

training and experience, as well as the experience of other law enforcement officers consulted,

and based upon all the facts set forth herein, the interception of wire communications over the

target telephones is the only reasonable method of developing evidence of the full scope of the

suspected violations being committed by the target subjects and others as yet unknown. This is

because normal investigative procedures have been tried and have failed, appears reasonably

unlikely to succeed if continued, or are too dangerous to employ further in this investigation.

### Period of Time for Interception

83. Based upon my experience and the experience of other agents working on this

investigation, and based upon the facts set forth herein, demonstrating a consistent course of

criminal conduct over a substantial time period, that after the described communications have

first been intercepted, additional communications of the same type will occur. The interception

of more than one such communication will be necessary to determine the identities of the co-

conspirators and to establish and understand the full extent and nature of their participation in the

W1-0074

conspiracy and the method of its operation. For these reasons, authorization to intercept wire communications should not be terminated upon the interception of the first described communication, but should continue until the objectives of the investigation are attained.

84. Pursuant to 18 U.S.C. § 2518(5), the Order for target telephone #1 and target telephone #2 is sought for a period of time until the interception fully reveals the manner in which the above named individuals and their confederates participate in the above described offenses, or for a period of thirty days measured from the date interceptions begin, or ten days after this order is entered, whichever is earlier.

<u>**Monitoring and Minimization**</u>

85. All monitoring of wire communications will be minimized in accordance with the minimization requirements of Chapter 119 of Title 18, United States Code, and all interceptions conducted pursuant to this Court's Order will be terminated upon attainment of the authorized objectives or, in any event, at the end of thirty days measured from the date interceptions begin, or ten days after this order is entered, whichever is earlier.

86. Monitoring of an intercepted conversation will be immediately terminated when it is determined that the conversation's subject matter is unrelated to communications subject to interception under Chapter 119 of Title 18, United States Code. Wire interception will be suspended immediately when it is determined, through voice identification, physical surveillance or otherwise, that none of the named interceptees or any of their confederates, when identified, is a participant in the conversation unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. Reasonable spot monitoring will be utilized to ensure that minimized calls have not become criminal in nature. All monitoring of

W1-0075

wire communications over the target telephones will be minimized in accordance with Chapter 119 of Title 18, United States Code.

87. A memorandum outlining all of the guidelines for minimization and application of privileges, as well as a copy of the application and Order, will be provided to all monitors. All privileged communications, including calls placed by MILES, WIGGINS, and LOMAX to or from their attorneys in connection with their pending state charges will be minimized. Monitors will be informed of the identity of their attorneys to ensure no privileged communications are intercepted.

88. The "investigative or law enforcement officers of the United States" and translators, if necessary, who are to carry out the requested interception of wire communications, will be instructed concerning the steps they should take to avoid infringing upon any attorney-client privilege or other recognized privileges. In addition, all communications intercepted will be conducted in such a way as to minimize the interception of communications not otherwise criminal in nature or subject to interception under Chapter 119, Title 18, United States Code. All monitoring of wire communications will cease when it is determined that the monitored conversation is not criminal in nature. Interception of wire communications will be suspended immediately when it is determined through voice identification, physical surveillance, or otherwise, that neither the target subjects nor any of their confederates, when identified, are participants in the conversation, unless it is determined during the portion of the conversation already overheard that the conversation is criminal in nature. If an interception is minimized, monitoring agents shall spot check to insure that the conversation has not turned to criminal matters.

W1-0076

89. It is requested that the order provide that, if necessary, translators be authorized to assist in conducting this wire surveillance and to receive disclosure of intercepted communications. It is further requested, pursuant to Section 2518(5), Title 18, United States Code, that in the event the intercepted communications are in a code or foreign language, and an expert in that code or foreign language is not reasonably available during the interception period, that minimization may be accomplished as soon as practicable after such interception. Monitoring will be conducted by Special Agents of the FBI, or deputized task force officers under the supervision of investigative or law enforcement officers authorized to conduct the interception. Pursuant to 18 U.S.C. § 2518(5), interception and monitoring also will be conducted in part by other government personnel, or by individuals operating under a contract with the FBI, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception. These other, non-agent individuals, will be fully informed of the contents of the Court's authorization Order, as well as the minimization requirements and limits on disclosures set forth in Chapter 119 of Title 18, United States Code. Your affiant, as well as other agents, investigators, and other authorized personnel participating in this interception of wire communications, will operate all equipment necessary to monitor all calls and the FBI will maintain custody of the logs of conversation monitored.

90. In the event that intercepted communications are in a code or foreign language and an expert translator in that code or foreign language is not reasonably available during the interception period, minimization will be accomplished as soon as practicable after such interception in accordance with 18 U.S.C. § 2518(5). Accordingly, in the event the translator is not a federal agent, the translator, whether a language-trained support employee or someone under contract with the government, will be under the direct supervision of a federal agent. If,

W1-0077

however, such a translator is not reasonably available on the spot, the following after-the-fact minimization procedures have been established pursuant to 18 U.S.C. § 2518(5): (i) all such foreign language conversations will be intercepted and recorded in their entirety; and (ii) as soon as practicable after such interception, these conversations will be reviewed and minimized by a translator under the guidance of a federal agent, after which an English translation of the pertinent criminal conversations will be furnished to the supervising federal agent.

<u>**Technical Assistance**</u>

91.       I request that, pursuant to the provisions of 18 U.S.C. § 2518(4), the Court direct that the communications service provider furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with such services.  Reasonable expenses incurred through the furnishing of facilities or assistance will be processed for payment by the FBI, United States Department of Justice.

92.    Based on all of the above, I submit that there is probable cause to believe that the above-described violations have occurred, are presently occurring, and will continue to occur; that the target subjects, and others as yet unknown or unidentified, have used, are using and will continue to use the target telephone in furtherance of illicit narcotics activities; that normal

W1-0078

investigative techniques have failed to produce evidence necessary to sustain a prosecution of

the aforesaid offenses and reasonably appear unlikely to succeed.

Eric S. Nye, Special Agent
Federal Bureau of Investigation
United States Department of Justice

SWORN TO AND SUBSCRIBED before me this _24_ day of June, 2013

William D. Quarles, Jr.
United States District Judge
District of Maryland

I hereby attest and certify on _6/17/2013_
that the foregoing document is a full, true and correct
copy of the original on file in my office and in my
legal custody.

FELICIA C. CANNON
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

By_____ Deputy

63

W1-0079