FILED                    ENTERED
RECEIVED

SEP 3 0 2013

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF MARYLAND**                BY _____ DEPUTY

13-2509AG

| IN THE MATTER OF THE SEARCH OF | ) | **UNDER SEAL** |
| CERTAIN SPECIFIED PREMISES | ) | Misc. No._____ 90 |
|  | ) |  |

13-2322SAG

<u>**AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**</u>

ERIC S. NYE, a Special Agent with the Federal Bureau of Investigation, being duly

sworn, deposes and states:

1. I have been employed as a Special Agent of the Federal Bureau of Investigation

(FBI) since 2006. Since becoming a law enforcement officer, I have participated in numerous

investigations of unlawful drug trafficking, and have conducted or participated in surveillances,

the execution of search warrants, the recovery of substantial quantities of narcotics and narcotics

paraphernalia, and the debriefing of informants and cooperating witnesses. I have also reviewed

taped conversations, as well as documents and other records relating to narcotics trafficking and

money laundering. Through my training, education and experience, I have become familiar with

the manner in which illegal drugs are transported, stored, and distributed; the methods of

payment for such drugs; the possession and use of firearms in connection with the trafficking of

such drugs; and the manner in which narcotics traffickers store and conceal the proceeds of their

illegal activities.

2. During these investigations, I have examined records consisting in part of buyers'

and sellers' lists, and pay/owe ledgers. I have conducted surveillance of numerous drug dealers.

I have interviewed drug dealers, users and confidential informants and have discussed with them

the life-style, appearance and habits of drug dealers and users. I have become familiar with the

manner in which narcotics trafficker smuggle, transport, store and distribute narcotics, as well as

how they collect and launder drug proceeds. I am also familiar with the manner in which

1

**SCANNED**

③

narcotics traffickers use telephones, cellular telephone technology, coded communications or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

I.       **Premises to be Searched**

3.   This affidavit is being submitted in support of an application for search warrants for the premises set forth below (collectively, the "SUBJECT PREMISES").  Based on the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that there is presently concealed in

a.   3434 Cliftmont Avenue, Baltimore, Maryland, utilized and/or occupied by Wayne Clayton Jones, the items set forth in Attachment B (see discussion at paragraphs 25, 28, 30, 31, and 33):

b.   3406 Brendan Avenue, Baltimore, Maryland, utilized and/or occupied by ANTHONY MILES, the items set forth in Attachment A (see discussion at paragraphs 7, 8, 10-12, 16, 18, 19, 26, 29, and 34):

c.   520 N. Rock Glen Road, Baltimore, Maryland, utilized and/or occupied by Keya Dean, the items set forth in Attachment A (see discussion at paragraphs 10, 12, 16-18, 25-29, and 44):

d.   2817 Presbury Avenue, Baltimore, Maryland, utilized and/or occupied by Marlow Bates, the items set forth in Attachment B (see discussion at paragraphs 27):

e.   22 Torlina Court, Woodlawn, Maryland, utilized and/or occupied by Marlow Bates and Joseph Speed, the items set forth in Attachment B (see discussion at paragraphs 45):

2

SW-0024

*Cfn*
*9·23·13*

   f.   3922 Vero Road, Suite L, Halethorpe, Maryland, (360 Telecom Solutions, LLC) utilized as a business front by Antoine Wiggins, the items set forth in Attachment B (see discussion at paragraph 15, 34, 35, 42, and 49):

   g.   4150 Brown Bark Circle, Randallstown, Maryland, utilized and/or occupied by Antoine Wiggins, the items set forth in Attachment B (see discussion at paragraphs 14, 15, 47 and 54):

   h.   2545 W. Lanvale Street, Baltimore, Maryland, utilized and/or occupied by Donte Thomas, the items set forth in Attachment A (see discussions at paragraph 40, 41, and 48):

   i.   2500 W. Belvedere Avenue, Apartment 606, Baltimore, Maryland, utilized and/or occupied by Abraham Goode, the items set forth in Attachment A (see discussions at paragraph 36, 37, 39 and 46):

   j.   19726 Beaver Dam Road, Rawlings, Maryland, utilized and/or occupied by Virginia Moore and Randy Adkins, the items set forth in Attachment A (see discussions at paragraph 43 and 50):

   k.   2013 Honda Accord, VIN:1HGCT2B81DA001890, bearing Maryland license plate 80282CE, utilized by Antoine Wiggins, the items set forth in Attachment B (see discussions at paragraph 9 and 54);

   l.   2007 Jeep Wrangler, VIN 1J4GA39187L172823, bearing Maryland license plate 4BC7293, utilized by Antoine Wiggins, the items set forth in Attachment B (see discussions at paragraph 49);

SW-0025

CK
9·23·13

    m.  2007 Ford F150, Harley Davidson model, VIN 1FTRW12537FB49059,

         bearing Maryland license plate A198460, utilized by Enzo Blanks, the

         items set forth in Attachment B (see discussions at paragraph 20 and 51);

    n.  2007 Bentley convertible, VIN SCBDR33W97C046446, bearing

         Maryland license plate 6AZ2001, registered to 360 Telecom Solutions,

         LLC, and utilized by Antoine Wiggins, Enzo Blanks, and Kendrick Kelly,

         the items set forth in Attachment B (see discussions at paragraphs 10, 20,

         38, and 50);

all of which constitute evidence, fruits, and instrumentalities of, inter alia, violations of Title 21,

United States Code, Sections 841 and 846, which prohibit the distribution, possession with the

intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled

substances.  Further descriptions of the SUBJECT PREMISES are provided below at in section

III "The Subject Premises" beginning on page 31.

      4.  Because this Affidavit is being submitted for the limited purpose of establishing

probable cause for warrants to search the SUBJECT PREMISES set forth above, I have not

included every detail of every aspect of the investigation.  Rather, I have set forth only those

facts that I believe are necessary to establish probable cause for each of the respective premises.

The information contained in this Affidavit is based upon my personal knowledge, federal Title

III intercepts, my review of documents and other evidence, and my conversations with other law

enforcement officers and other individuals.  All conversations and statements described in this

Affidavit are related in substance and in part unless otherwise indicated.

SW-0026



II.    **Background**

5.    This investigation began in November 2012, in east Baltimore with the targeting of WAYNE CLAYTON JONES, also known as "WEEZY," who was believed to be dealing large quantities of high-grade marijuana. JONES was known to frequent/live in the 3400 block of Cliftmont Avenue in Baltimore. Based on a well-placed Confidential Witness, hereinafter referred to as CW1, your affiant was able to determine that there was not only distribution of marijuana but also the distribution of large quantities of heroin involving many more individuals. CW1, cooperating entirely of its own accord, initially provided general information as to the criminal behavior of JONES but soon provided very detailed and accurate intelligence concerning others described below[1].  CW1 is not pending any criminal charges and is not being provided any consideration for any court proceeding.  CW1 is being provided monetary compensation for its time and the intelligence provided.

6.    On November 8, 2012, CW1 made your affiant aware of an unknown male associate of JONES, known only as "BIGS." CW1 explained that BIGS was selling heroin in Baltimore and that he was looking for a new source of supply.  CW1 also explained that BIGS was supposedly on Federal supervised release for a previous Federal drug conviction. Eventually your affiant identified "BIGS" as ANTHONY MILES and determined that he was on federal supervised release from the 2005 conviction for possession of a firearm during the trafficking of CDS. CW1 further explained that MILES was bragging that he worked for his cousin, later identified as ENZO BLANKS, and that if CW1 had a heroin supplier his cousin

---

[1] CW1 has been providing accurate and timely information to your affiant for approximately ten months.  During that time your affiant has been able to corroborate almost all reporting made by CW1 as a recording device was used in a significant portion of his meetings with subjects of this investigation.  Additionally, your affiant has obtained third party confirmation of CW1's reporting by obtaining private business and government surveillance video that corresponded to the CW1's reporting. Lastly, CW1's reporting has been corroborated through the multiple pen registers and the associated geopositioning data, mentioned infra.  Your affiant considers CW1's reporting extremely reliable.  CW1 criminal history consists of one arrest for assault in the second degree in 2007.

SW-0027

would be able to pay for 1 1/2 kilograms up front. Your affiant knows, through training, knowledge, and experience, that the wholesale price of heroin coming into Baltimore is anywhere from $60,000 to $70,000 per kilogram. MILES also provided CW1 with his cellular telephone number of (240)559-7700. Continued reporting from CW1, based on statements from MILES, provided clarity as to the heroin distribution network of BLANKS and MILES. CW1, as explained below, provided accurate and timely intelligence concerning the heroin distribution by MILES and BLANKS.

7. On January 11, 2013, MILES, utilizing (240)559-7700, placed a call to CW1 asking for a ride. CW1 picked up MILES in front of MILES's mother's residence at 3406 Brendan Avenue (**location B**). CW1 and MILES drove somewhere on the west-side, possibly off of North Avenue and met with an unknown male, later identified as MARLOW BATES. MILES provided something to BATES and BATES asked if it was "got good." MILES replied that it was good. When MILES got back into the vehicle he showed CW1 a stack of what he claimed was $10,000. Based on training, knowledge, and experience your affiant believes that the money referenced by CW1 is drug proceeds.

8. On January 18, 2013, CW1 reported[2] that ANTHONY MILES met with MARLOW BATES, near the intersection of Franklin Street and Warwick Street. During this meeting BATES provided MILES with $10,000 in cash. CW1 explained that originally they were supposed to meet BATES near his stash house but when they got to the house there was a heavy police presence. Because of the police presence they went to a gas station at the previously mentioned intersection and called BATES. BATES arrived and assured MILES that there was nothing to worry about and showed MILES that he had another $10,000 on him.

---

[2] CW1's reporting was verified by audio and/or video, which was reviewed by your affiant, except for reporting in paragraphs 8, 11, 16, 17, 19, 27, and 28. In those instances the information was obtained through debriefings of CW1.

SW-0028

CℓR
9·23·13

BATES calmed MILES by explaining that if he was concerned about law enforcement presence he would not be driving around with all of this cash. From this meeting MILES took the money and drove immediately over to the vicinity of the Lexington Market in downtown Baltimore. MILES met an unknown black male, later identified as ENZO BLANKS[3], on the street. MILES provided BLANKS with a bag containing $8,000. MILES complained to BLANKS about not being able to get a hold of another unknown male. CW1 explained that BLANKS provided MILES with a telephone number for this unknown person (UM1) and MILES placed a call to UM1. MILES left BLANKS and traveled to the intersection of Calvert Street and Fayette Street in downtown Baltimore. A white Acura MDX arrived and pulled into the underground parking garage of the condominium. MILES then walked into the parking garage and returned ten minutes later. When he returned he told CW1 to drive carefully because he was "filthy." CW1 understood this to mean that MILES was in possession of drugs, as a common street phrase for driving while in possession of drugs is driving "dirty." MILES then returned directly to his mother's residence located at **3406 Brendan Avenue (location B)**. Based on training, knowledge, and experience your affiant believes that UM1, later identified as KENDRICK KELLY[4], residing at the Munsey Apartments at Calvert and Fayette Streets, is working in conjunction with ENZO BLANKS and specifically is providing heroin to MILES who in turn stores that heroin at 3406 Brendan Avenue.

    9. On February 3, 2013, at approximately 11:57 p.m., ANTOINE WIGGINS was pulled over by the Baltimore Police driving his **2013 black Honda Accord, Maryland registration 80282CE (location K)**. During the traffic stop a K9 was called for to scan the

---

[3] CW1 was shown a picture of ENZO BLANKS and identified him as the person it knew to be ANTHONY MILES "cousin."
[4] CW1 was shown a picture of KENDRICK KELLY and identified him as the person living at 7 N. Calvert Street in Baltimore.

SW-0029

C/r
9.23-13

vehicle. While waiting for the K9, the officers explained that WIGGINS drove away at a high rate of speed and began throwing a large quantity of gel capsules out the car window. The officers pursued the vehicle but eventually lost visual contact of WIGGINS. The officers notified Baltimore County Police of the incident and provided a description of the vehicle and the area where the vehicle was last seen. At approximately 12:14 a.m. on February 4, 2013, the Baltimore County Police located **WIGGINS's Honda Accord (location K)** abandoned in front of 1436 Dartmouth Avenue. Near the driver's side door they found gel capsules, later positively tested as heroin. They followed the path through the lawn and discovered more gel capsules of heroin and $845.00 in cash. The officer noted that the heroin gel capsules and money were strewn about in a manner indicating that the subject was running from the vehicle. When inspecting the vehicle closely, the officers found gel capsules littering the driver side seat and floor board area. In total, the BCPD recovered 138 gel capsules of heroin on the ground, 39 capsules in the vehicle, and $845.00 in cash on the ground.

10. On February 15, 2013, CW1 reported that he picked up MILES at **3406 Brendan Avenue** and drove him to the parking garage for the Redwood Apartments located on Eutaw Street near the Lexington Market. When they arrived MILES went into the garage and picked up his Mercedes. MILES told CW1 that he needed to go get air in the tires and instructed him to wait. When MILES returned they headed back to Brendan Avenue when MILES, on (240)217-4060, received a call from MARLOW BATES. MILES told CW1 to take him to his mother's house (**3406 Brendan Avenue**). MILES went inside of **3406 Brendan Avenue** and a few minutes later came outside with a black plastic bag. MILES and CW1 then drove over to the McDonald's restaurant located on Route 40 near the intersection of Academy Road in Baltimore County. When they arrived they met KEYA DEAN. She was driving a Jeep Cherokee. She met

8

SW-0030

MILES inside of CW1's car and when MILES gave her the heroin she placed it inside of her pants. When they departed the area, MILES placed a call to ENZO BLANKS to find out where he was. MILES met BLANKS at the Loafer's bar on Caton Avenue in Baltimore. When they arrived at Loafer's, BLANKS was already there parked in a white convertible **Bentley (location N)**. MILES got into the **Bentley** and spoke with BLANKS for approximately ten minutes. The security cameras at Loafer's were examined and the footage of this meeting was secured as evidence. MILES and CW1 then drove over to west Baltimore and met MARLOW BATES at the intersection of Saratoga Street and Bruce Street. BATES was driving a black Honda Accord with Maryland registration 2AV2717. BATES got into the vehicle with MILES, asked him if they were safe to be meeting here and BATES replied that this was his block. BATES provided cash to MILES and stated, "this is 42." MILES replied, "It's supposed to be 44." Based on training, knowledge, and experience your affiant knows that drug dealers often refer to monetary values in a truncated fashion and in this instance they were referring to $4,200 and $4,400. After exchanging money, MILES explained to BATES that he was going to get a "missile" tomorrow. BATES replied that was what he needed. Based on training, knowledge, and experience your affiant knows that "missile" was being used as a reference to high quality heroin. During this same trip, CW1 explained that MILES at one point raised up a large stack of cash, holding it with both hands, and screamed that he just made $20,000 in an hour. MILES continued to emphatically slap his legs and exclaim that it was a good day and things were going well. Additionally, based on training, knowledge, experience, and multiple surveillances, your affiant knows that KEYA DEAN lives in **520 N. Rock Glen Road, Baltimore, Maryland (location C)** which is only one block, roughly 70 yards away from the meeting location at the intersection of Kingston Road and Edmonson Avenue. Your affiant knows that DEAN meets with MILES at

SW-0031

this intersection, places the heroin in her pants, and then walks back to **520 N. Rock Glen Road (location C)** to stash the heroin. Additionally, your affiant knows both BLANKS and KELLY to utilize the convertible **Bentley (location N)** to transport heroin and/or drug proceeds as mentioned in this paragraph.

    11. On February 16, 2013, CW1 reported that it picked up MILES at **3406 Brendan Avenue (location B)** and MILES again explained that he needed to drive safely because he was "dirty." MILES and CW1 drove to the McDonald's restaurant located on Route 40 near the intersection of Academy Road in Baltimore County. When they arrived KEYA DEAN was not there yet. MILES, utilizing (240)217-4060, placed a call to BATES asking when he expected his sister to arrive. BATES then placed a three way call to KEYA DEAN. Shortly after the call, DEAN arrived at the McDonald's driving a minivan with Maryland handicap plates. CW1 reported that DEAN got into the vehicle with MILES. MILES provided the heroin to DEAN, at which time she placed the heroin inside of her pants. She returned to her own vehicle and departed the area. When MILES and CW1 left the parking lot MILES placed a call, utilizing (240)217-4060, to BATES at (443)759-1041. MILES explained to BATES that one was 85 and the "missile" was 90. Based on training, knowledge, and experience your affiant knows that 85 and 90 are references to $85 and $90 per gram and that "missile" is a reference to higher quality heroin. CW1 explained that MILES was instructed by BATES to meet them later that night at a strip club and that "ZO" (ENZO BLANKS) would be there as well. During the ride back to **3406 Brendan Avenue**, MILES explained to CW1 that the money that he was making selling heroin was "chump change" compared to the money that ENZO BLANKS was making. MILES claimed that BLANKS was making $150,000 a day "with his eyes closed." MILES also relayed to CW1 that there was a rumor going around that someone was going to rob MILES. MILES

10

C/n
9-23-13

explained that this ended up not being true, but he explained that if anyone did try to rob him he was ready and that specifically he had an M16 with a "fifty round clip" inside of his house. MILES bragged that if they came to rob him he would go outside shoot them and then go back in and rest. MILES also made reference to having a shotgun that you don't need to pump (auto-loading shotgun). Your affiant knows MILES to be a felon and therefore unable to legally possess a firearm and/or ammunition.

12. On February 18, 2013, MILES placed a call to CW1 asking for a ride. When CW1 arrived at **3406 Brendan Avenue** MILES was not yet there. A few minutes later MILES walked up to the house and entered the residence. A few minutes later MILES exited the residence and got into CW1's vehicle. MILES explained to CW1 that he was "dirty" and to take the highway. While driving to west Baltimore, MILES placed a call from (240)217-4060 to MARLOW. BATES explaining that he had, "mixed three of them." Based on training, knowledge, and experience, your affiant knows that heroin dealers often mix different supplies of heroin together to improve the overall quality of the heroin. CW1 and MILES eventually stopped at the corner of Kingston Road and Edmondson Avenue **(location C)**. They were met by KEYA DEAN. DEAN got into the car with MILES. CW1 reported MILES gave her heroin and DEAN placed the heroin inside of her pants. CW1 and MILES then returned to Brendan Avenue. During the ride back MILES explained that MARLOW BATES was a high ranking member of BGF (Black Guerilla Family).

13. On February 19, 2013, your affiant met with agents with the DEA, at which time they informed your affiant that they had conducted an investigation into the drug activities of ENZO BLANKS in 2011. They explained that they had information from a cooperator, hereinafter referred to as CW2, that ENZO BLANKS, aka ZO, and ANTOINE WIGGINS, aka

11

SW-0033

Cfn
9·23·13

TWIZZY, were involved in large scale heroin trafficking. The DEA explained that during their investigation, and without their knowledge or direction, the Baltimore Police executed a search warrant at 118 N. Howard Street, Apt 811, Baltimore, Maryland, the residence of ENZO BLANKS. When the Baltimore Police approached the apartment to execute the warrant, BLANKS was coming out of the apartment. He was stopped and detained and notified of the warrant. On his person was found 150 gel capsules of heroin (net weight 20.17g). During the execution of the warrant, the BPD detectives discovered multiple bags containing empty gel capsules, four capsule filler trays, one capsule filler tray containing 50 gel capsules of heroin (net weight 9.40g), one capsule filler tray containing 48 gel capsules of heroin (net weight 8.39g), a clear zip lock bag containing quinine (net weight 85.93g), a clear plastic bag containing heroin (net weight 54.11g), and a clear plastic bag containing three heroin compressed pellets (net weight 44.63g). In addition, BPD detectives found multiple items indicative of narcotics trafficking, including a blender, scale, sifter, strainers, cups, razor blade, spoon, and cups, all of which tested positive for heroin residue. BLANKS refused to cooperate with law enforcement and went to trial. BLANKS was found guilty and given a sentence of 15 years of which 15 years was suspended. BLANKS was given five years probation.

14. On February 23, 2013, officers with the Baltimore Police Department and the Baltimore County Police Department, based on the events of February 3rd and 4th (explained in paragraph 9) executed a search and seizure warrant at **4150 Brown Bark Circle, Randallstown, Maryland (location G)**, the residence of WIGGINS in Baltimore County. Detectives were able to seize one gel capsule of heroin, $81,133 in US currency, two money counters, a police scanner, multiple cellular telephones, plastic baggies with residue, and documents pertaining to

12

SW-0034

businesses and a boat slip rental.  WIGGINS refused to cooperate with law enforcement.  This case is still pending and has not been scheduled for trial.

15.   An arrest warrant was issued in Baltimore County for ANTOINE WIGGINS, and on February 27, 2013 that warrant was executed.  Detectives of the Baltimore County Police Department traveled to **4150 Brown Bark Circle, Randallstown, Maryland (location G)**, where they witnessed WIGGINS attempting to back out of the driveway in his Honda Accord.  Detectives arrested WIGGINS and at the time of his arrest he was found to be in the possession three bundles of U.S. currency that were banded together with small rubber bands.  When asked how much money was in his pockets, WIGGINS replied, "That's three grand.  I own my company and I was going to buy computers."  On the way to the precinct the officers explained that they were going to count and verify the seized currency, and WIGGINS was again asked how much currency he had on him during his arrest.  At this time WIGGINS stated, "It's $7,500."  The currency was counted at the precinct and found to be $7,456.00.  The currency was placed into a brown bag at which time a K-9 scan was conducted in the room.  The dog indicated the presence of narcotics on the bag of money.  Based on training, knowledge, and experience, your affiant knows that drug dealers often are in possession of large amounts of U.S. currency, and the currency is usually packaged with small rubber bands to provide for ease of counting and transfer of large quantities of funds.  Additionally, your affiant knows higher level, or more sophisticated drug dealers, maintain front companies to launder, or legitimize, the source of their income.  Specifically it has been determined that WIGGINS maintains a company, **360 Telecom Solutions (location F)**, as his front company.  A check of this business address has revealed an almost completely empty office suite, indicating to your affiant that the business is being utilized to launder drug proceeds.

13

C/r
9.23.13

16. On March 9, 2013, MILES placed a call to CW1 asking for a ride. CW1 picked up MILES at **3406 Brendan Avenue (location B).** MILES and CW1 drove to the intersection of Kingston Road and Edmondson Avenue **(location C)** in west Baltimore. MILES attempted to contact BATES but he would not answer the telephone. Eventually MILES called KEYA DEAN and she arrived and met with MILES. MILES provided her with 150 grams of heroin. DEAN placed the heroin in her pants. Once she left the vehicle, CW1 and MILES drove to Saratoga Street and Bruce Street and met MARLOW BATES. BATES got into the vehicle and handed a stack of cash to MILES and stated, "This is five." BATES further explained, "I owe you $9,800 more, plus an additional three." BATES further explained, "Let's just call it ten grand, cause I wipe my ass with ten grand." MILES angrily stated, "You let me drive over here with 150 grams and you don't answer your phone!" Based on training, knowledge, and experience, your affiant knows that the reference to 150 grams is a reference to 150 grams of heroin and that this heroin was stored in **520 N. Rock Glen Road (location C).**

17. On March 16, 2013 CW1 explained that at approximately 1:00 p.m. ANTHONY MILES called CW1 and requested a ride. CW1 arrived at 3406 Brendan Avenue a few minutes later. When MILES got into the car he was in possession of a clear plastic bag of what CW1 believed to be heroin. While in the car, MILES was actively shaking the bag so as to mix up the contents. They traveled over to the intersection of Kingston Road and Edmondson Road and met with KEYA DEAN **(location C).** She was there waiting for them, but this time she walked to the corner and did not take the Jeep Cherokee. When she got into the car she took possession of the heroin and put it in her pants. They then met with MARLOW BATES at the gas station on Franklin Street across from the McDonald's. BATES pulled up in a blue Honda Accord with an unknown black male. BATES and MILES went inside of the store and BATES gave him the

SW-0036

cash. A video was retrieved from the store that confirmed this meeting between BATES and MILES. Based on training, knowledge, and experience, your affiant knows that MILES transports heroin to KEYA DEAN, who then stores it in **520 N. Rock Glen Road (location C).** After delivering it to DEAN, MILES would then drive to meet BATES to receive payment for the heroin.

18. On March 27, 2013, MILES called CW1, utilizing (443)857-5428 (TT1), and asked CW1 to pick him up. This call was confirmed by pen register data. CW1 called your affiant and informed him that he was on the way to pick up MILES. Based on this information, surveillance was established at the vicinity of Kingston Road and Edmondson Avenue at approximately 5:34 p.m. At approximately 5:43 p.m., your affiant witnessed CW1's vehicle pull onto Kingston Road from Edmondson Avenue and park on the corner **(location C).** Approximately four minutes later KEYA DEAN was seen walking west bound away from the vicinity of **520 N. Rock Glen Road (location C).** DEAN approached the vehicle and entered the rear driver side door. DEAN closed the door and was seated in the vehicle for approximately six seconds. DEAN got out of CW1's vehicle and stood at the door and spoke with MILES for a few seconds and walked away. CW1 explained that DEAN was returning 100 grams of heroin to MILES on behalf of MARLOW BATES because the heroin was still wet and needed to be dried before they could sell it. CW1 explained that once MILES picked up the heroin from DEAN they went back to **3406 Brendan Avenue (location B).** A review of the body recording revealed that MILES explained to CW1 that "it was good" but DEAN gave it back because none of them know how to dry it. MILES indicated that he was going to dry it for them. Based on training, knowledge, and experience your affiant knows that when cutting agents are added to heroin the

15

SW-0037

contents are often moistened. Your affiant also knows that this heroin was stored with DEAN at **520 N. Rock Glen Road (location C)**.

19. On March 28, 2013, MILES called CW1, utilizing (443)857-5428 (TT1), and asked CW1 to pick him up. This call was confirmed by pen register data. CW1 picked up MILES at **3406 Brendan Avenue (location B)**, and took MILES to the mall to get shoes. MILES eventually received a call from MARLOW BATES, on TT1, explaining that he was ready. MILES explained to CW1 that BATES stated he was ready and instructed CW1 to take him back to the house. They returned to **3406 Brendan Avenue (location B)** and MILES entered the residence and a short time after that returned to the car. MILES instructed CW1 to take him to the intersection of Kingston Road and Edmondson Avenue. When they arrived they were met by KEYA DEAN. DEAN got into the vehicle and was provided with 100 grams of heroin. MILES explained to CW1 that this was the 100 grams that DEAN had returned to MILES on the previous day because it was not dried properly. She placed the heroin in her waist band and exited the car. CW1 and MILES then drove to the intersection of Fayette Street and Gilmore Avenue, behind an apartment building in an alley, where they met MARLOW BATES. BATES provided MILES with money for the heroin previously provided to DEAN. BATES stated, "It's good this time?" CW1 explained that this was a reference to the heroin not being wet like the last time when they had to return it to MILES.

20. On March 30, 2013, the Baltimore Police Department conducted a traffic stop on a white **convertible Bentley (location N)** with Maryland registration 6AZ2001. The officers observed the Bentley come into the 600 block of Gold Street and stop in the middle of the block. An unknown male exited one of the row houses on the block, approached the car, and placed a brown paper bag inside of the vehicle on the passenger side. The vehicle departed and failed to

SW-0038

use a turn signal to indicate its turn. The vehicle was stopped and a K9 scan was executed. The dog alerted to the presence of narcotics on the passenger side and trunk area of the vehicle. Based on this K9 alert, the vehicle was searched. The brown bag, that officers had just recently witnessed being placed in the vehicle by an unknown male, was found to contain $8,000 in U.S. currency. The driver was identified as KENDRICK KELLY, black male, date of birth June 25, 1978. When questioned about the money, he explained that it had been in the car for days and that he had forgotten about it but that he was on his way to the bank to deposit the money. During this vehicle stop, Detective Julie Pitocchelli, a Task Force Officer with the FBI's Safe Streets Task Force, was on duty in the Western District. Familiar with this Bentley, as it was the same Bentley that ENZO BLANKS used to meet MILES at Loafer's on February 15, 2013, to collect drug proceeds, Detective Pitocchelli made contact with the officers and the money was seized by the FBI. A picture of the driver, KENDRICK KELLY, was compared to a picture of an unknown male that CW1 had previously identified as the male that lived in the Munsey Building at 7 N. Calvert Street in Baltimore, at which time it was confirmed that the UM, previously described as UM1, was KELLY. At approximately 6:40 p.m., that same night, a **Harley Davidson edition Ford F-150 pick-up truck, Maryland registration A198460 (location M)**, was pulled over by the Baltimore Police. The driver was identified as ENZO BLANKS and the passenger was identified as KENDRICK KELLY.

21. An open source database check revealed that ROBERT VERNON LOMAX, III, black male, date of birth January 17, 1983, was a resident of 603 Gold Street. LOMAX was listed as a former employee of **360 Telecom Solutions**, a company owned and operated by ANTOINE WIGGINS. A check of Maryland wage records confirmed that LOMAX at one time was an employee of 360 Telecom Solutions.

17

22. On April 10, 2013, a trash pull was conducted at 603 Gold Street, Baltimore, Maryland. A review of the trash revealed plastic bags containing suspected heroin residue. Based on training, knowledge, and experience, your affiant knows that when heroin is delivered in bulk it is maintained in plastic bags. When it is delivered to a cut house, it is emptied out of those bags so as to add more adulterant or cutting agent to increase the quantity of narcotic for retail purposes. The plastic bags that contained the original heroin are often discarded into the trash.

23. On April 10, 2013, the Honorable Nathan Braverman, of District Court of Maryland for Baltimore City, authorized a search and seizure warrant for 603 Gold Street, Baltimore, Maryland.

24. On April 18, 2013, a search and seizure warrant was executed at 603 Gold Street, Baltimore, Maryland. Just prior to executing the warrant, surveillance witnessed ROBERT LOMAX exit the residence and enter a Chrysler minivan. The minivan was stopped and LOMAX was returned to the residence. A search of his person revealed a large sum of U.S. currency. LOMAX explained that it was $2,000. LOMAX explained that there was more cash in the house and some marijuana in the basement. LOMAX repeatedly denied having any other narcotics in his residence. A search of the residence discovered a Gucci bag in the master bedroom which contained 14 rubber- banded bundles of US currency totaling $14,000. Additionally, on the dresser in the master bedroom was $1,000. A search of the basement revealed a cooler that contained two vacuum sealed bags of marijuana and a false bottom vegetable can that contained multiple plastic bags of suspected heroin. When questioned, LOMAX explained that it was his and that it was heroin. He stated that it was about 70 grams. The Baltimore Police Laboratory confirmed that the substance was heroin and that its net weight

18

SW-0040

C|r
9-23-13

was 78.16 grams.  He explained that he sells it by the gram and that he does it to supplement his income from his employment.  LOMAX was placed under arrest and charged with possession with the intent to distribute.  Additionally, $16,835 in U.S. currency was seized.  In LOMAX's master bedroom photographs were discovered that depicted him with ENZO BLANKS and with ANTOINE WIGGINS.  A search of his phone revealed a contact, "ZO," with telephone number (443)280-0184.  Your affiant knows this nickname and telephone number to be associated with ENZO BLANKS.  Additionally there were handwritten telephone lists found in LOMAX's bedroom that listed telephone number (240)559-7700, which your affiant knows to be used by ANTHONY MILES.  Based on training, knowledge, and experience, your affiant knows that drug dealers frequently change their telephone numbers to avoid detection by law enforcement.

   25. On April 26, 2013, CW1 received a call from MILES on TT1 requesting a ride. This call was verified by pen register data.  CW1 picked up MILES at WAYNE CLAYTON JONES's house on **Cliftmont Avenue (location A)**.  CW1 took MILES directly to the intersection of Kingston Road and Edmondson Avenue and met with KEYA DEAN **(location C)**.  DEAN got into the vehicle and MILES provided her with a baggie of tan colored powder CW1 knew to be heroin.  DEAN placed the bag inside the waist band of her pants and got out of the vehicle.  CW1 was uncertain of the amount of heroin but stated that MILES was hitting it against his leg on the way over in an attempt to mix up the contents.  After meeting with DEAN, they drove over to the Loafer's bar on Route 40 in Catonsville where they met with MARLOW BATES.  BATES provided MILES with $7,000 and explained that he would have the rest for him tomorrow.  Based on training, knowledge, and experience, your affiant knows that heroin is sometimes distributed as a tan colored powder.  Additionally, based on multiple recordings of MILES and BATES, your affiant knows that BATES has explained that he buys "fifty grams of

SW-0041

C/h
9-23-13

dope a day" from MILES. Your affiant knows, based on training, knowledge, and experience, that in Baltimore heroin is referred to as dope.

26. On April 30, 2013, the CW1 received a call from MILES on TT1 requesting a ride. CW1 picked up MILES at **3406 Brendan Avenue (location B)** and took him to the intersection of Maryland Avenue and 24th Street. When they arrived, CW1 witnessed KENDRICK KELLY arrive at the location driving a Honda Odyssey minivan. MILES entered the minivan to speak with KELLY. They were in the van for a few minutes, and then KELLY got out of the vehicle and entered 2401 Maryland Avenue. KELLY returned a short time later and got back into the van with MILES. A few minutes later MILES exited the van and got back into the vehicle with CW1. They drove to the intersection of Kingston Street and Edmondson Avenue and met with KEYA DEAN **(location C)**. DEAN got into the vehicle and MILES provided her with a baggie of heroin. She exited the vehicle and CW1 drove around the corner where they waited for MARLOW BATES to arrive. A few minutes later BATES arrived and walked up to CW1's car and handed a large stack of money to MILES. CW1 then drove MILES back to **3406 Brendan Avenue (location B)**.

27. On May 3, 2013, CW1 received a call from MILES (TT1) requesting a ride. This call was verified by pen register data. CW1 picked up MILES and took him to the Redwood Apartments located at the intersection of Eutaw Street and Redwood Street in downtown Baltimore. CW1 parked the car and witnessed MILES meet with ENZO BLANKS, who was parked on the street in a silver Ford Edge with Tennessee registration E80-14Z (registered to EAN Holdings, LLC). MILES and BLANKS met inside of the vehicle for approximately five minutes. MILES exited the vehicle and walked back over to CW1's vehicle. Geopositioning data revealed that MILES (TT2) was in the general vicinity of the Redwood Apartment at 6:12

20

SW-0042

*C[handwritten]*
*9·23-13[handwritten]*

p.m.  At 6:37 p.m. MILES, utilizing TT2, placed a call to BLANKS and spoke with him for one minute.  CW1 and MILES departed downtown and MILES placed a call to BATES.  BATES instructed him to go meet with KEYA DEAN.  CW1 drove MILES to the intersection of Kingston Street and Edmondson Avenue and met with DEAN **(location C)**.  A check of geopositioning data revealed that MILES (TT2) was at this intersection at 6:54 p.m.  DEAN got into the vehicle with MILES and CW1 and MILES provided her with a baggie of heroin.  DEAN got out of the vehicle and they looped around the block to leave and CW1 saw that MARLOW BATES's silver Honda Accord was parked at **DEAN's residence (location C)**.  Pen register data confirmed that MILES placed a call, utilizing TT1 at 7:01 p.m., to BATES at which time BATES instructed him to go to his mother's house to meet him.  CW1 drove to the 2700 block of Presbury Street and waited approximately 15 minutes for BATES to arrive.  When BATES arrived he walked into **2817 Presbury Street (location D)**.  A few minutes later MILES received a call from BATES requesting that he come inside.  When MILES returned to CW1's car, he explained that he picked up seven stacks.  A check of pen register data revealed five calls between MILES (TT1) and BATES between 7:38 p.m. and 8:20 p.m.  Geopositioning data confirmed that MIELS (TT2) was in the 2800 block of Presbury at 7:14 p.m.  Based on training, knowledge, and experience, your affiant knows that "stack" is a coded reference to $1,000, and that MILES's reference to seven stacks was $7,000.

    28. On May 5, 2013, CW1 received a call from MILES (TT1) requesting a ride.  This call was verified by pen register data.  CW1 picked up MILES at WAYNE CLAYTON JONES's residence, which is located at **3434 Cliftmont Avenue (location A)**.  CW1 and MILES traveled downtown to the intersection of Eutaw Street and Redwood Street.  When they arrived BLANKS was waiting for them in the same Ford Edge.  MILES left CW1 and got into the vehicle with

SW-0043

BLANKS.  CW1 explained that MILES met with BLANKS at approximately 6:18 p.m.  They sat in the vehicle for approximately ten minutes.  BLANKS got out of the vehicle and entered the apartment building.  BLANKS returned ten minutes later and met with MILES in the vehicle again.  CW1 explained that BLANKS then handed something to MILES.  CW1 was uncertain what BLANKS gave to MILES but suspected that it was heroin.  MILES exited BLANKS vehicle and then got back into the CW1's vehicle.  CW1 and MILES left the area and traveled over to the intersection of Kingston Road and Edmondson Avenue.  When they arrived they met with KEYA DEAN.  DEAN got into the vehicle and MILES gave her a baggie of heroin and she placed it in her waist band.  DEAN got out of the vehicle and CW1 drove MILES over to the Bank of America at the Mondawmin Mall in northwest Baltimore.  They met BATES, and BATES provided MILES with cash and stated, "This is for fifty."  A check of the "City Watch" camera system revealed that MILES did meet BLANKS in the vicinity of the Redwood Apartments.  A check of geopositioning data for TT2 verified that MILES did travel to the Redwood Apartment building to meet BLANKS at 6:18 p.m., and then traveled west to meet DEAN at the intersection of Kingston Road and Edmondson Avenue, and then traveled to Mondawmin Mall to meet BATES.  Based on training, knowledge, and experience your affiant knows that MILES provided heroin to DEAN, intended for BATES, and that she stored that heroin in her residence located at **520 N. Rock Glen Road (location C).**

     29. On May 11, 2013, MILES called CW1, utilizing (443)857-5428 (TT1), and asked CW1 to pick him up.  This call was verified through pen register data.  CW1 picked up MILES at **3406 Brendan Avenue (location B).**  CW1 placed a call to your affiant informing him of MILES's request to be picked up.  Your affiant established surveillance in the vicinity of Kingston Road and Edmondson Avenue at approximately 2:30 p.m.  CW1 and MILES drove to

SW-0044

the intersection of Kingston Road and Edmondson Avenue. At approximately 2:39 p.m., CW1 and MILES parked on Kingston Road. A video and audio recording was being produced inside of the vehicle in addition to your affiant's physical surveillance. The video inside and pen register data revealed that at approximately 2:41 p.m., MILES, on (TT1), received a call from (443)310-9005. MILES was instructed to come down the street. Your affiant witnessed the vehicle driving down Kingston Road. The video inside of the vehicle confirmed that when MILES drove down the street he met MARLOW BATES, who was waiting in his Honda Accord. BATES got into CW1's vehicle with MILES. BATES handed a large stack of money to MILES, and MILES asked, "What's that?" BATES replied, "Forty-two fifty." They discussed money owed to MILES and BATES replied, "Hey, I just bought some motherfucking grams man, waiting on you. I hate going on hold my nigga. That shit, it be flippin' my stomach yo! I hate going on hold." BATES, while exiting the vehicle, stated, "I got shit to do. I'm getting ready to call you 'bout another, 'bout like 75 yo." MILES replied, "Alright." BATES stated, "Keep bullshittin' nigga. I sell dope nigga!" Based on training, knowledge, and experience, your affiant knows that BATES pays MILES $85 per gram of heroin and that the payment of $4,250 was for 50 grams of heroin. MILES handed BATES a small baggie of heroin that was consistent with a 50 gram bag. BATES's reference to calling about "75" was a warning to MILES that he would probably need another 75 grams of heroin soon. BATES's reference to "going on hold" was a reference to running out of heroin and having to shut down his shop because BATES had to wait for MILES to resupply him with more heroin. Based on training, knowledge, and experience your affiant believes that BATES stashed that heroin at the residence of KEYA DEAN located at **520 N. Rock Glen Road (location C)**.

SW-0045

CJA
9·23·13

30. On June 12, 2013, at approximately 9:26 pm, MILES, utilizing TT2, received an incoming call from (443) 239-0400 (Call #876), which is subscribed to an unknown subscriber, but utilized by TYRIE COY AMOS. AMOS stated, "Is you around? I mean, is you ready?" MILES replied, "Ready for what?" AMOS stated, "The text. For my girl to come down." AMOS went on to explain, "I said she's leaving tomorrow, I said today. She's leaving tomorrow. That's what the text said." MILES and AMOS continued to discuss the timing of the girl's travel. AMOS told MILES, "I thought she was gonna have the bread she ain't [unintelligible]. I gotta have something just to travel." MILES explained that he is not in the area, but told AMOS, "Oh, matter of fact, just, uh call Weez, yo." ("Weez" has been identified as WAYNE CLAYTON JONES.) AMOS asked, "You gonna tell him a stack." MILES replied, "Just tell him [Weez], uh, tell him to give your girl a stack, and I'm a call right remind him. He should have it there." Based on training, knowledge, and experience, your affiant believes AMOS was advising that his drug courier was in Baltimore, and that he needed MILES to pay the drug courier $1,000.00 ("a stack"). Your affiant knows that the AMOS has coordinated heroin deliveries from EUGENE THOMAS in Atlanta to MILES in Baltimore. This call identified that at least one of the drug couriers was in Baltimore and that she needed money to travel back to Atlanta. MILES agreed to give her $1,000 and instructed AMOS to tell the courier to go to JONES' house at **3434 Cliftmont Ave. (location A)** to get the money. A check of the pen register/Title III data for TT2 indicated that MILES did receive an electronic communication less than an hour before this call from AMOS utilizing telephone number (443)239-0400. A subsequent pen register order on the telephone utilized by the unknown female, (404)808-3854, confirmed that she was in Baltimore, left the next morning and went to New York. The unknown female spent a few days in New York and then traveled back to Atlanta. Your affiant

24

believes that MILES is storing not only high grade marijuana but heroin and drug proceeds in **3434 Cliftmont Avenue (location A)**, the residence of JONES.

31. On June 12, 2013, at approximately 8:31 pm, MILES, utilizing TT1, placed an outgoing call to (443) 360-8509 (Call #296), which is subscribed to Yasmin K. Rajpaul, but the user of the telephone has been identified as WAYNE CLAYTON JONES aka, WEEZY. MILES stated, "Hey. Cuz girl gonna come through there, right. Give her a stack for me." MILES went on to explain, "But look. Hey. Cuz gonna, cuz gonna call you right after I get off the phone with you and tell you what time she gonna come." Based on training, knowledge, and experience, your affiant believes MILES was instructing JONES to pay the drug courier, sent by AMOS, $1,000.00 when she arrived at JONES' house. Based on these calls your affiant believes that JONES and MILES are storing drug proceeds in **3434 Cliftmont Avenue (location A)**.

32. On June 14, 2013, at approximately 4:26 pm, MILES, utilizing TT1, placed an outgoing call to JONES at (443) 360-8509 (Call #346). MILES told JONES, "If Burnout come around, right, don't give him nothing, just get that bread from him." Based on training, knowledge, and experience, your affiant believes MILES was instructing JONES that if a customer, known as Burnout, came to JONES' house, that JONES should not give him any narcotics, but should get the money from Burnout. Based on training, knowledge, and experience your affiant believes the money that MILES was talking about is payment for a prior narcotics transaction.

33. Your affiant believes, based on his training, knowledge, and experience that this investigation has shown that JONES and MILES are coconspirators in an ongoing criminal enterprise which distributes large quantities of controlled substances. Additionally, based on intercepted calls and reporting from CW1, your affiant has determined that MILES utilizes

SW-0047

JONES, and his residence, **3434 Cliftmont Ave, Baltimore, MD (location A)**, to stash not only

marijuana but heroin and associated drug proceeds. Although your affiant was well aware of the

distribution of heroin in west Baltimore to MARLOW BATES, your affiant was unaware, until

monitoring of court authorized intercepted telephone calls, that MILES has many customers in

east Baltimore that come to him to purchase marijuana and heroin. These east side customers are

all directed to meet MILES at JONES' residence, **3434 Cliftmont (location A)** to complete the

drug transactions.

34. On June 19, 2013, MILES, utilizing TT2, placed a call to ENZO BLANKS at

(443)280-0184 (TT3) (Call #1798). MILES explained to BLANKS, "Yeah, I need, I need, I

need a motherfucking G yo!" BLANKS replied, "A G?" MILES stated, "Yeah...I got my man

coming to me, so. That's why I'm, I, I, call you back." BLANKS replied, "Alright, let me

know." MILES went onto to state, "Hey, I went online today and got my federal tax ID number

too. That shit was simple as a bitch." BLANKS replied, "Told you that shit was easy,

yo...alright cool just meet me 'round the joint." Based on training, knowledge, and experience,

your affiant knows that MILES (TT2) is calling BLANKS (TT3) to get one thousand dollars to

purchase the exotic marijuana from the unknown male referenced in the three preceding

paragraphs. BLANKS agreed to give him the money and asked MILES to come to his apartment

to get it from him. Additionally, MILES made reference to the federal tax ID. Based on

training, knowledge, and experience, your affiant knows that drug traffickers very frequently

establish a business, on paper but sometimes actually purchasing a "brick and mortar" location,

as a front to lauder their drug proceeds. Drug traffickers understand that it would be easy for law

enforcement to articulate that one was living outside of his/her means if that person had no

documented source of "legitimate" income and was purchasing high-end vehicles and other

SW-0048

flashy items.  Your affiant believes that BLANKS has instructed MILES on the necessary steps to create a business with the intent of using that business to launder drug proceeds as MILES has no recorded income with the state, and has gone as far as to lie to his federal supervised release agent as to his current employment, implying that he was currently employed.  Additionally, your affiant believes that these documents, and other evidence of money laundering will be found in the residence of MILES, **3406 Brendan Avenue (location B)** and of BLANKS (11 S. Eutaw Street, Apt 1607), and WIGGIN's business, **360 Telecom Solutions, LLC, 3922 Vero Rd., Suite L, Halethorpe, Maryland (location F)**.

  35. On June 20, 2013, a covert video system was installed to monitor individuals entering and leaving apartment 421, in the McHenry Row Apartments.  This apartment was rented and utilized by ANTOINE WIGGINS.  Your affiant discovered this location after EUGENE THOMAS met with ANTHONY MILES in the parking lot and provided MILES with approximately 300 to 500 grams of heroin on May 24, 2013.  This meeting was captured on a covert in-car audio/video system in CW1's vehicle.  This video clearly depicted, as did apartment security video, THOMAS exiting the apartment building and proceeding directly to the vehicle and providing MILES with the suspected heroin.  Since the video system has been installed, it has captured WIGGINS, THOMAS, and other unidentified individuals entering the apartment.  Additionally it has captured multiple unknown females, carrying roller type luggage into the apartment.  On August 5, 2013, WIGGINS and THOMAS packed the apartment up and moved all of the items to **3922 Vero Road (360 Telecom Solutions – Location F)**.  Based on training, knowledge, and experience, and the video of the May 24, 2013 heroin deal, your affiant believes that WIGGINS and THOMAS utilized this apartment as a stash house for heroin coming into Baltimore from Atlanta.  Immediately following his arrival in Baltimore, your

SW-0049

affiant asked the Maryland Transportation Authority Police to determine if THOMAS arrived via airliner. MTAP did confirm that THOMAS arrived in Baltimore via Airtran Airlines from Atlanta. Based on this information and proffers of prior drug couriers of THOMAS', your affiant believes that the females that have entered the apartment with roller type luggage were transporting heroin on his behalf.

36. On June 21, 2013 at approximately 12:54 pm, MILES, utilizing target telephone #1, received an incoming call from (443) 468-8091 (Call #563), which is subscribed to Abraham Goode. GOODE asked, "What was the count?" MILES replied, "It was ten." GOODE stated, "Ten, ok. I wanna make sure. Let me see. Three, four, five, six, seven, eight, nine, ten. Ok. Well, I got, um, see three, four, five here now." MILES asked, "Ok. You say you got five there now?" GOODE replied, "Yeah. Four, five. ... I got in, in, in, in, in the money." MILES stated, "I know. ... You want me come pick it up?" GOODE replied, "Yeah. 'Cause I wonder was I givin' out too much on that thing or what." MILES stated, "Nah. I." GOODE stated, "I do it, I do way you tell me to do it." Based on training, knowledge, and experience, your affiant believes that GOODE was advising MILES he had money for narcotics that MILES had supplied him, and MILES wanted to know if GOODE wanted him to pick up the money. Your affiant believes that these drugs proceeds are being maintained in GOODE's residence, **2500 W. Belvedere Avenue, Apartment 606, Baltimore, Maryland (location I).**

37. On June 26, 2013, at approximately 7:21 pm, MILES, utilizing target telephone #1, received an incoming call from (443) 468-8091 (Call #704), which is subscribed to Abraham Goode. GOODE stated, "Yeah. I got two over here now." MILES asked, "You said two?" GOODE replied, "Yeah." MILES stated, "Oh. Ok." GOODE stated, "I ain't heard nothin' from, uh, eastern shore yet." MILES replied, "Oh. Alright." Based on training, knowledge, and

SW-0050

experience, your affiant believes GOODE was advising MILES he had money from the sale of the narcotics that MILES had supplied to him.  Additionally, GOODE was advising MILES that he still had not heard from his narcotics customers that lived on the eastern shore.  Additionally, your affiant believes that GOODE's reference to "over here" is his residence (**location I**).

38. On July 2, 2013, surveillance was conducted at the McHenry Row apartments.  A check of the secured garage revealed a white convertible **Bentley with Maryland plate 6AZ2001 (location N)** and a light blue Aston Martin Rapide with Maryland plate 78539CE.  The Bentley is registered to 360 Telecom Solutions, LLC, and the Aston Martin was registered to the Vaughn Group.  The Vaughn Group's listed agent originally was THOMAS's mother, but has since been changed to THOMAS' sister.  Access to McHenry Row's garage is limited to residents with access keys.  Your affiant knew this location, specifically apartment 421, to be utilized by EUGENE THOMAS and ANTOINE WIGGINS as a heroin stash house.

39. On July 21, 2013 at approximately 2:08 p.m., MILES utilizing target telephone #1, received an incoming call from (443) 468-8091 (call #1661), which is subscribed to ABRAHAM GOODE.  GOODE stated, "I just talked to a man down, down across the water.  He said, the, the cars are moving so slow that you could walk faster than the cars moving.  He got, he got, he got, uh, nineteen.  That means he got, got my nine and got, and got ten."  MILES replied, "Oh, okay."  MILES later asked, "Hey, unc, let me tell you this.  If you going, if you going to give him the whole thing, then I ain't gotta put it in singles, right? ... I said, if you giving him everything, then I don't have to put it in singles."  GOODE replied, "No.  Put the, put the, uh, the, uh, dime in one block. ... But, uh, but give me, give me some loose ones, right? Uh, ten loose ones."  Based on training, knowledge and experience, your affiant believes GOODE was telling MILES one of his customers was coming to pick up narcotics.  GOODE was ordering

29

additional narcotics from MILES for this customer. MILES was confirming how GOODE wanted the narcotics packaged and the weight of the narcotics when MILES delivered the narcotics to GOODE. Additionally, your affiant believes that before GOODE sends this heroin to the Eastern Shore he is stashing it in his residence (**location I**), along with the associated proceeds.

40. On August 13, 2013 at approximately 11:07 a.m. BATES, utilizing TT4, received an incoming call from (443) 453-7811 (call #843), the subscriber of which is unknown, but the user of which has been identified as DONTE THOMAS. BATES asked, "What you doing Shorty?" THOMAS replied, "Uhhh standing up on my block." BATES later asked, "What they say? They like it?" THOMAS replied, "Yeah. I'm getting ready get the fuck from right here. My lil' man and 'em out. I'm ready fa. Yo we 'ont need to be standing out here this long." Based on training, knowledge, and experience your affiant knows that THOMAS was explaining to BATES that he was out supervising his heroin shop and that he had juveniles distributing the heroin. THOMAS joking explained that he needed to leave because he was out at the shop too long and might be arrested by the police. Based on this call, and many other intercepted calls, your affiant knows THOMAS to be an associate of MARLOW BATES in the distribution of heroin in west Baltimore and that he resides at **2545 W. Lanvale Street, Baltimore, Maryland (location H)**.

41. On August 14, 2013 at approximately 11:42 a.m. BATES, utilizing TT4, received an incoming call from (443) 453-7811 (call #843), the subscriber of which is unknown, but the user of which has been identified as DONTE THOMAS. BATES asked, "Yo. What, what's, what's up with your little nigga, yo?" THOMAS stated, "Huh? I, I told you I went up ther to make sure they was out." BATES asked, "They out, yo?" THOMAS stated, "Yeah." BATES

SW-0052

asked, "You ain't grab no bread off of 'em?" THOMAS stated, "Naw, not, only the, um, bread from the one he did yesterday." BATES replied, "Oh, alright." Based on training, knowledge and experience, your affiant believes BATES was asking THOMAS whether he had checked on his heroin shop and whether the males who sell for him were out working yet. THOMAS told BATES the males were out selling the heroin. BATES asked THOMAS if he got money from the male(s) from the heroin sales. THOMAS explained that he had the money from yesterday's heroin sales, but he did not pick any money up from that day's sales. Based on training, knowledge, and experience your affiant believes THOMAS to be storing these drug proceeds and other indications of his involvement in the distribution of heroin inside of his residence (**location H).**

42. On August 15, 2013 at approximately 1:02 p.m., BLANKS, utilizing TT3, received an incoming call from (240) 396-7361 (call #5280), which is utilized by ANTHONY MILES. BLANKS stated, "I said, we had problems in our country yesterday. Just couldn't go nowhere. People being followed and shit like that. Shit 'bout to get real." MILES stated, "Yeah?" BLANKS stated, "Yeah. Come outside Shorty crib one day got ghost cars behind my shit. Like serious though. Like real serious." MILES asked, "What happened?" BLANKS stated, "I said, I come out Shorty crib one day. Got ghost cars behind my shit and just looking." MILES asked, "Just looking?" BLANKS stated, "I walk down the, I walk down the block and come back, the car gone. Big, Big Homie, Big Bro and other Big Bro said they been seeing shit like that all day. Pull up to the office **[location F]** one day ghost joints out front of the joint." Based on training, knowledge and experience, your affiant believes BLANKS believes that he saw law enforcement surveilling his activities, that others have also sent law enforcement surveilling them and they have seen what they believe to be law enforcement vehicles in a

31

variety of locations that they frequent. BLANKS explained to MILES how he went around the block when he saw a law enforcement vehicle, but the car was gone when he came back around the block. The agents believe BLANKS was warning MILES to be aware they are under surveillance.

43. On August 15, 2013 at approximately 10:33 p.m., BLANKS, utilizing target telephone #3, received an incoming text from (304) 813-3522 (call #5392), the user of which is VIRGINIA MOORE. MOORE wrote, "(1 of 2) Hi me an randy can c0me 2m0r at 1 0k he wants 300 als0 i nd a 100 pack for s0me 1   i g0t ther m0ney 700 and yes i g0t y0ur cash 2100 and 70". At approximately 10:33 p.m. MOORE's text continued (call #5393), "(2 of 2) 0 2800 t0tal 0k please make alittle stronger  d0 u g0t new stuf f thank u v". At approximately 11:03 p.m., BLANKS sent an outgoing text to MOORE (call #5404) that stated, "Ok ok." Based on training, knowledge and experience, your affiant believes MOORE was ordering gel caps of heroin from BLANKS and explained that she had the money for the gel caps of heroin she was ordering as well as for the gel caps of heroin that BLANKS fronted her on August 14, 2013. MOORE also asked BLANKS to improve the quality of the gel caps he was supplying her with. Additionally, your affiant knows that the texted reference to "randy" was a reference to her son-in-law, and co-conspirator, RANDY ADKINS. Surveillance was conducted on September 22, 2013, and MOORE was observed leaving **19726 Beaver Dam Road, Rawlings, Maryland (location J).**

44. On September 4, 2013, surveillance was conducted at **520 N. Rock Glen Road, Baltimore, Maryland (location C)**. At approximately 8:19 a.m. KEYA DEAN was observed exiting the residence with a small child and getting into a Jeep Cherokee.

SW-0054

45. On September 4, 2013, surveillance was conducted in the vicinity of **22 Torlina Court, Woodlawn, Maryland (location E)**. During this surveillance JOSEPH SPEED, aka MAN MAN was observed exiting the residence and speaking to an unknown female. Based on intercepted calls on TT4 (MARLOW BATES) your affiant knows that BATES utilizes this address. During an intercepted call BATES explained that he lived with his baby's mother at her mother's home. Additionally, he explained that "MAN MAN" lived there as well. These calls also revealed that he needed to be in this house by a certain time due to a curfew. A check with BATES' Federal Probation Agent revealed that BATES listed this address as his residence for purposes of nightly curfew checks.

46. On September 4, 2013, a check with building management at **2500 W. Belvedere Avenue, Baltimore, Maryland (location I)** confirmed that the resident of **apartment 606** was ABRAHAM GOODE. Based on intercepted calls on the title III of ANTHONY MILES, your affiant knows GOODE to be distributing heroin to the eastern shore of Maryland for MILES. When MILES has trouble selling heroin in Baltimore, due to low quality, he provides the heroin to GOODE who then sells it to individuals on the eastern shore.

47. On September 4, 2013, a check of the Maryland Property records indicated that the owners of **4150 Brown Bark Circle, Randallstown, Maryland (location G)**, were DANA WHITE and ANTOINE WIGGINS.

48. On September 5, 2013, technically trained agents of the FBI tracked, pursuant to a court order, a phone utilized by DONTE THOMAS to **2545 W. Lanvale Street, Baltimore, Maryland (location H)**. Surveillance was initiated and at approximately 8:01 a.m. a white Honda Accord, bearing Maryland license plate 88225CC pulled up to the residence and THOMAS quickly ran up to the residence. THOMAS obtained a key from the mail box affixed

SW-0055

to the front of the residence and entered. THOMAS was in the residence for a few minutes and then quickly returned to the Honda and left the area. Based on training, knowledge, and experience, your affiant knows that THOMAS not only left his cellular telephone at this residence, but that he has complete access to this residence. Your affiant knows this residence to be occupied by THOMAS' mother and that often times drug dealers will utilize family residence, unbeknownst to their family, to store drugs, paraphernalia, records, weapons, and cellular telephones. Based on geolocation data from the above mentioned order it has been determined that THOMAS does sleep at this location. Furthermore, based on intercepted calls on TT4, your affiant knows that THOMAS operates a drug shop on behalf of MARLOW BATES, in the vicinity of the Pedestal Gardens Apartment complex located at 1500 Madison Avenue, Baltimore, Maryland.

49. On September 5, 2013, the BPD conducted a traffic stop of a **2007 Jeep, Maryland license 4BC7293 (location L)**, for illegal tint. The driver of the vehicle was identified as KENDRICK KELLY. During the initial conversation with the officer, KELLY explained that the vehicle belonged to his partner and that his partner lived in the Scarlett Building. KELLY also informed the officer that he was currently unemployed but that he used to work for a cable company. During the traffic stop a K9 scan of the vehicle was performed and was positive for the presence of controlled substances. The vehicle was searched and no drugs were discovered, but KELLY admitted to smoking marijuana in the vehicle. During the search the officer noted that both the speaker panels and the cargo area carpet were both loosened. Based on training, knowledge, and experience, your affiant knows that KELLY is an associate of ANTOINE WIGGINS who is the registered agent of **360 Telecom Solutions, LLC (location F)**. The vehicle that KELLY was driving was registered to that company. Your affiant, based on

34

training, knowledge, and experience, believes that KELLY was referring to WIGGINS when he referred to his partner living in the Scarlett Building. Additionally, your affiant knows that drug dealers often utilize natural cavities in vehicles to secrete large quantities of drugs for the purpose of transporting them covertly. During this process screws and other fastening bolts are stripped and/or loosened due to frequently accessing cavities which normally would not be accessed. During this traffic stop, and subsequent search, it was noted by the officer that these areas in the back of the vehicle appeared to be tampered with and were previously utilized to possibly store illegal drugs for purposes of transportation and avoiding detection by law enforcement.

50. On September 6, 2013, surveillance was conducted in the vicinity of the McHenry Row Apartments. A **convertible white Bentley, Maryland license plate 6AZ2001 (location N)** was parked in the parking garage adjacent to the apartments. Your affiant knows that ANTOINE WIGGINS rented an apartment in this building and that WIGGINS, along with other conspirators, utilized this parking garage, both the public and the secured areas, to store high end vehicles, one of which is this Bentley.

51. On September 10, 2013, officers of the Baltimore Police Department (BPD) performed a car stop of a **2007 Ford F150 Harley Davidson truck** in the 300 block of W. Madison Street. The driver of the vehicle was ENZO BLANKS. BLANKS was found to be in possession of 444 suspected heroin gel caps. Based on court authorized intercepts on BLANKS' telephone your affiant knows that BLANKS was in the process of supplying customers from western Maryland, VIRGINIA MOORE and RANDY ADKINS, with those pills. During the arrest, BLANKS provided the officers consent to search his girlfriend's apartment located at 301 W. Madison Street. Inside the officers discovered more heroin, cutting agents, sifters, scales and

35

SW-0057

a capping machine.  Based on training, knowledge, and experience, your affiant believes that BLANKS utilizes his **F150 truck (location M)** to transport and distribute heroin in the Baltimore area.  Additionally, your affiant knows that throughout the monitoring of BLANKS' cellular telephone, MOORE and ADKINS have traveled to Baltimore, from Rawlings, Maryland, almost every three days to purchase on average 500 heroin pills at a time.  Your affiant knows, based on intercepted calls, that the pills that BLANKS was arrested with were intended for MOORE and ADKINS who were in Baltimore ready to meet BLANKS.  Based on training, knowledge, and experience your affiant knows that MOORE and ADKINS transport these heroin pills to western Maryland, store them at their residence, **19726 Beaver Dam Rd., Rawlings,Maryland (location J)** and then resell them at almost twice what they bought them for.

52. On September 13, 2013, a state search warrant was executed at 11 S. Eutaw Street, Apartment 1607, Baltimore, Maryland, the residence of ENZO BLANKS.  Officers of the BPD and TFO's of the FBI's SSTF knocked and announced at the residence with no answer.  The apartment was forcibly entered and REBECCA BELETE was found to be the only person inside.  BELETE was read her Miranda rights after which she explained that she did not know the resident of the apartment and that she was just sleeping there for the night because her girlfriend let her stay there.  She explained that she was from Prince George's County.  Your affiant knows BELETE to be the girlfriend of BLANKS and is the lessee of 301 W. Madison Street, Apartment 612W., which was being maintained as a heroin stash house by BLANKS.  This residence was searched incident to BLANKS' arrest on September 10, 2013, explained in a previous paragraph.  During the execution of the search warrant members of the FBI Safe Streets Task Force (SSTF) discovered pieces from multiple "quick cap" capping machines utilized to

36

place heroin into gelatin capsules for distribution.  Additionally, a digital scale with suspected drug residue on it was seized.

53. On September 13, 2013, ENZO BLANKS was arrested, on a state warrant, by members of the FBI's SSTF at Baltimore Washington Airport attempting to board a flight to Las Vegas, Nevada.  He was in line to board the plane with ANTOINE WIGGINS.

54. On September 17, 2013, a surveillance was conducted at **4150 Brown Bark Circle, Randallstown, Maryland (location G)**.  At approximately 7:10 a.m., ANTOINE WIGGINS exited the residence and got into a black Honda minivan.  Parked in front of this vehicle was WIGGIN's blue **2013 Honda Accord (location K)**.

III.    **The Subject Premises**

55. Based on the information set forth elsewhere in this affidavit, my training, experience, and participation in narcotics investigations, and my conversations with other law enforcement officers, there is probable cause to believe that the SUBJECT PREMISES are locations being used for the storage and distribution of narcotics, narcotics proceeds, associated narcotic distribution documentation, and the facilitation of narcotics offenses.

56. Based upon my training and experience and my participation in this and other narcotics investigations, as well as my conversations with other agents, I know the following:

a.   Narcotics traffickers often maintain on hand large amounts of both narcotics and currency in order to maintain and finance their on-going narcotics business, as well as paraphernalia used in the manufacture, packaging, preparation, and weighing of illegal narcotics in preparation for trafficking, and narcotics traffickers maintain these items where they have ready access to it.

37

SW-0059

C/N
9-23-13

b.  Narcotics traffickers often maintain financial records and financial instruments related to their narcotics transactions and the profits derived from those transactions including, but not limited to, currency, bank checks, cashier's checks, Western Union receipts, money orders, stocks, bonds, precious metals, and real estate records;

c.  Narcotics traffickers frequently maintain records of their narcotics transactions including, but not limited to, books, ledgers, records and other documents relating to the manufacture, transportation, possession, and distribution of controlled substances.  Such documents are frequently maintained where the traffickers have ready access to them, including in their homes and vehicles;

d.  Narcotics traffickers commonly maintain books, records and other documents that identify and contain the names, addresses and/or telephone or pager numbers of associates in their narcotics-trafficking or money-laundering activities, including, but not limited to: address books, telephone books, rolodexes, telephones, pagers, or personal digital assistants with stored telephone information, notes reflecting telephone and pager numbers, photographs (to include still photos, negatives, movies, slides, video tapes, and undeveloped film), and audiotape recordings of conversations, including those made over telephone answering machines.  These individuals often utilize telephones, cellular telephones and other portable electronic devices to maintain contact with other associates of their illegal businesses, and telephone records, bills and electronic devices are often found in their places of residence, or the residences of family members, friends or associates, in their business locations, or in places used by drug traffickers to conduct their drug distribution activity, such as stash houses, leased storage facilities or safe houses;

38

SW-0060

e.  Narcotics traffickers commonly maintain identification and travel documents, including, but not limited to, tickets, transportation schedules, passports, notes and receipts related to travel, and motel/hotel receipts;

f.  Indicia of occupancy, residency and/or ownership of the premises to be searched are often present in such premises;

g.  Narcotics traffickers commonly maintain many of the foregoing items in computer files; and

h.  Narcotics traffickers commonly maintain the foregoing items inside combination or key-lock safes or strong boxes, suitcases, locked cabinets and other types of locked or closed containers, or hidden compartments, which are secreted in locations such as the SUBJECT PREMISES, where they may maintain these items securely.

### A.  3434 Cliftmont Avenue, Baltimore, Maryland

57.  As discussed, in paragraphs 25, 28, 30, 31, and 33 above, JONES has utilized his home, **3434 Cliftmont Avenue, Baltimore, Maryland**, as a stash house for marijuana, heroin, weapons, and drug proceeds.   As discussed in paragraph 30 above, a courier was sent directly to JONES' residence to collect $1,000 in drug proceeds.

58.  This Premise is described as a two-story brick row home that can be accessed from the street by steps leading to the first floor porch.  The house is brick with white trim and white pillars on the front porch.  The front door is white with a black security door with a white piece of wood next to the door with the numbers "3434" affixed.

59.  Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found at 3434 Cliftmont Avenue, Baltimore, Maryland, the items set forth in Attachment B,

SW-0061

which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances.

**B.   3406 Brendan Avenue, Baltimore, Maryland**

60.   As discussed in paragraphs 7, 8, 10-12, 16, 18, 19, 26, 29, and 34 above, MILES has often met with CW1 at this location for the purpose of distributing heroin and then collecting heroin proceeds.   Additionally, MILES has collected heroin, in CW1's presence, from his suppliers, BLANKS, KELLY, and THOMAS, and brought that heroin back to this residence. This premise is described as a two story tan colored single family home surrounded by a waste-high chain-link fence.   The front door of the premise is white in color with a black mail box affixed to the lower part of the door.   In the front lawn of the premise, inside of the fence, is a black pole of which holds a small affixed with the numbers "3406."

61. Based upon the Title III intercepts, surveillances, reporting of CW1, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found at **3406 Brendan Avenue, Baltimore, Maryland,** the items set forth in Attachment A, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances.

**C.   520 N. Rock Glen Road, Baltimore, Maryland**

62.   As discussed in paragraphs 10, 12, 16-18, 25-29, and 44 above, MILES has often met with KEYA DEAN at this location for the purpose of providing her with heroin that was

SW-0062

intended for MARLOW BATES.   DEAN, on multiple occasions, met with MILES one block away from the premises to collect the heroin and would then immediately return to the premise. The premises is described as a two story single family.  The premises first story is brick while the second story is tan with dark brown trim.  The front door of the premise is red with a dark brown storm door with a black mail box affixed to the right of the door.  This house is located on the south side of the road and is the second house from the intersection with Edmondson Avenue.

63. Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found at **520 N. Rock Glen Road, Baltimore, Maryland,** the items set forth in Attachment A, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances.

**D. 2817 Presbury Street, Baltimore, Maryland**

64. As discussed in paragraph 27, MILES has met with MARLOW BATES at this location for the purpose of obtaining drug proceeds from MARLOW BATES.  Additionally, on September 17, 2013, a pen registered with geopositioning data was obtained and confirmed that he still frequents this location, in addition to 22 Torlina Court.  Your affiant knows this residence to be occupied by BATES' mother but knows BATES to utilize this as both a residence and a stash location for his illegal product and proceeds.  The premise is described as a two story brick row house.  The premise is the second residence from the corner and has a white door with a black plaque to the left of the door with the numbers "2817" affixed.

SW-0063

65. Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found at **2817 Presbury Street, Baltimore, Maryland,** the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances.

### E.  22 Torlina Court, Woodlawn, Maryland

66. As discussed in paragraph 45, MARLOW BATES and JOSEPH SPEED, who distribute heroin in west Baltimore, both live at this residence. The premise is described as a duplex with a brick facade and a brown front door. On the wall next to the front door, is a black mail box. Above that mailbox is a white board with the numbers "22".

67. In speaking with Federal Probation and Parole officials it was determined that this location is listed by BATES as his residence for purposes of curfew. Based on geopositioning data and Title III intercepted calls your affiant knows BATES, and JOSPEH SPEED, to stay at this location.

68. Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found at **22 Torlina Court, Woodlawn, Maryland,** the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances.

42

SW-0064

### F. 3922 Vero Road, Suite L, Halethorpe, Maryland (360 Telecom Solutions, LLC.)

69. As discussed in paragraphs 15, 34, 35, 42, and 49, ANTOINE WIGGINS maintains a business, 360 Telecom Solutions, LLC, at this location. Additionally, your affiant knows, through surveillance that WIGGINS and THOMAS emptied the contents of a heroin stash apartment into this business. Your affiant believes this business is a front and is utilized to launder drug proceeds. The premises is described as suite in a single story commercial business strip. The building is brick and the location has a single tinted glass front door. Immediately above the door is a large black panel with white letters which read, "360 Telecom Solutions".

70. As early as September 16, 2013, your affiant confirmed that the front lobby of the business is void of any indication that it is truly a functioning, legitimate, business. Your affiant believes this business to be a means to launder drug proceeds.

71. Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found at **3922 Vero Road, Suite L, Halethorpe, Maryland,** the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances.

### G. 4150 Brown Bark Circle, Randallstown, Baltimore, Maryland

72. As discussed in paragraphs 14, 15, 47, and 54, ANTOINE WIGGINS, who runs a heroin distribution network in Baltimore, resides at this location. WIGGINS works in conjunction with EUGENE THOMAS, who traffics the heroin from Atlanta to Baltimore. The premise is described as a three story condominium with beige siding, red shutters, and a red front

SW-0065

door. On the white trim surrounding the front door are the numbers "4150." The residence is the second from the end.

73. Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found at **4150 Brown Bark Circle, Randallstown, Maryland**, the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances.

**H. 2545 W. Lanvale Street, Baltimore, Maryland**

74. As discussed in paragraph 40, 41, and 48, DONTE THOMAS, aka CRUDDY, who distributes heroin, and runs a robbery crew, in west Baltimore, lives at this residence. The premise is described as a two story row-house with white trimmed windows, and a black front door. On the right side of the door is a black plaque with white numbers "2545."

75. Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found at **2545 Lanvale Street, Baltimore, Maryland**, the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances.

44

SW-0066

**I.   2500 W. Belvedere Avenue, Apartment 606, Baltimore, Maryland (Weinberg Place Apartments)**

76. As discussed in paragraph 36, 37, 39, and 46, ABRAHAM GOODE, who distributes heroin to the eastern shore of Maryland, lives at this residence. The premises is described as an apartment inside of the Weinberg Place Apartment building located at the intersection of W. Belvedere Avenue and Preakness Way in northwest Baltimore. The door to the premises is described as a white door with a gold-colored door knob. Next to the door is a small black placard on the wall with the numbers "606" printed in white.

77. Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found at **2500 W. Belvedere Avenue, Apartment 606, Baltimore, Maryland**, the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances.

**J.   19726 Beaver Dam Road, Rawlings, Maryland**

78. As discussed in paragraphs 43 and 50, VIRGINIA MOORE and RANDY ADKINS, who frequently travel to Baltimore to purchase large quantities of heroin, live at this residence. The premise is described as a one story small single family red house with a white front door. The white front door is adorned with an oval window in the center. A small wooden porch is attached to the rear of the residence with a large fenced dog kennel adjacent to this porch.

45

SW-0067

79. On September 17, 2013, a check of land records revealed that VIRGINIA MOORE was the listed owner of this residence. Additionally, as noted previously in paragraph 43, MOORE was observed on September 22, 2013 leaving the residence.

80. Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found at **19726 Beaver Dam Road, Rawlings, Maryland,** the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances.

### K. 2013 Honda Accord, VIN:1HGCT2B81DA001890, bearing Maryland license 80282CE

81. As discussed in paragraph 9 and 54, ANTOINE WIGGINS, who distributes heroin in Baltimore, owns and utilize this vehicle in Baltimore, Maryland. The vehicle is described as a 2013 Honda Accord bearing Maryland license 80282CE. Your affiant knows that, based on a car stop by the Baltimore Police, that WIGGINS utilizes this vehicle to transport heroin throughout Baltimore.

82. Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found in **2013 Honda Accord, VIN:1HGCT2B81DA001890, bearing Maryland license 80282CE,** the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which

SW-0068

prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances.

**L.   2007 Jeep Wrangler, VIN 1J4GA39187L172823, bearing Maryland license 4BC7293**

83. As discussed in paragraph 49, KENDRICK KELLY, who distributes heroin in Baltimore, utilizes this vehicle, which is registered to ANTOINE WIGGINS, who supplies KELLY with heroin.  The premise is described as a 2007 Jeep Wrangler bearing Maryland license plate 4BC7293.

84. Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found in **2007 Jeep Wrangler, VIN 1J4GA39187L172823, bearing Maryland license 4BC7293**, the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances

**M. 2007 Ford F150, Harley Davidson model, VIN 1FTRW12537FB49059, bearing Maryland license A198460**

85. As discussed in paragraphs 20 and 51, ENZO BLANKS, who distribute heroin in Baltimore, owns and utilizes this vehicle to distribute heroin in and around the city of Baltimore. The vehicle is described as a 2007 Ford F150 Harley Davidson model pick-up truck bearing Maryland license A198460.

86. Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found in **2007 Ford F150, Harley Davidson model, VIN 1FTRW12537FB49059, bearing**

SW-0069

**Maryland license A198460**, the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances

### N. 2007 Bentley convertible, VIN: SCBDR33W97C046446, bearing Maryland license plate 6AZ2001

87. As discussed in paragraphs 10, 20, 38, and 50, ENZO BLANKS and KENDRICK KELLY, who distribute heroin in Baltimore, utilizes this vehicle to distribute heroin, and collect drug proceeds, in and around the city of Baltimore. The vehicle is described as a 2007 white convertible Bentley bearing Maryland license 6AZ2001. On September 7, 2013, it was confirmed with Maryland Motor Vehicles that this vehicle is registered to 360 Telecom Solutions, LLC, a company known to be owned and operated by ANTOINE WIGGINS.

88. Based upon the Title III intercepts, surveillances, and other investigations discussed above, I respectfully submit that there is probable cause to believe that there will be found in **2007 Bentley convertible, VIN: SCBDR33W97C046446, bearing Maryland license plate 6AZ2001**, the items set forth in Attachment B, which constitutes evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846, which prohibit the distribution, possession with the intent to distribute and conspiracy to distribute and possess with the intent to distribute controlled substances.

### IV.   Conclusion

89. Based upon the foregoing, I respectfully submit that there is probable cause to believe that there will be found in the respective SUBJECT PREMISES the items set forth in

48

13-2509SAG  ＆  13-2322SAG

Attachments A and B, respectively, which constitute evidence, fruits, and instrumentalities of, inter alia, the aforementioned violations of federal laws.

90. Given the confidential nature of this continuing investigation, I respectfully request that this affidavit and all of the papers submitted herewith be maintained under seal until otherwise ordered by this Court.

WHEREFORE, in consideration of the facts presented, I respectfully request that this Court issue a search warrant for each of the SUBJECT PREMISES and authorize the search and seizure of the items described in the respective attachments hereto.

Special Agent Eric S. Nye

Federal Bureau of Investigation

Sworn to before me this 24th day of September, 2013

Stephanie A. Gallagher

UNITED STATES MAGISTRATE JUDGE

SW-0071